FENNEMORE CRAIG, P.C.
Brenoch R. Wirthlin (Nevada Bar No. 10282)
Kevin Hejmanowski (Nevada Bar No. 10612)
300 South Fourth Street, Suite 1400
Las Vegas, Nevada  89101
Telephone:  (702) 692-8000
Facsimile:  (702) 692-8099
Email:  bwirthlin@fclaw.com
*Attorneys for Defendants*

# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

| | |
|---|---|
| BART STREET III, a Nebraska Limited Liability Company, <br><br> Plaintiff, <br><br> v. <br><br> ACC ENTERPRISES, LLC, a Nevada Limited Liability Company; ACC INDUSTRIES, INC., a Nevada corporation; CALVADA PARTNERS, LLC, a Nevada Limited Liability Company, <br><br> Defendants. | Case No. 2:17-cv-00083-GMN-VCF <br><br><br> **DEFENDANTS ACC ENTERPRISES, LLC, AND ACC INDUSTRIES, INC.'S MOTION TO DISMISS** <br><br> **[Oral Argument Requested]** <br> **LR 78-1** |

Defendants ACC Enterprises, LLC and ACC Industries, Inc. (collectively the "ACC Entities" or "Defendants"), by and through counsel, Fennemore Craig, P.C., hereby submit their motion to dismiss plaintiff Bart Street III's ("Bart Street" or "Plaintiff") on the bases set forth herein.  This motion is brought pursuant to FRCP 12(b)(1), 12(b)(6), 12(b)(7) and FRCP 19, and is based on the attached memorandum of points and authorities, all exhibits attached thereto, any oral argument the Court chooses to entertain, and all papers and pleadings on file herein.

DATED this 24th day of March, 2017.

FENNEMORE CRAIG, P.C.

By _____
Brenoch R. Wirthlin (Nevada Bar No. 10282)
Kevin Hejmanowski (Nevada Bar No. 10612)
*Attorneys for Defendant Calvada Partners, LLC*

## MEMORANDUM OF POINTS AND AUTHORITIES

**I.    INTRODUCTION AND SUMMARY OF ARGUMENT**

Defendants' Motion should be granted for several reasons:

**First**, under FRCP 19(a)(1)(A), an absent party is a necessary party if "in that person's absence, the court cannot accord complete relief among existing parties." However, Plaintiff's Complaint is misleadingly fails to acknowledge that the Defendants will be unable to pursue their counterclaims against Solutionary, Inc. ("Solutionary")[1], including but not limited to breach of oral contract and breach of the covenant of good faith and fair dealing for failing to follow through with the agreement to provide further funding to Defendants as set forth in the Motion and herein. There is no dispute that Steven Idelman ("Idelman"), principal of Plaintiff, corresponded with Defendants on multiple occasions through email using a signature block on his email which included the email address steveidelman@solutionary.com. Further, there is no question that as a matter of law, Solutionary was only dissolved as a Nevada corporation in December, 2012. Thus, under Nevada's statutes governing corporations Solutionary can be both **revived** and **renewed** by simply filing a few documents and paying the proper fees.

**Second**, while an absent party may, under certain circumstances, be an entity who "claims an interest relating to the subject of the action" under FRCP 19(a)(1)(B), that is only one of multiple ways an entity can be a necessary party to an action. Further, as noted above, the fact that Solutionary is not mentioned on the notes is irrelevant as this case centers around a **subsequent oral modification** of the parties original agreement, and Solutionary was involved in that modification.

Further, despite Plaintiff's failure to admit the truth, there is significant email correspondence from Idelman to Defendants in which Idelman admits that he did agree to "prorated equity with caveat [sic] that our **debt piece conversion rights** are good regardless of when we

---

[1] As noted in the Motion, and as Plaintiff deliberately omits, Idelman did not mention by name the Nevada entity which was a necessary part of the subsequent oral modification to the parties' loan agreements. During the negotiations regarding the subsequent oral modification, Idelman corresponded with Defendants with a signature block which included the email address steveidelman@solutionary.com. For ease of reference the entity at issue will be referred to as Solutionary, although Calvada expressly reserves the right to request and conduct jurisdictional discovery and amend any pleadings necessary to assert the true name of the entity at issue.

convert and that if you needed to raise more money then we would have right of first refusal **and if we didn't convert the [sic] any future dilution would come from you and Howard**." *See* Exhibit 12 hereto (emphasis added), August 29, 2016 email correspondence from Idelman to Pete Seltzer (principal of Calvada) and Howard Misle (principle of the ACC Entities) (referred to herein as the "August 2016 Email"). Why would Idelman, principle of Bart Street, be discussing **future dilution** if, as Bart Street currently claims, this was merely a loan transaction and no subsequent oral modification of the parties' agreement took place? And, in fact, Idelman's August 2016 Email was in response to an email from Mr. Seltzer earlier that day in which Mr. Seltzer points out that he was told that the "9 [million dollar] equity deal had changed to 6 [million] equity and 3 [million] debt which Howard [Misle] agreed too [sic]. In this email I clearly stated we are ok with this but needed to pro rate the percentage then as original deal called for 20% for 9 [million] and now it was only 6 [million]." *Id.* **Idelman's response confirms the parties has orally modified the original loan agreement.** In fact, Idelman specifically says that he "**did agree to prorated equity**…" *Id.* Clearly the parties are talking about an agreement which is different than that alleged in Bart Street's complaint which only involves, according to Bart Street, two loans totaling $4.7 million. *See* Complaint at ¶ 13 (loan of $3.5 million) and ¶ 22 (loan of $1.2 million). Yet, in the August 2016 Email Idelman is clearly acknowledging the agreement between the parties for a total of **$9 million**. Strangely enough, this modified agreement is never mentioned in Plaintiff's Complaint. Why? Because Plaintiff is attempting to evade its oral modification to the parties' agreement, an oral modification that included a total of $9 million and the participation of Solutionary, which would destroy diversity jurisdiction.

**Third**, while NRS § 78.585(1) provides for a three year statute of limitations for dissolved corporations <u>for events that occurred prior to dissolution</u>, this cannot apply to actions taken after dissolution in anticipation of revival and reinstatement. Otherwise a corporation could be dissolved, wait three years, then be revived and reinstated **with no potential future liability whatsoever**.

**Fourth**, Solutionary is absolutely an indispensable party to this litigation. While the term 'indispensable' has similarly been removed from the text of Rule 19, courts still use it as shorthand

for whether dismissal under Rule 19(b) is warranted." *B. Fernandez & Hnos, Inc. v. Kellogg USA, Inc.*, 516 F.3d 18, 23 (1st Cir. 2008) (quoting FED. R. CIV. P. 19(b)). Further, without Solutionary being joined as a party Defendants will be unable to pursue their counterclaims against Solutionary for breach of the parties' subsequent oral modification of the original agreement, and therefore Plaintiff's Complaint must be dismissed as Solutionary is a necessary and indispensable.

**Fifth**, under the *Colorado River* and *Burford* doctrines this Court should dismiss the instant case as a concurrent state court case is pending and the issues involved in this case are inextricably intertwined with Nevada's new laws legalizing recreational marijuana.[2]

**Sixth**, the Plaintiff's case should be dismissed pursuant to FRCP 12(b)(6) for failure to state a claim because the purported contractual breaches alleged by Plaintiff would necessarily require this Court to enforce an illegal contract and because the contracts themselves limit the acts which can constitute breach of the contracts, none of which Plaintiff has alleged.

## II.    STATEMENT OF FACTS

1.      Calvada Partners, LLC ("Calvada"), defendant herein, along with the ACC Entities, owns and operates a marijuana cultivation plant in Pahrump, Nevada. Currently ACC Industries owns a license to operate a marijuana growhouse. In order to fund operations of Defendants' business, ACC Industries entered into that certain loan agreement with a lender Beverly Pacific, whose successor in interest is Vert Holdings, LLC ("BP") in the amount $2,000,000 on or around March 15, 2016 ("March 2016 Loan"). *See* Declaration of Howard Misle ("Misle Declaration"), attached hereto as **Exhibit 1**, at ¶ 3; *see also* Declaration of Pete Seltzer ("Seltzer Declaration" and collectively the "Declarations"), attached hereto as **Exhibit 2**, at ¶ 2.

2.      On or around May 27, 2016, ACC Enterprises and ACC Industries entered into that certain Asset Contribution Agreement pursuant to which ACC Industries transferred its assets to ACC Enterprises. A true and correct copy of the Asset Contribution Agreement is attached hereto as **Exhibit 3**.

---

[2] On November 8, 2016, Nevada voters approved Question 2, which legalizes, regulates and taxes recreational marijuana throughout the state. *See also* NRS 453A.010 et seq. which legalizes medical marijuana.

3.     Because Defendants needed additional funding to grow their business, they entered into negotiations with Steve Idelman, principal of Bart Street and, on information and belief, believed to own or control Solutionary, Inc. ("Solutionary")[1] for additional capital to fund Defendants' Pahrump business. *See* the Declarations at ¶ 3.

4.     Steve Idelman ("Idelman"), the principal of Bart Street was a friend of the family member of Howard Misle's ("Misle"), principal of the ACC Entities. *Id.* at ¶ 4.

5.     On July 8, 2016, Pete Seltzer ("Seltzer"), principal of Calvada, sent an email to Idelman with details of the Defendants' anticipated business sales and other details regarding the Defendants' marijuana growing business. *See* **Exhibit** 4. Seltzer's email included several marijuana related terms. *Id.* Seltzer's email also included several spreadsheets regarding the Defendants' business plan for a marijuana growing business which also included several marijuana related terms. *Id.*

6.     In response, Idelman thanked Seltzer and stated he would get back to Seltzer and Misle the next week. *Id.*

7.     On July 12, 2016, Seltzer again emailed Idelman discussing the Defendants' marijuana growing business, and Idelman again responded thanking Seltzer for the information. *Id.*

8.     On July 15, 2016, Seltzer sent an email to Idelman with a link to an article regarding "Why California voters and others will say yes to marijuana". *See* **Exhibit 5**. Idelaman's response was "Awesome!" *Id.* Idelman also added Sean Mullen ("Mullen"), Plaintiff's attorney or consultant, to this email response as well. *Id.*

9.     Also during the time of these emails, Misle and Seltzer discussed the Defendants' marijuana business many times with Idelman and Mullen, making very clear that the Defendants' business was the growing and sale of marijuana. *See* Declarations at ¶ 5.

10.    On August 8, 2016, Seltzer sent an email to Mullen setting out more details of the Defendants' marijuana business plan and stating specifically as follows:

---

[1] As set forth in previous pleadings, Defendants believe that the Nevada entity Idelman mentioned as part of the parties' agreement may have been Solutionary; however, Defendants reserve the right to request and conduct discovery regarding the actual name of said entity, against whom Defendants will assert various counterclaims.

*LASTLY, PLEASE REMEMBER THAT THE **RECREATIONAL VOTE OCCURS THIS NOV 2016 AND IS EXPECTED TO PASS**. AS AGREED UPON AT OUR MEETING IN PAHRUMP LAST WEEK, WE ESTIMATED A 6 MONTH PERIOD TO WRITE RULES AND IMPLEMENT THEM FOR RECREATIONAL. THUS AROUND MID 2017 IT SHOULD BECOME MUCH EASIER TO SELL OUR PRODUCT AS WE WILL HAVE 50 MILLION POTENTIAL CUSTOMERS ANNUALLY TO LAS VEGAS AND ANYONE OVER 21 WITH DRIVERS LICENSE CAN BUY

A. WHEN THIS OCCURS, **BLUNT SALES SHOULD GO UP** AS WELL SINCE VISITORS WILL WANT QUICK EASY INSTANT GRATIFICATION  AS OPPOSED TO BUYING JUST FLOWER.

B. THE NEVADA STATE PUBLIC HEALTH DEPT. HAS STATED AN 18 MONTH MORATORIUM ON **NO NEW LICENSES TO CULTIVATE ONCE RECREATIONAL PASSES.**
…

E. **TO REACH CULIVATION** REVENUE STAGE TAKES AT LEAST 5 MONTHS SINCE YOU MUST START WITH A SEED

*See* **Exhibit 6** (emphasis added).

11.     On August 9, 2016, the parties exchanged emails setting a time to discuss the deal. *See* **Exhibit 7.**  During that phone call, the parties again discussed the fact that the Defendants' business was the growing and sale of marijuana. *See* Declarations at ¶ 6.

12.     On August 17, 2016, Seltzer again emailed Mullen regarding the Defendants' marijuana business and discussing the possible use of the proceeds from the anticipated loan from Plaintiff to purchase, among other things, "blunt machines" and working capital for the Defendants' marijuana growing business. *See* **Exhibit** 8.  Mullen responds stating that the funding for the Defendants' marijuana business is "locked in for Friday." *Id.*

13.     On August 18, 2016, Idelman emailed Pete Seltzer, principal of Calvada ("Seltzer") and Misle stating that it was "Awesome!!!" and "Truly excellent news" that Defendants were able to grow and sell marijuana in various states based on a recent court ruling. *See* **Exhibit 9** hereto. Idelman and Sean Mullen ("Mullen") were well aware that Defendants' business was growing marijuana.  Further, in said email Idelman used the same signature block he had used many times in corresponding with Defendants which included the email address steveidelman@solutionary.com. *Id.* (including various other emails in which Idelman used the Solutionary email address in his signature block).

14.     On or around August 19, 2016, ACC Industries and ACC Enterprises as borrowers, and Bart Street, as lender, executed that certain promissory note in the amount of $3,500,000 ("August Note"). A copy of the August Note is attached hereto as **Exhibit 10**. Bart Street drafted the August Note. *See* Declarations at ¶ 7.

15.     The August Note had an effective date of August 19, 2016. *Id.*

16.     Pursuant to the terms of the August Note Bart Street agreed to lend ACC Industries and ACC Enterprises the amount of $3,500,000. *Id.*

17.     The terms of the August Note provided potential uses for the money loaned pursuant to the Note. However, nowhere does the August Note require that the advanced funds be used in the potential manner set forth in the August Note. *Id.*

18.     Further, at no time had the parties to the August Note ever stated or required that the money advanced pursuant to the August Note be used in the potential manner set forth in the August Note. *See* Declarations at ¶ 8.

19.     The terms of the August Note provide that repayment of the August Note was not required to take place until September 1, 2017. *Id.* at ¶ 1.

20.     Section 5 of the August Note provides the following regarding default:

5. **Default**. If there shall be any event of default hereunder, at the option and upon written notice to the Borrower, this Note shall accelerate and all principal and unpaid accrued interest shall become due and payable. The occurrence of any one or more of the following shall constitute an event of default:

a.     The Borrower fails to pay timely any of the principal amount due under this Note on the date the same becomes due and payable or any accrued interest or other amounts due under this Note on the date the same becomes due and payable;

b.     The Borrower files any petition or action for relief under any bankruptcy, reorganization, insolvency or moratorium law or any other law for the relief of, or relating to, debtors, now or hereafter in effect, or makes any assignment for the benefit of creditors or takes any corporate action in furtherance of any of the foregoing;

c.     An involuntary petition is filed against the Borrower (unless such petition is dismissed or discharged within sixty (60) days under any bankruptcy statute now or hereafter in effect, or a custodian, receiver, trustee, assignee for the benefit of creditors (or other similar official) is appointed to take possession, custody or control of any property of the Borrower; or [sic]

7

1    *Id.*

2    21.     No other actions or events are listed as constituting an event of default under the

3 August Note. *Id.*

4    22.     The August Note contains a paragraph 10 which is entitled "Modification; Waiver."

5 However, the August Note contains no prohibition against oral modification and contains no merger

6 or integration clause. *Id.*

7    23.     The August Note also contains a paragraph regarding right of first refusal which

8 provides as follows:

9

10        12. **Right of First Refusal**. During the period of time that there is any outstanding principal or interest due under this Note, at the option of the Holder, the Holder shall have a First Right of Refusal to participate and obtain fully paid and non-assessable

11        Units or Shares of either or both ACC INDUSTRIES, INC. and ACC ENTERPRISES, LLC.

12 *Id.*

13    24.     While the August Note did not specifically require that the money loaned be used in

14 the manner set forth in the loan itself, the loan clearly contemplated and stated that at least a portion

15 of those funds would be used as "Operating Capital" for Defendants to operate their marijuana

16 growhouse, and set forth the possible uses of the funds loaned as follows:

17        $725,000.00 to Borrower as Operating Capital [for marijuana business];

18        $25,000.00 to Holder as due diligence costs;

19        $2,200,000.00 to Beverly Pacific, LLC;

20        $275,000.00 to Insight Medica, LLC;

21        $275,000.00 to Hill Health, LLC;

22    For a total loan amount of $3,500,000.00.

23 *See* Exhibit 10 at p. 1.

24    25.     Defendants informed Plaintiff from the beginning of the negotiations that the money

25 they sought was to operate their marijuana business in Pahrump. *See* Declarations at ¶ 9.

26    26.     The $725,000.00 was set out in the Note as operating capital for Defendants'

27 marijuana business. *Id.* The money from the August loan that was referenced regarding Insight

28 Medica, LLC and Hill Health, LLC was to pay off loans to those entities in order to facilitate the

1  operation of Defendants' marijuana business. *Id.* Defendants made this clear to Plaintiff very early

2  on in the negotiations and well before the August Note was signed. *See* Declarations at ¶ 10.

3        27.    The terms of the August Note provide that repayment of the August Note was not

4  required to take place until September 1, 2017. *Id.* at ¶ 1.

5        28.    The August Note also contains a paragraph regarding the governing law the parties

6  selected which provides as follows:

7

8      9. **Governing Law**. This Note shall be governed by and construed under the laws of the State of Nevada, **as applied to agreements among Nevada residents, made**

9      **and to be performed entirely within the State of Nevada, without giving effect to conflicts of laws principles.**

10  *See* Exhibit 10 at ¶ 9 (second emphasis added).

11        29.    On August 22, 2016, Idelman and Mullen each sent an email to Defendants stating

12  that Idelman and Mullen wanted "protection against dilution." *See* **Exhibit 11**. This email

13  confirmed the parties' conversation that their agreement had been orally modified to provide for

14  Bart Street to obtain equity in ACC Enterprises, rather than simply a loan. *See* Declarations at ¶ 10.

15        30.    On August 29, 2016, Idelman sent an email to Seltzer and Misle admitting that he

16  had agreed to "prorated equity with caveat that our debt piece conversion rights are good regardless

17  of when we convert and that if you needed to raise more money then we would have right of first

18  refusal and if we didn't convert the [sic] any future dilution would come from you and Howard."

19  *See* **Exhibit 12**.

20        31.    In his August 29, 2016 email Idelman confirmed the parties' oral agreement that

21  BP's debt would be converted into equity in ACC Enterprises. Defendants disclosed to Idelman that

22  they intended to convert BP's debt into equity into ACC Enterprises consistent with a right of first

23  refusal. In response, Idelman exercised his purported right of refusal and stated to Misle, "I don't

24  give a damn what you guys do with keeping BP in the deal as long as we're not diluted and it comes

25  from your end only." *See* Misle Declaration at ¶ 10.

26        32.    Further, in a subsequent call between Idelman, Seltzer and Misle, Idelman again

27  stated that he agreed to the conversion of BP's debt to equity in ACC Enterprises. *See* Declarations

28  at ¶ 11.

33.     Further, Idelman's August 29, 2016 email was acknowledgment and admission in response to an email from Seltzer stating that the deal between the parties included six (6) million dollars coming from Bart Street and Solutionary as equity in ACC Enterprises and three (3) million dollars coming from Bart Street and Solutionary as debt. *Id.*

34.     On or around September 6, 2016, ACC Industries, ACC Enterprises, and Calvada Partners, as borrowers, and Bart Street, as lender, executed that certain Promissory Note dated September 6, 2016 ("September Note") attached as **Exhibit 13**. Bart Street drafted the September Note. *See* Declarations at ¶ 12.

35.     Pursuant to the terms of the September Note Bart Street agreed to lend ACC Industries, ACC Enterprises and Calvada the amount of $1,200,000. *Id.*

36.     The terms of the September Note provided potential uses for the money loaned pursuant to the Note. However, nowhere does the September Note require that the advanced funds be used in the potential manner set forth in the September Note.

37.     One of the potential uses of the funds provided to Defendants under the September Note included "$700,000.00 to acquire Parcel #040-041-34" ("Parcel 34"). However, no time frame whatsoever was provided in the September Note for purchase of Parcel 34.

38.     The terms of the September Note provide that repayment of the September Note was not required to take place until September 1, 2017. *Id.* at ¶ 1.

39.     Section 5 of the September Note provides the following regarding default:

5. **Default**. If there shall be any event of default hereunder, at the option and upon written notice to the Borrower, this Note shall accelerate and all principal and unpaid accrued interest shall become due and payable. The occurrence of any one or more of the following shall constitute an event of default:

a.      The Borrower fails to pay timely any of the principal amount due under this Note on the date the same becomes due and payable or any accrued interest or other amounts due under this Note on the date the same becomes due and payable;

b.      The Borrower files any petition or action for relief under any bankruptcy, reorganization, insolvency or moratorium law or any other law for the relief of, or relating to, debtors, now or hereafter in effect, or makes any assignment for the benefit of creditors or takes any corporate action in furtherance of any of the foregoing;

c.      An involuntary petition is filed against the Borrower (unless such petition is dismissed or discharged within sixty (60) days under any bankruptcy

statute now or hereafter in effect, or a custodian, receiver, trustee, assignee for the benefit of creditors (or other similar official) is appointed to take possession, custody or control of any property of the Borrower; or [sic]

*Id.*

40.    No other actions or events are listed as constituting an event of default under the September Note. *Id.*

41.    The September Note contains a paragraph 10 which is entitled "Modification; Waiver." However, the September Note contains no prohibition against oral modification and contains no merger or integration clause. *Id.*

42.    The September Note also contains a paragraph regarding right of first refusal which provides as follows:

> 12. **Right of First Refusal.** During the period of time that there is any outstanding principal or interest due under this Note, at the option of the Holder, the Holder shall have a First Right of Refusal to participate and obtain fully paid and non-assessable Units or Shares of either or both ACC INDUSTRIES, INC. and ACC ENTERPRISES, LLC.

*Id.*

43.    The September Note also contains a paragraph regarding the governing law the parties selected which provides as follows:

> 9. **Governing Law.** This Note shall be governed by and construed under the laws of the State of Nevada, **as applied to agreements among Nevada residents, made and to be performed entirely within the State of Nevada, without giving effect to conflicts of laws principles.**

*See* Exhibit 13 at ¶ 9 (second emphasis added).

44.    On September 7, 2016, Mullen admitted that the deal between the parties was ongoing, that the Notes did not constitute the entirety of the parties' agreement, and that Plaintiff and Solutionary, believed to be the Nevada entity Idelamn referred to as part of the deal, had reached a subsequent agreement with the Defendants when Mullen stated in his email that the funding completed to that point included a total of $4,700,000.00 and that "**[t]he next step is to discuss finalizing the equity piece of the deal**. I will begin those discussions with [Seltzer]." *See* **Exhibit 14**, emphasis added.

45.    Further, Idelman sent a follow up email on September 7, 2016, stating, "All good & thanks everyone" subsequent to Mullen's prior email. *Id.*

46.     On October 4, 2016, Seltzer sent an email to Mullen and Idelman in which Seltzer stated that "[t]he $700k earmarked for [Parcel 34] pay off to Debbie Brooks has not happened yet as Howard is trying to work with Debbie to lower our initial payment owed." *See* **Exhibit 15** to the Motion.  Mullen's response was "Thanks for the update" and a request for executed copies of the Notes. *Id.* Mullen did not suggest this constituted a breach of any agreement. *Id.*

47.     Further, because recreational marijuana was not permitted in Nevada at the time of the parties' negotiations but the parties believed there was a substantial likelihood that recreational marijuana would be approved in Nevada in November, 2016.

48.     Consistent with Mullen's and Idelman's admissions regarding the equity piece of the deal, the parties agreed upon the deal as set forth in the email chain attached as **Exhibit 16**, which included in total nine (9) million dollars, six (6) million dollars coming from Bart Street and Solutionary as equity in ACC Enterprises and three (3) million dollars coming from Bart Street and Solutionary as debt, the parties had agreed that Bart Street would fund Defendants the $4,700,000 prior to the vote in November, 2016 regarding recreational marijuana and the parties further agreed that the  remaining approximately $4,300,000 would be provided to Defendants by Bart Street and Solutionary after the vote in November, 2016, provided the vote approved the sale and distribution of recreational marijuana in Nevada. *See* Declarations at ¶ 13.

49.     On October 6, 2016, Idelman sent an email to Defendants showing excitement regarding polls that predicted the recreational use of marijuana would be approved in Nevada. *See* **Exhibit 17**.  Defendants continued to update Idelman and Mullen on the status of the vote on the legalization of recreational marijuana in Nevada because that was the "equity piece of the deal" to which Mullen had referred in his September 7, 2016 email. *See* Declarations at ¶ 14.

50.     On October 8, 2016, Mullen thanked Seltzer for the update regarding the legalization of recreational marijuana in Nevada. *See* **Exhibit 18**.

51.     On October 16, 2016, Misle emailed Idelman telling him that Misle had been negotiating the loans to try to get a reduced price for the purchase of Parcel 34. *See* **Exhibit 19**. Idelman's response was that he "[a]ppreciate[d] the message" and was "happy to get past this

1    stuff." *Id.* Idelman's response did not in any way state or suggest that he believed there had been a

2    breach of the September Note. *Id.*

3          52.    On October 30, 2016, Seltzer again updated Idelman and Mullen regarding the polls

4    concerning the legalizations of recreational marijuana in Nevada. *See* **Exhibit 20**.

5          53.    On November 9, 2016, Seltzer sent an email to Idelman and Mullen regarding the

6    fact that recreational marijuana had been approved in Nevada and moving forward with the parties'

7    agreement. *See* **Exhibit 21**.  In response, Idelman thanked Seltzer and asked that he be available for

8    a call as Misle was out of the country.  Idelman stated in his email that he "just want[ed] to clarify

9    something." *Id.*

10         54.    Seltzer contacted Idelman at his request, believing the call to be a discussion about

11   moving forward with the "equity piece" of the deal as Mullen had referred to it.  Instead, despite his

12   statement via email that he simply wanted to clarify something, in the November 9, 2016 call,

13   Idelman stated that he was breaching the parties' agreement by demanding a premature return of all

14   monies and refusing to go forward with the "equity piece" of the deal on which the parties had

15   already agreed. *See* Seltzer Declaration at ¶ 16.

16         55.    Calvada and the ACC Entities filed a complaint against Bart Street on December 14,

17   2016.  A copy of that complaint is attached hereto as **Exhibit 22**.  A First Amended Complaint

18   adding Solutionary, Inc., as well as additional factual allegations was filed on February 24, 2017.

19   *See* **Exhibit 23**.  The First Amended Complaint has been served on Bart Street and is in the process

20   of being served on Solutionary after  opposing counsel refused to accept service on their behalf.  *See*

21   **Exhibit 24**, affidavit of service on Bart Street; and **Exhibit 25**, email from opposing counsel

22   refusing to accept service.

23         56.    On January 10, 2017, Bart Street filed its complaint in Federal Court ("Complaint")

24   (Doc 1).  According to the Complaint, the August Promissory Note "controlled how [Defendants]

25   could use the loan monies." *See* Complaint at ¶ 14.  Further, according to the Complaint:

26       Specifically, [the August Note] required [Defendants] to (i) use $725,000.00 as
         operating capital; (ii) pay $25,000.00 to Bart Street as due diligence costs; (iii) pay
27       $2.2 million dollars to Beverly Pacific, LLC (hereinafter, "BP") to pay off a prior
         loan; (iv) pay $275,000.00 to Insight Media, LLC; and (v) pay $275,000.00 to Hill
28       Health, LLC.

1   *See* Complaint at ¶ 14.

2       57.    As set forth above, and in discussions between the parties, Plaintiff knew that the

3   "operating capital" was to operate the Defendants' marijuana growing business. *See* Declarations at

4   ¶ 16.

5       58.    Further, according to the Complaint, the September Note "controlled how

6   [Defendants] could use the loan monies." *See* Complaint at ¶ 23. According to the Complaint:

7       Specifically, [the September Note] required them to (i) use $500,000.00 to acquire
        parcel #040-041-35 in Nye County, Nevada (hereinafter, the "35 Parcel"), and (ii)

8       use $700,000.00 to acquire parcel #040-041-34 in Nye County, Nevada (hereinafter,
        the "34 Parcel").

9   *See* Complaint at ¶ 23.

10      59.    At the time of the execution of the September Note, Defendants had informed

11  Plaintiff on multiple occasions that the purpose of acquiring the two Parcels was to expand and

12  operate their marijuana growhouse. *See* Declarations at ¶ 15.

13  **III.    STANDARD OF REVIEW**

14      Under Rule 12(b)(1), Plaintiff bears the burden of establishing by a preponderance of

15  evidence that the Court has subject matter jurisdiction. *See Lujan v. Defenders of Wildlife*, 504

16  U.S. 555, 561 (1992); *Kelly v. Wengler*, 822 F.3d 1085, 1094 (9th Cir. 2016); *US Ecology, Inc. v.

17  U.S. Dep't of Interior,* 231 F.3d 20, 24 (D.C. Cir. 2000). Federal courts are courts of limited

18  jurisdiction and the law presumes that "a cause lies outside this limited jurisdiction." *Kokkonen v.

19  Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994); *see also General Motors Corp. v.

20  Environmental Prot. Agency*, 363 F.3d 442, 448 (D.C. Cir. 2004) (noting that, "[a]s a court of

21  limited jurisdiction, we begin, and end, with an examination of our jurisdiction"). Because subject

22  matter jurisdiction focuses on the Court's power to hear the claim, Plaintiff's factual allegations in

23  the Complaint "will bear closer scrutiny in resolving a 12(b)(1) motion than in resolving a 12(b)(6)

24  motion." *Grand Lodge of Fraternal Order of Police v. Ashcroft*, 185 F. Supp. 2d 9, 13-14 (D.D.C.

25  2001) (internal citation and quotation omitted).

26  **IV.    ARGUMENT**

27      **A.    Solutionary is a necessary and indispensable party and complete relief cannot
            be according without Solutionary.**

28

FRCP 12(b) provides in relevant part:

**(b) How to Present Defenses.** Every defense to a claim for relief in any pleading must be asserted in the responsive pleading if one is required. But a party may assert the following defenses by motion:

> **(1)** lack of subject-matter jurisdiction;
> ...
> **(6)** failure to state a claim upon which relief can be granted; and
> **(7)** failure to join a party under Rule 19.

Fed. R. Civ. P. 12 (West 2009). A party may not "avoid the requirement of complete diversity by failing to join a nondiverse party if that person is 'indispensable' to the proper resolution of the litigation." *Chesapeake & Ohio Ry. Co. v. Certain Underwriters at Lloyd's, London,* 716 F. Supp. 27, 29 (D.D.C. 1989), *rev'd on other grounds,* 910 F.2d 960 (D.C. Cir. 1990) (*citing* 14 C. Wright, A. Miller, & E. Cooper, *Federal Practice and Procedure* § 3637 (2d ed. 1986)). Rule 19 sets forth a two-step analysis for the required joinder of parties. First, courts must determine whether a party is required and must therefore be joined. Fed. R. Civ. P. 19(a). If so, and if joinder is not feasible, then the court must next balance the equitable factors set forth in Rule 19(b) to decide if the party is indispensable such that the action should be dismissed. Fed. R. Civ. P. 19(b).

Further, "[w]here a party required under Rule 19 has not been joined, a party may move for dismissal under Rule 12(b)(7)." *Cabrera-Morales v. UBS Trust Co.,* 769 F. Supp. 2d 67, 70 (D.P.R. 2011); *see also Alto v. Black,* 738 F.3d 1111, 1126 (9th Cir. 2013).

Further, the Ninth Circuit has recognized the following:

> A Rule 19 motion poses "three successive inquiries." *Peabody II,* 400 F.3d at 779. "First, the court must determine whether a nonparty should be joined under Rule 19(a)." *Id.* That nonparty (or "absentee") is now referred to as a "person required to be joined if feasible." If an absentee meets the requirements of Rule 19(a), "the second stage is for the court to determine whether it is feasible to order that the absentee be joined." *Id.* "Finally, if joinder is not feasible, the court must determine at the third stage whether the case can proceed without the absentee" or whether the action must be dismissed. *Id.* A nonparty in whose absence an action must be dismissed is one who "not only [has] an interest in the controversy, but [has] an interest of such a nature that a final decree cannot be made without either affecting that interest, or leaving the controversy in such a condition that its final termination may be wholly inconsistent with equity and good conscience." *Shields v. Barrow,* 58 U.S. 130, 139, 17 How. 130, 15 L.Ed. 158 (1855).

1   *E.E.O.C. v. Peabody W. Coal Co.*, 610 F.3d 1070, 1078 (9th Cir. 2010).

2       In this case, despite Plaintiff's failure to admit the truth, Solutionary is necessary and

3   indispensable under the Ninth Circuit's required analysis.  There is significant email correspondence

4   from Idelman to Defendants in which Idelman admits that he did agree to "prorated equity with

5   caveat [sic] that our **debt piece conversion rights** are good regardless of when we convert and that

6   if you needed to raise more money then we would have right of first refusal **and if we didn't**

7   **convert the [sic] any future dilution would come from you and Howard**." *See* Exhibit 12 hereto

8   (emphasis added), August 29, 2016 email correspondence from Idelman to Pete Seltzer (principle of

9   Calvada) and Howard Misle (principle of the ACC Entities) (referred to herein as the "August 2016

10  Email").  Why would Idelman, principle of Bart Street, be discussing **future dilution** if, as Bart

11  Street currently claims, this was merely a loan transaction and no subsequent oral modification of

12  the parties' agreement took place?  And, in fact, Idelman's August 2016 Email was in response to

13  an email from Mr. Seltzer earlier that day in which Mr. Seltzer points out that he was told that the

14  "9 [million dollar] equity deal had changed to 6 [million] equity and 3 [million] debt which Howard

15  [Misle] agreed too [sic].  In this email I clearly stated we are ok with this but needed to pro rate the

16  percentage then as original deal called for 20% for 9 [million] and now it was only 6 [million]." *Id.*

17  **Idelman's response confirms the parties has orally modified the original loan agreement.**  In

18  fact, Idelman specifically says that he "**did agree to prorated equity**…" *Id.*  Clearly the parties are

19  talking about an agreement which is different than that alleged in Bart Street's complaint which only

20  involves, according to Bart Street, two loans totaling $4.7 million. *See* Complaint at ¶ 13 (loan of

21  $3.5 million) and ¶ 22 (loan of $1.2 million).  Yet, in the August 2016 Email Idelman is clearly

22  acknowledging the agreement between the parties for a total of **$9 million**.  Plaintiff is attempting to

23  evade its oral modification to the parties' agreement, an oral modification that included a total of $9

24  million and the participation of Solutionary, which would destroy diversity jurisdiction.

25      Further, while it is true that under FRCP 19(a)(1)(A), an absent party is a necessary party if

26  "in that person's absence, the court cannot accord complete relief among existing parties." *See*

27  Opposition at p. 3.  However, Defendants will be unable to pursue their counterclaims against

28

Solutionary[3] which are clearly mandatory as they involve the same transactions that will be litigated in the instant case.  Further, there is no dispute that Steven Idelman ("Idelman"), principal of Plaintiff, corresponded with Defendants on multiple occasions through email using a signature block on his email which included the email address steveidelman@solutionary.com.  Accordingly, Solutionary is a necessary and indispensable party in this matter.

**C.**     **NRS 78.585(1) does not apply in this case.**

Plaintiff will likely argue that because NRS § 78.585(1) provides for a three year statute of limitations for dissolved corporations <u>for events that occurred prior to dissolution.</u>  Plaintiff will likely argue that once three years have lapsed after a corporation's dissolution, the corporation can never be sued again under any circumstance.  This is legally incorrect.  If Plaintiff's errant reasoning were adopted it would permit a corporation to be dissolved, wait three years, then be revived and reinstated **with no potential future liability whatsoever**.  Thus, Plaintiff's reading of the statute is incorrect and does not prevent Solutionary from being joined to this litigation as the necessary and indispensable party it is.

NRS 78.730 provides in relevant part that ***any corporation which did exist*** or is existing under the laws of this State ***may***, upon complying with the provisions of NRS 78.180, ***procure a renewal or revival*** of its charter for any period, together with all the rights, franchises, privileges and immunities, and subject to all its existing and preexisting debts, duties and liabilities secured or imposed by its original charter and amendments thereto, or existing charter, by making the required filings.  *See* NRS 78.730.   Further, unlike reinstatement, which has a 5-year limited (NRS 78.180(4)), revival has no time limit.  *Redl v. Heller*, 120 Nev. 75, 79-80, 85 P.3d 797, 799-800 (2004) ("a corporation seeking reinstatement cannot be reinstated if its charter has remained revoked for a period of five consecutive years. There is no similar restriction on revival. … Although a

---

[3] As noted in the Motion, and as Plaintiff deliberately omits, Idelman did not mention by name the Nevada entity which was a necessary part of the subsequent oral modification to the parties' loan agreements.   During the negotiations regarding the subsequent oral modification, Idelman corresponded with Defendants with a signature block which included the email address steveidelman@solutionary.com.  For ease of reference the entity at issue will be referred to as Solutionary, although Defendants expressly reserve the right to amend any pleadings necessary to assert the true name of the entity at issue.

1 corporation cannot be reinstated after five years, there is no provision under NRS 78.730 that

2 prevents a corporate revival after five years.").

3       Thus, under Nevada's statutes governing corporations Solutionary can be both **revived** and

4 **renewed** by simply filing a few documents and paying the proper fees.  Thus, any assertion that it is

5 somehow "factually impossible" for the parties to have discussed Solutionary being part of the

6 subsequent oral modification to the parties' agreement is nonsensical and demonstrates either a

7 complete misunderstanding of Nevada's statutory corporate structure, or a willingness to attempt to

8 mislead this Court to believe that a necessary and indispensable party to the parties' subsequent oral

9 modification of the loans, and therefore to this lawsuit, does not exist.

10       Further, while it is true that an absent party may, under certain circumstances, be an entity

11 who "claims an interest relating to the subject of the action" under FRCP 19(a)(1)(B), that is only

12 one of multiple ways an entity can be a necessary party to an action.  Further, as noted above, the

13 fact that Solutionary is not mentioned on the notes is irrelevant as this case centers around a

14 **subsequent oral modification** of the parties original agreement, and Solutionary was involved in

15 that modification.  *See* attached Declarations and correspondence.

16       Moreover, Solutionary is absolutely an indispensable party to this litigation.   Without

17 Solutionary being joined as a party Defendants will be unable to pursue mandatory counterclaims

18 against Solutionary for breach of the parties' subsequent oral modification of the original agreement,

19 and therefore Plaintiff's Complaint must be dismissed.

20       Further, a party asserting improper joinder of another party to defeat diversity jurisdiction

21 carries a "heavy burden" of persuasion. *Hunter v. Philip Morris USA,* 582 F.3d 1039, 1046 (9th

22 Cir.2009).   "The defendant must demonstrate that there is *no possibility* that the plaintiff will be

23 able to establish a cause of action in state court against the alleged sham defendant." *Good v.*

24 *Prudential Ins. Co. of Am.,* 5 F.Supp.2d 804, 807 (N.D.Cal.1998).

25       Here Bart Street cannot meet this burden.   In fact, as set forth in the First Amended

26 Complaint in the state court litigation, Defendants have , in fact, established several causes of action

27 in state court against Solutionary.  The "critical question" under Rule 19(b)—and thus the key to

28 whether a party is "indispensable"—is "'whether in equity and good conscience' the action may

1    proceed in [the party's] absence." *B. Fernandez & Hnos, Inc. v. Kellogg USA, Inc.*, 516 F.3d 18, 23

2    (1st Cir. 2008) (quoting FED. R. CIV. P. 19(b)).  Accordingly, because this action cannot proceed

3    with Solutionary, Defendants' Motion should be granted.

**D.   All factors require joinder of Solutionary and because Solutionary's joinder would destroy diversity jurisdiction, this matter must be dismissed.**

6    As noted in the Motion, Rule 19(b) provides four non-exhaustive factors for the trial court to

7    consider in determining whether a party is indispensable:

> (1) the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties;
>
> (2) the extent to which any prejudice could be lessened or avoided by: (A) protective provisions in the judgment; (B) shaping the relief; or (C) other measures;
>
> (3) whether a judgment rendered in the person's absence would be adequate; and
>
> (4) whether the plaintiff would have an adequate remedy if the action were dismissed for non-joinder.

14   In deciding a motion to dismiss under Rule 12(b)(7), a court is not limited to the pleadings

15   and may consider other relevant extra-pleading evidence.  *Hohri v. United States*, 782 F.2d 227, 241

16   (D.C. Cir. 1986), *vacated on other grounds*, 482 U.S. 64 (1987); *Herbert v. Nat'l Acad. of Scis.*, 974

17   F.2d 192, 197 (D.C. Cir. 1992); 5C CHARLES ALAN WRIGHT & ARTHUR R. MILLER,

18   FEDERAL PRACTICE AND PROCEDURE § 1359, at 68 (3d ed. 2004) (WRIGHT & MILLER).

19   A defendant may move to dismiss a complaint for "failure to join a party under Rule 19." Fed. R.

20   Civ. P. 12(b)(7).  Courts may consider materials outside the pleadings in resolving a motion to

21   dismiss under Rule 12(b)(7), *Anderson v. Hall*, 755 F. Supp. 2, 5 (D.D.C. 1991), and consideration

22   of such materials will not convert the motion into a Rule 56 motion for summary judgment, *see*

23   *Estes v. Shell Oil Co.*, 234 F.2d 847, 849 n.5 (5th Cir. 1956).

24   Here, as set forth above, Defendants will be unable to pursue mandatory counterclaims

25   against Solutionary if it is not named as a plaintiff in this matter.  Bart Street has deliberately

26   excluded Solutionary from this action in violation of FRCP 12(b)(1), 12(b)(7) and 19 and therefore

27   the Plaintiff's complaint must be dismissed.  All factors set forth in the Rule 19 analysis weigh in

28   favor of dismissal.  Any judgment rendered in Defendants' favor will not include all parties against

1   whom Defendants will be entitled to collect, including Solutionary.  Second, there are no measures

2   that can be taken aside from joining Solutionary, that would lessen or avoid the damage to

3   Defendants in not being able to pursue its claims against all applicable entities.  However, joining

4   Solutionary as a plaintiff would destroy the Court's diversity jurisdiction and therefore the instant

5   Complaint must be dismissed.  Third, as set forth above, no judgment rendered in the absence of the

6   missing plaintiff/counter-defendant would be adequate.  Finally, the fourth factor weighs heavily in

7   favor of dismissal as Bart Street and Solutionary have an adequate remedy in state court in Nevada.

8   Accordingly, the Motion must be granted and Plaintiff's Complaint dismissed.

9       **E.**     **Under the *Colorado River* and *Burford* Doctrines, this Court should dismiss or**
10              **stay the instant action.**

11          Filed concurrently with this motion is a motion to dismiss based upon the *Colorado River*

12   and *Burford* doctrines, a motion filed by Calvada.  Rather than repeat each and every argument, the

13   ACC Entities hereby incorporate by reference Calvada's Motion and relief requested as if set forth

14   in its entirety.

15      **F.**     **As set forth above, this case must be dismissed under FRCP 12(b)(6) for failure**
16              **to state a claim as Plaintiff's theory would require this Court to enforce an**
              **illegal contract.**

17          As set forth above, enforcement of Plaintiff's theory of the Notes at issue would result in the

18   enforcement of an illegal contract.  State law clearly state law provides the rule of decision on the

19   merits in this case, since – even though this is a breach of contract case – the Plaintiff's theory of the

20   purported breach of contract would require this Court to find that a contract for the operation and

21   expansion of a drug business was enforceable, which it cannot do.  *See Crockett & Myers, Ltd. v.*

22   *Napier, Fitzgerald & Kirby, LLP.*, 430 F. Supp. 2d 1157, 1162 (D. Nev. 2006) ("As the Court noted

23   in its prior Order, Nevada recognizes the rule that "traditionally neither courts of law nor equity will

24   interpose to grant relief to parties to an illegal agreement." *Shimrak v. Garcia–Mendoza,* 112 Nev.

25   246, 912 P.2d 822, 825–26 (1996)); *Rivero v. Rivero*, 125 Nev. 410, 429, 216 P.3d 213, 226 (2009)

26   ("Parties are free to contract, and the courts will enforce their contracts if they are not

27   unconscionable, illegal, or in violation of public policy.").  And, in fact, the Plaintiff waived any

28

right to federal court by agreeing that the Notes should be "governed by and construed under the laws of the State of Nevada, **as applied to agreements among Nevada residents, made and to be performed entirely within the State of Nevada, without giving effect to conflicts of laws principles**." *See* Exhibits 10 and 13 at ¶ 9 (second emphasis added).

Further, courts across the country have recognized that where a contract contains a provision enumerating the events or acts that constitute a default of the contract, such a provision constitutes the only events that can constitute a breach of the parties' agreement.  For example, in *Carte Blanche (Singapore) Pte. Ltd. v. Carte Blanche Int'l, Ltd.*, 683 F. Supp. 945, 952–53 (S.D.N.Y. 1988), *aff'd,* 888 F.2d 260 (2d Cir. 1989), the Second Circuit dealt with a franchise agreement which one party claimed had been breached through use of a name without consent.  While the arbitrator had found that consent should have been requested, they did not find that failure to obtain consent constituted a breach or even a default under the agreement, and their finding was upheld by the Second Circuit, which held that "**although the arbitrators found that consent should have been requested, they did not find that failure to obtain such consent was a material breach or an event of default under the Franchise Agreement.** As such, this is not a case of inconsistency between the findings of the arbitrators and the requirements of the Franchise Agreement."  *Id.* (emphasis added); *see also Elliott Associates v. Bio-Response, Inc.*, 1989 Del. Ch. LEXIS 63, *10-11 (Del. Ch. May 23, 1989) (holding that a party's alleged anticipatory repudiation "would not constitute a default under the terms of the [Agreement] since Section 6.01 does not list anticipatory repudiation as an event of default."); *In re Granger*, 2009 Bankr. LEXIS 4359, *13, 2009 WL 8467148 (B.A.P. 1st Cir. May 6, 2009) (holding that specific remedies available in the case of defined "events of default" were unavailable to the plaintiff because defendant's alleged breach of contract – obtaining a bankruptcy discharge – was not specifically listed among the other "events of default"); *Cent. Southwest Tex. Dev., LLC v. JPMorgan Chase Bank, N.A.*, 2012 U.S. Dist. LEXIS 189890, *23 (W.D. Tex. Aug. 21, 2012) (holding that a landlord's failure to perform under a Lease "did not constitute an 'event of default'" because the contract defined "event of default" to only include failures to perform that continued for thirty days after notice had been given, and the landlord had never been received notice of its failure to perform); *Sport & Health Co. v. Club*

1  *Props. Co.*, 1999 Va. Cir. LEXIS 563, *12-13 (Va. Cir. Ct. Apr. 27, 1999) (holding that a single

2  breach of contract was not an "event of default," because "event of default" was defined to include

3  two or more breaches).

4       Here, as noted above, the Notes at issue contain an express provision listing what constitutes

5  a "default" under the Notes, which provision includes only (1) failure to pay principal due; (2) filing

6  a bankruptcy petition; (3) an involuntary petition being filed against the borrower. *See* Exhibits 10

7  and 13 hereto.  There is no requirement that the funds be used in the potential manner listed in the

8  Notes, and that was never the parties' agreement.  Under the terms of the Notes, the principal is not

9  due until September, 2017, and any ambiguity must be construed against the drafter, *i.e.* Bart Street.

10  Clearly the Plaintiff cannot fabricate a default and then claim failure to repay amounts falsely

11  demanded as a breach.  Regarding the second and third events which constitute a default, there is no

12  question that none of the Defendants have filed a bankruptcy petition, or had an involuntary petition

13  filed against them.  Because the Complaint does not even allege that the Defendants breached any of

14  the listed events of default, Plaintiff's Complaint must be dismissed pursuant to FRCP 12(b)(6) for

15  failure to state a claim upon which relief can be granted as well.

16  **V.      REQUEST FOR EVIDENTIARY HEARING**

17       In deciding a motion to dismiss under Rule 12(b)(7), a court is not limited to the pleadings

18  and may consider other relevant extra-pleading evidence.  *Hohri v. United States*, 782 F.2d 227, 241

19  (D.C. Cir. 1986), *vacated on other grounds*, 482 U.S. 64 (1987); *Herbert v. Nat'l Acad. of Scis.*, 974

20  F.2d 192, 197 (D.C. Cir. 1992); 5C CHARLES ALAN WRIGHT & ARTHUR R. MILLER,

21  FEDERAL PRACTICE AND PROCEDURE § 1359, at 68 (3d ed. 2004) (WRIGHT & MILLER).

22  A factual attack on subject matter jurisdiction may be accompanied by extrinsic evidence. *St. Clair*

23  *v. City of Chico*, 880 F.2d 199, 201 (9th Cir. 3 *3  1989); *Trentacosta v. Frontier Pac. Aircraft*

24  *Indus., Inc.*, 813 F.2d 1553, 1558 (9th Cir. 1987).  The opposing party must then "present affidavits

25  or any other evidence necessary to satisfy its burden of establishing that the court, in fact, possesses

26  subject matter jurisdiction." *St. Clair*, 880 F.2d at 201.  When considering a factual attack on subject

27  matter jurisdiction, "the district court is ordinarily free to hear evidence regarding jurisdiction and to

28

rule on that issue prior to trial, resolving factual disputes where necessary." *Augustine v. United States*, 704 F.2d 1074, 1077 (9th Cir. 1983). "No presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims."

*Thornhill Pub. Co. v. Gen. Tel. & Elecs. Corp.*, 594 F.2d 730, 732 (9th Cir. 1979) (*quoting Mortensen v. First Fed. Sav. Loan Ass'n*, 549 F.2d 884, 891 (3rd Cir. 1977)).

Further, a defendant may move to dismiss a complaint for "failure to join a party under Rule 19." Fed. R. Civ. P. 12(b)(7).  Courts may consider materials outside the pleadings in resolving a motion to dismiss under Rule 12(b)(7), *Anderson v. Hall,* 755 F. Supp. 2, 5 (D.D.C. 1991), and consideration of such materials will not convert the motion into a Rule 56 motion for summary judgment, *see Estes v. Shell Oil Co.,* 234 F.2d 847, 849 n.5 (5th Cir. 1956).

Moreover, as courts have recognized,

> Under Rule 12(b), a "speaking" motion, i.e., a motion that includes evidentiary matters outside the pleadings, is properly converted to a Rule 56 motion **only when it is made under Rule 12(b)(6): failure to state a claim**.[4]

*Kamen v. Am. Tel. & Tel. Co.*, 791 F.2d 1006, 1010–11 (2d Cir. 1986) (emphasis added).  Thus, as the court in *Southport Lane Equity II, LLC v. Downey*, 177 F. Supp. 3d 1286, 1295 (D. Nev. 2016) did, this Court can review evidence which relates only to jurisdictional issues without converting the Motion into one for summary judgment.  Accordingly, in the event the Court is not inclined to grant Defendants' Motion, Calvada respectfully requests an evidentiary hearing and discovery on the issues solely relating to whether this Court has subject matter jurisdiction in this case, including but not limited to discovery from Idelman and Bart Street regarding Solutionary and/or any other Nevada entity made part of the parties' subsequent modification of their agreement.

## VII.   CONCLUSION

For all these reasons, Defendants respectfully request that this Court grant their motion to

---

[4] While the ACC Defendants do move in part under FRCP 12(b)(6) to dismiss the Complaint, that portion of the Defendants' argument is not dependent on any documents outside the Complaint and the attached exhibits and therefore cannot be

1    dismiss, and grant such other and further relief as the Court deems appropriate and necessary.

2          DATED this 24th day of March, 2017.

3                                        FENNEMORE CRAIG, P.C.

4                                        By

5                                          Brenoch R. Wirthlin (Nevada Bar No. 10282)
                                           Kevin Hejmanowski (Nevada Bar No. 10612)
6                                          300 South Fourth Street, Suite 1400
                                           Las Vegas, Nevada  89101
7                                          *Attorneys for Defendants*

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

I hereby certify that on the 24th day of March, 2017, I served a copy of the foregoing **DEFENDANTS ACC ENTERPRISES, LLC, AND ACC INDUSTRIES, INC.'S MOTION TO DISMISS** upon the parties to this action via electronic service pursuant to the U.S. District Court CM/ECF filing system.

Daniel R. McNutt, Esq.
Carbajal & McNut, LLP
625 South Eighth Street
Las Vegas, Nevada 89101
drm@cmlawnv.com
*Attorneys for Bart Street III*

_____
/s/ Adrina Harris
An employee of Fennemore Craig, P.C.