**FENNEMORE CRAIG, P.C.**
Brenoch R. Wirthlin (Nevada Bar No. 10282)
Kevin Hejmanowski (Nevada Bar No. 10612)
300 South Fourth Street, Suite 1400
Las Vegas, Nevada  89101
Telephone:  (702) 692-8000
Facsimile:  (702) 692-8099
Email:  bwirthlin@fclaw.com
Email:  khejmanowski@fclaw.com
*Attorneys for Defendants*

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| BART STREET III, a Nebraska Limited Liability Company, | Case No. 2:17-cv-00083-GMN-VCF |
| Plaintiff, | **DEFENDANTS' RENEWED MOTION TO DISMISS** |
| v. | Oral Argument Requested |
| ACC ENTERPRISES, LLC, a Nevada Limited Liability Company; ACC INDUSTRIES, INC., a Nevada corporation; CALVADA PARTNERS, LLC, a Nevada Limited Liability Company, | LR 78-1 |
| Defendants. | |

Defendants ACC Enterprises, LLC ("Enterprises"), ACC Industries, Inc. ("Industries," and together with Industries the "ACC Entities"), and Calvada Partners, LLC ("Calvada," and together with the ACC Entities, "Defendants"), by and through counsel, Fennemore Craig, P.C., hereby submit their Renewed Motion to Dismiss ("Renewed Motion") pursuant to this Court's Order (ECF No. 134) ("MSJ Order").  This motion is brought pursuant to FRCP 12(b)(1), 12(b)(6), 12(b)(7) and FRCP 19, and is based on the attached memorandum of points and authorities, all exhibits attached thereto, any oral argument the Court entertains, and all papers and pleadings on file herein.

DATED this 26th day of October, 2017.     **FENNEMORE CRAIG, P.C.**

By:   /s/ Brenoch Wirthlin
Brenoch R. Wirthlin (Nevada Bar No. 10282)
Kevin Hejmanowski (Nevada Bar No. 10612)
*Attorneys for Defendants*

*Left margin (vertical):* **FENNEMORE CRAIG, P.C.**  300 S 4th Street, Suite 1400  Las Vegas, Nevada 89101  Tel: (702) 692-8000   Fax: (702) 692-8099

# I.    STATEMENT OF FACTS

## A.    Relevant Procedural background

1.    On December 14, 2016, Defendants filed their State Court complaint commencing case no.: CV38198 in the Fifth Judicial District Court in Nevada ("State Court Action").

2.    On February 24, 2017, Defendants filed their First Amended State Court complaint in the State Court Action. Solutionary, Inc., a Nevada corporation ("Solutionary" or "Solutionary-NV") is a named defendant in the First Amended State Court complaint.

3.    On January 10, 2017, Bart Street III, LLC, ("Bart Street" or "Plaintiff"), as plaintiff, the instant action.

4.    On April 3, 2017 Bart Street filed its Petition for Removal of the State Court Action, commencing case no.: 2:17-cv-00942-JAD-CWH ("Removed Action").

5.    On April 24, 2017, a Delaware entity known as Solutionary, Inc. ("Solutionary-DE"), which was not named in the State Action or the Removed Action, purported to appear in the Removed Action.

## B.    Relevant substantive background

Defendants own and operate a marijuana cultivation plant in Pahrump, Nevada ("Business"). *See* Declaration of Howard Misle ("Misle Declaration"), **Exhibit 1** hereto, at ¶ 3; Declaration of Peter Seltzer ("Seltzer Declaration" and together with the Seltzer Declaration, referred to as the "Declarations"), **Exhibit 2** hereto, at ¶ 3  Currently Defendants are licensed to grow medical and recreational marijuana. *Id*. at ¶ 4.  Defendants became acquainted with Plaintiff's ("Bart Street") principal, Steven Idelman ("Idelman")[1] through a family relation with Howard Misle ("Misle"), principal of the ACC Entities. *Id*. at ¶ 5.  This family relation was Howard Shrier.  Because Defendants needed additional funding to grow their business, they entered into negotiations with Idelman, principal of Bart Street and, on information and belief, believed to own or control Solutionary-NV[2] for additional capital to fund Defendants' Pahrump business. *Id*.  Idelman

---

[1]  "Counter-defendants" shall mean Bart Street, Idelman, Sean Mullen ("Mullen"), Stavely Wright ("Wright") and Solutionary-NV, as Defendants have counterclaims against these individuals and entities, among others.

[2]  Defendants believe that the Nevada entity Idelman mentioned as part of the Parties' agreement is believed to be

FENNEMORE CRAIG, P.C.
300 S 4ᵗʰ Street, Suite 1400
Las Vegas, Nevada 89101
Tel: (702) 692-8000  Fax: (702) 692-8099

FENNEMORE CRAIG, P.C.
300 S 4ᵗʰ Street, Suite 1400
Las Vegas, Nevada 89101
Tel: (702) 692-8000   Fax: (702) 692-8099

expressed an interest in obtaining equity in Defendants' business and in around June, 2016, the Parties[3] began negotiations for Counter-defendants to provide funding to Defendants' marijuana business. *Id*. at ¶ 6. Idelman came to Las Vegas and visited Defendants' Pahrump marijuana facility. *See* Misle Declaration at ¶ 6. At the time, recreational marijuana ("Recreational") had not been approved in Nevada.[4] Further, Enterprises had entered into a loan with Beverly Pacific ("BP") which had an outstanding principal in the amount of $2,000,000 ("BP Loan"). *See* Declarations at ¶ 7. BP had expressed interest in converting its loan to equity in the Business. *Id*. at ¶ 8. Defendants were in need of some capital to operate and expand their Business as Defendants anticipated that Recreational, which was up for approval in Nevada in November, 2016, would be approved and that Defendants would be able to obtain a Recreational license, thereby greatly expanding their business and increasing profits exponentially. *Id*. at ¶ 9. Defendants had obtained the option to purchase a parcel of land on which they were operating their Business at the time they began negotiations with Counter-defendants, and wanted to buy adjacent parcels to substantially expand their business. *Id*. at ¶ 10. On July 7, 2016, Pete Seltzer ("Seltzer"), principal of Calvada, sent an email to Idelman stating that it was "great to meet [Idelman] today"[5] and giving Idelman the web addresses of Defendants' marijuana business for Idleman to review. *See* **Exhibit 3**. The next day Seltzer sent a follow up email to Idelman with details of the Defendants' anticipated business sales and other details regarding the Defendants' marijuana growing business. *See* **Exhibit 4**. Seltzer's email included several marijuana related terms and included several spreadsheets regarding the Defendants' business plan for a marijuana growing business which also included several marijuana related terms. *Id*.

On July 12, 2016, Seltzer again emailed Idelman discussing the Defendants' marijuana

---

Solutionary; however, Defendants reserve the right to request and conduct discovery regarding the actual name of said entity.

[3] "Parties" shall mean Defendants and Counter-defendants.

[4] Defendants request the Court take judicial notice of the fact that on November 8, 2016, Nevada voters approved Question 2, which legalizes, regulates and taxes recreational marijuana throughout the state. *See also* NRS 453A.010 et seq. which legalizes medical marijuana.

[5] All typos and grammatical errors remain in the email and text communications. Unless otherwise stated, all emphases in quoted language is added.

FENNEMORE CRAIG, P.C.
300 S 4th Street, Suite 1400
Las Vegas, Nevada 89101
Tel: (702) 692-8000   Fax: (702) 692-8099

growing business and plans for expansion, and Idelman again responded thanking Seltzer for the information.  *See* **Exhibit 5**.  During the time of these emails, Misle and Seltzer discussed the Defendants' marijuana business many times with Idelman and Mullen, making very clear that the Defendants' business was the growing and sale of marijuana.  *See* Declarations at ¶ 11.   The parties continued ongoing negotiations through July and August.  *See id.* at ¶ 12; *see also* **Exhibit 6**, various email correspondence.   During these negotiations Idelman consistently used the same signature block he had used many times in corresponding with Defendants which included the email address steveidelman@solutionary.com.  *See id*.   Based on this and other representations and statements made by Idelman, Defendants were informed and believed that, while Idelman confirmed another entity was involved in the negotiations but did not state the entity's name, Solutionary (assumed and believed to be the referenced entity) was acting through Idelman as a party in the negotiations.  *See* Declarations at ¶ 13.   In addition, while the Parties at times reference the term "Idelman Group" in the negotiations, this only further supports Defendants' claims that there were multiple entities involved in the negotiations, not just Bart Street.  *Id*. at ¶ 14.

On August 8, 2016, Seltzer sent an email to Mullen setting out more details of the Defendants' marijuana business plan and stating specifically Defendant's anticipation that Recreational would pass and that Defendants intended to grow and sell Recreational marijuana in addition to medical marijuana.  *See* **Exhibit 7** hereto.  In that email Seltzer also stated to Mullen that Seltzer had "adjusted The Idelman equity from my last term sheet which had you at 10% in building B and 26% in Building A and C (20% avg.)."  *See id*.

During this time frame the parties had been attempting to resolve the issues related to BP.  In a nutshell, it had been contemplated that BP would convert its outstanding loan into equity in the Defendants' Business, but this conflicted with the Counter-defendants' desire to become "undiluted partners" with Defendants.  *See* **Exhibit 8**.  On August 15, 2016 Seltzer stated to Idelman and Mullen that in fact, it appeared that BP wanted to exercise its options to obtain equity in the Business and Defendants fully intended to honor their contractual commitments BP – even though it may have meant (at that time) that the deal between the Defendants and Counter-defendants could not be entered into:

> Guys thank you for your efforts and believing in our business.  **We really wanted you as partners, however, it is with mixed emotions that I tell you that we were notified today that Beverly Pacific (Marciano) intends to convert their note and fund next week.**  Again THANK YOU for your time and consideration.

*See* **Exhibit 9**.  Thus, Defendants would honor their commitment to BP, even though that meant that Counter-defendants could not join Defendants as a partner in Defendants' business.  However, Counter-defendants wanted to partner with Defendants *even if that meant waiving any right of first refusal ("ROFR") regarding BP*, which Counter-defendants did.

In fact, the next day, on August 16, 2016, Idelman contacted Seltzer to attempt to save the deal between the Parties, thereby waiving any right of first refusal.  In response to Idelman's call, Seltzer explained that he was not sure the deal was even still possible due to the commitment to BP:

> Good morning steve.  I listened to your msg and already spoke to Howard who will call u.  **I must call our lawyer to see if it's even still possible** since BP announced conversation last eve, set things in motion.  **Must see if we are now contractual bound or if it's still possible to convince BP not to convert."**

*See* **Exhibit 10**.

Additionally, in a text message dated August 16, 2016, Idelman, principal and agent of Bart Street and Solutionary, admitted the following to Wright, who is also a member of Bart Street:

> Ready to do deal.  Important, please call me as soon as you can on this number 402.680.5000.  Ned [Need] you to confirm you are in for 5 mil.  **We will have 6 mil equity and 3 mil debt and can convert the debt to equity.**  Way exciting, need talk with you as we want to move quickly as there are some other investors who want the deal.  We have done very deep due diligence.

*See* **Exhibit 11** hereto (emphasis added) ("August 16 Text").  Mullen later confirmed the Parties' agreement – including the fact that the two loans at issue were merely part of the overall $9M Deal and *were merely taking the form of a loan* in an email exchange dated August 17, 2016, one day after the above text message.  In that exchange, Mullen says to Seltzer, principal of Calvada, the following:

> **Pete - sounds like we are moving forward**.  Sounds like there is a need for an advance on 3.5m … Do to the short notice on this, **I anticipate the advance will be in the form of loan.**  Agree?

*See* **Exhibit 12 at 8:56 AM**.  In response, Seltzer responds as follows:

**FENNEMORE CRAIG, P.C.**
300 S 4th Street, Suite 1400
Las Vegas, Nevada 89101
Tel: (702) 692-8000   Fax: (702) 692-8099

> **Sean, I did not want to bother you on vacation in Colorado but yes, we are moving forward as partners!!**  Steve [Idelman] and Howard [Misle] are both Very excited and their energy radiates…
> **Deal is for: $6,000,000 in Equity, $3,000,000 Loan at interest rate TBD…**

*See id.* at 10:54 AM.

In fact, Mullen later forwarded this email to Idelman requesting that Idelman "confirm your understanding **of the deal**." *Id.* at 10:54 AM.  Mullen states that he would like to change the deal but never once do Mullen or Idelman respond to Seltzer and claim that he has incorrectly stated the deal or that there is no deal.

Thus, while the Parties entered into the notes dated August 19, 2016 ("August Note"), **Exhibit 13** hereto, and the note dated September 6, 2016 ("September Note" and collectively the "Notes"), **Exhibit 14** hereto, the Notes were merely one part of the Parties' agreement and, in reality, were an advance on the total $9M Deal that happen to take the form of notes, not the entirety of the Parties' deal as Counter-defendants claim.  Further, while the terms of the Notes do not specifically require the funds provided be used in a specific way (although that is Bart Street's contention), they clearly contemplate that the funds will support the expansion and operation of Defendants' marijuana Business.

Moreover, **Mullen himself admitted the Parties' deal was for 9 million**.  In an email from Mullen to Idelman, dated August 17, 2016, Mullen states to Idelman that, in fact, the Parties' deal is for 9 million dollars:

> I have an email into Pete to get their "use of proceeds" and to confirm the loan transaction for the 3.5  Who funds what portion of the 3.5?  I assumed it would be pro rata?  **I will assume that the total is nine.  Stave is in for five.  How much are you in for?  Three for you and one for me?**…

*See* **Exhibit 15**.

Further, on August 19, 2016, Seltzer emails Idelman and Mullen and again refers to them as his "**Partners**." *See* **Exhibit 16** at 9:34 AM.  Mullen responds and copies Idelman, but ***never once***

*disputes that the parties are partners in the $9 million financing deal*.  *Id.* Then, on August 22, 2016, Mullen emails Seltzer, and Idelman follows up with an email as well, in which Mullen and Idelman state that the indemnification provision "really needs to address **our protection against dilution**."  *See* **Exhibit 17** at 4:57 PM.  That the parties were discussing "protection against dilution" shows that the financing was not simply a loan.

Moreover, on August 22, 2016, Seltzer sent a copy of the Indemnity Agreement which Counter-defendants had requested be prepared,  see *Id* . The Indemnity Agreement is attached as **Exhibit 18**.  The Indemnity Agreement describes the Parties full $9M Deal as follows:

> Indemnitees [Counter-defendants], or principals thereof, have made or are **making a loan concurrently with the date hereof to ACC [Enterprises] LLC, in the amount of $3,000,000 (the "Loan"), and subsequent to the making of a loan, will be making an equity investment in ACC [Enterprises] LLC in the amount of $6,000,000.**

*See Id.*  After reviewing the draft Indemnity Agreement, Mullen and Idelman – Bart Street and Solutionary-NV's principals – expressed no objection to the description of the parties' $9M Deal. This constitutes an admission to the terms of the agreement by silence. *See Davies v. Butler*, 95 Nev. 763, 778, 602 P.2d 605, 614 (1979) (recognizing that admission by silence occurs when "remarks were made to, or in the hearing of, any defendant," and the defendant responds with silence); *see also In re Harrison Living Tr.*, 121 Nev. 217, 223, 112 P.3d 1058, 1062 (2005) ("[S]ilence can raise an estoppel quite as effectively as can words."). The only suggestion that Counter-defendants provided was to add a provision to address "protection against dilution." *See* Exhibit 17.  This response demonstrates conclusively that the financing provided to Defendants was always intended to be more than just a loan – it was an *investment* in Defendants' marijuana business, an investment that warranted "protection against dilution."  Second, the response also shows that the principals of Counter-defendants and Defendants – Howard Misle, Pete Seltzer, Sean Mullen, and Steven Idelman – all shared the same understanding regarding their financing agreement: that the Counter-defendants would provide a total of $9 million in financing to Defendants.

Regarding the right of first refusal with BP, when Defendants had not heard back from their August 15 email, on August 23, 2016, Defendants again texted Idelman and Mullen and requested

FENNEMORE CRAIG, P.C.
300 S 4th Street, Suite 1400
Las Vegas, Nevada 89101
Tel: (702) 692-8000   Fax:  (702) 692-8099

to know the status of the situation regarding BP and whether Bart Street was willing to waive any right of first refusal:

> What is the status on the release from BP?  It is approved by all and if so where is it?  If not what is the hold up?

*See* **Exhibit 19**.  In response Mullen stated the following:

> I have been communicating with Pete on this.  He indicated at 3 o'clock cst that he was going to have a call with you.  I assume you're in the loop.  If not I sent you a copy of the email I sent him.  **Simply put, this is your release.**  If you and your lawyer are comfortable with it that's fine.

*Id.*  Thus, as of August 23, 2016, Counter-defendants waived their right of first refusal and clearly indicated and affirmed their commitment to Defendants to enter into the $9M Deal.

Further, Idelman himself also acknowledged the Parties' deal was for Plaintiff to contribute a total of 9 million, as Idelman stated in the email correspondence between the parties on August 29, 2016.  In that exchange, Seltzer set forth the Parties' agreement on the terms set forth above and Idelman acknowledged that it was, in fact, the Parties' agreement.  Seltzer stated as follows:

> Gentlemen [Mullen and Idelman]:
> I sent this email 17 days ago to you Sean after steve and Howard worked out details via a 1 on 1 call.  I then wanted to recap it all in writing so we had an email trail backing it up what steve and howard agreed too.  **I was told the 9m equity deal had changed to 6m equity and 3m debt which Howard agreed too.**  In this email I clearly stated we are ok with this but needed to pro rate the percentage then as the original deal called for 20% for 9m and now it was only 6m.  Thus is was .666% of original equity. …

*See* **Exhibit 20** hereto at 7:12 PM.  In response, Idelman admitted the Parties' deal was in exactly as Seltzer had described it:

> We will have a call on this but for now **I did agree to prorated equity with caveat that our debt piece conversion rights are good regardless of when we convert** and that if you needed to raise more money then we would have right of first refusal **and if we didn't convert the any future dilution would come from you and Howard.** …

*Id.* at 5:53 PM. This is conclusive and irrefutable proof that the Plaintiff's narrative is false and misleading and that the truth is the Parties agreed to the $9M Deal, not merely the 4.7 million they provided prior to recreational marijuana being approved in Nevada.  Clearly "prorated equity"

FENNEMORE CRAIG, P.C.
300 S 4ᵗʰ Street, Suite 1400
Las Vegas, Nevada 89101
Tel: (702) 692-8000   Fax: (702) 692-8099

FENNEMORE CRAIG, P.C.
300 S 4th Street, Suite 1400
Las Vegas, Nevada 89101
Tel: (702) 692-8000  Fax: (702) 692-8099

referenced is the reduction of equity from $9M to $6M as $3M was now going to be debt, as referenced in Seltzer's August 29, 2016 email.  Here again the parties' $9M Deal was again affirmed by Mullen and Idelman in writing.

Moreover, Misle and Seltzer disclosed to Idelman that Defendants intended to convert BP's debt into equity in ACC Enterprises consistent with a right of first refusal.  In response Idelman exercised his purported right of first refusal and stated to "I don't give a damn what you guys do with keeping BP in the deal as long as we're not diluted and it comes from your end only."  *See* Declarations at ¶ 16.  Further, it is clear from communications between the parties that Plaintiff and its principals, up until just before the election, were fully committed to the $9M Deal.  As late as October 14, 2016, Idelman emailed Defendants and again referred to them as his "partners," indicating their intent for Plaintiff to own equity in ACC Enterprises. *See* **Exhibit 21.**

Subsequently, in November, 2016 the use, production and distribution of recreational marijuana was approved in Nevada.  Pursuant to the terms of the Parties' agreement, Defendants anticipated Bart Street and/or Solutionary providing the additional $4,300,000 in funding to Defendants as contractually agreed.  However, in violation of their agreement, Bart Street and Solutionary refused to provide said additional funding, to the detriment and damage of Defendants. *See* Declarations at ¶ 20.

At the time of the execution of the Notes at issue, Defendants had informed Bart Street, Idelman and Mullen on multiple occasions of the nature of Defendants' business and that the purpose of acquiring additional land and capital was to expand and operate Defendants' marijuana business.  *Id*. at ¶ 21.  On November 9, 2016, Seltzer sent an email to Idelman and Mullen regarding the fact that recreational marijuana had been approved in Nevada and moving forward with the parties' agreement for funding post-recreational approval.  *See* **Exhibit 22**.  In response, Idelman thanked Seltzer and asked that he be available for a call as Misle was out of the country.  *Id*.  Idelman stated in his email that he "just want[ed] to clarify something."  *Id*.  Seltzer contacted Idelman at his request, believing the call to be a discussion about moving forward with the remaining funding of the parties' $9 million deal as agreed.  Seltzer Declaration at ¶ 22.  Instead, despite his statements that he just wanted to clarify something, Idelman stated that he was breaching

FENNEMORE CRAIG, P.C.
300 S 4ᵗʰ Street, Suite 1400
Las Vegas, Nevada 89101
Tel: (702) 692-8000   Fax: (702) 692-8099

1    the parties' agreement by demanding a premature return of all monies and refusing to move forward

2    with post-recreational funding.  *Id.*

3         Moreover, a declaration provided by non-party witness Howard Shrier (attached as **Exhibit**

4    **23**), clearly sets forth a number of additional facts that support Defendants' position that the parties

5    had always planned on entering into an agreement whereby Plaintiff would obtain equity in

6    Defendants' marijuana business. Specifically, the declaration shows that as early as Summer 2016,

7    Idelman was actively looking to invest in marijuana. *Id.* at ¶ 4. Mr. Shrier, an acquaintance of both

8    Idelman and Misle, then introduced them to one another and understood that they had struck a deal.

9    *Id.* at ¶ 5-6. After finalizing their negotiations, Idelman agreed to reward Mr. Shrier for introducing

10   him to Misle by providing Mr. Shrier with a 1% ownership interest in Misle's business. *Id.* at ¶ 6.

11   Mr. Shrier understood this to mean that Idelman had agreed to obtain an equity ownership interest in

12   the marijuana business. *Id.* at ¶ 7. All of this confirms that the Parties agreed to the $9M Deal.  The

13   Shrier Declaration also states that Idelman informed him, specifically, that the deal was contingent

14   only upon legislative approval of the recreational marijuana ballot initiative. *Id.* at ¶ 5. It was not

15   contingent upon any particular candidate winning the presidential nomination.  *See* Misle

16   Declaration at ¶ 15.  Further, part of the initial $4,700,000 was to convert to equity upon Bart Street

17   and Solutionary following through with the additional funding after recreational marijuana was

18   approved, but Bart Street and Solutionary failed to do so.  *Id.*

19   **II.    STANDARD OF REVIEW**

20         "Federal courts are courts of limited jurisdiction, possessing only those powers granted by

21   the Constitution and by statute." *Salomon v. Fed. Nat'l Mortg*. Ass'n, No. 215CV00332GMNVCF,

22   2017 WL 1273868, at *1 (D. Nev. Mar. 31, 2017) (*citing United States v. Marks*, 530 F.3d 799, 810

23   (9th Cir. 2008)).  Federal Rule of Civil Procedure 12(b)(1) provides for dismissal of an action for

24   lack of subject matter jurisdiction. "A party invoking the federal court's jurisdiction has the burden

25   of proving the actual existence of subject matter jurisdiction." *Thompson v. McCombe*, 99 F.3d 352,

26   353 (9th Cir. 1996). A motion to dismiss for lack of subject matter jurisdiction pursuant to Rule

27   12(b)(1) may take one of two forms. *Thornhill Publ'g Co. v. General Tel. & Elec. Corp*., 594 F.2d

28   730, 733 (9th Cir. 1979). It may be a "facial" challenge or it may be a "factual" challenge. Id. "In a

facial attack, the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction." *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004).

Alternatively, "[a] factual challenge relies on affidavits or any other evidence properly before the court to contest the truth of the complaint's allegations." *Courthouse News Serv. v. Planet*, 750 F.3d 776, 780 (9th Cir. 2014). When a factual challenge is asserted, the Court need not presume the truthfulness of the allegations in the complaint. *See Meyer*, 373 F.3d at 1039; *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000). "Once the moving party has converted the motion to dismiss into a factual motion by presenting affidavits or other evidence properly brought before the court, the party opposing the motion must furnish affidavits or other evidence necessary to satisfy its burden of establishing subject matter jurisdiction." *Savage v. Glendale Union High Sch.*, 343 F.3d 1036, 1040 (9th Cir. 2003).

Further, the abstention doctrine comprises four "extraordinary and narrow exception[s]" to a federal court's duty to exercise jurisdiction. *In re Joint E. & S. Dist. Asbestos Litig.*, 78 F.3d 764, 775 (2d Cir. 1996). Except in actions for declaratory judgment, in which a court has broader discretion to abstain, *see generally Wilton v. Seven Falls Co.,* 515 U.S. 277, 115 S.Ct. 2137, 2144, 132 L.Ed.2d 214 (1995), a district court's decision to abstain is appropriate only in order (1) to avoid a federal constitutional issue where that issue may be mooted or altered by a state-court ruling on the state-law question, *see Railroad Commission of Texas v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941); or (2) to avoid hindrance of such state functions as criminal prosecutions or the collection of state taxes, *see Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971); or (3) to conserve federal judicial resources in those "exceptional circumstances" where there is concurrent state-court litigation whose resolution could result in "comprehensive disposition of litigation," *Colorado River,* 424 U.S. at 813, 817, 96 S.Ct. at 1244, 1246 (internal quotation marks omitted); or (4) to defer to state resolution of difficult state-law questions that involve local regulation and administration or important matters of local public policy, *see, e.g., Kaiser Steel Corp. v. W.S. Ranch Co.,* 391 U.S. 593, 88 S.Ct. 1753, 20 L.Ed.2d 835 (1968) (per curiam); *Louisiana Power & Light Co. v. City of Thibodaux,* 360 U.S. 25, 79 S.Ct. 1070, 3 L.Ed.2d 1058

FENNEMORE CRAIG, P.C.
300 S 4th Street, Suite 1400
Las Vegas, Nevada 89101
Tel: (702) 692-8000   Fax: (702) 692-8099

FENNEMORE CRAIG, P.C.
300 S 4ᵗʰ Street, Suite 1400
Las Vegas, Nevada 89101
Tel: (702) 692-8000   Fax: (702) 692-8099

1   (1959); *Burford v. Sun Oil Co.,* 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943).

2          Under Federal Rule of Civil Procedure 12(b)(6), a claim may be dismissed if it does not

3   "state a claim upon which relief can be granted." Fᴇᴅ.R.Cɪᴠ.P. 12(b)(6).  When considering a

4   motion to dismiss under Rule 12(b)(6), the plaintiff's complaint is liberally construed and all well-

5   pleaded facts are taken as true.  *Syverson v. IBM Corp*., 472 F.3d 1072, 1075 (9th Cir. 2007).

6          Finally, "[w]here a party required under Rule 19 has not been joined, a party may move for

7   dismissal under Rule 12(b)(7)." *Cabrera-Morales v. UBS Trust Co.*, 769 F. Supp. 2d 67, 70 (D.P.R.

8   2011); *see also Alto v. Black*, 738 F.3d 1111, 1126 (9th Cir. 2013).

9   Further, the Ninth Circuit has recognized the following:

10         A Rule 19 motion poses "three successive inquiries." *Peabody II,* 400 F.3d at 779.

11   "First, the court must determine whether a nonparty should be joined under Rule
     19(a)." *Id.* That nonparty (or "absentee") is now referred to as a "person required to

12   be joined if feasible." If an absentee meets the requirements of Rule 19(a), "the
     second stage is for the court to determine whether it is feasible to order that the

13   absentee be joined." *Id.* "Finally, if joinder is not feasible, the court must determine
     at the third stage whether the case can proceed without the absentee" or whether the

14   action must be dismissed. *Id.* A nonparty in whose absence an action must be
     dismissed is one who "not only [has] an interest in the controversy, but [has] an

15   interest of such a nature that a final decree cannot be made without either affecting
     that interest, or leaving the controversy in such a condition that its final termination

16   may be wholly inconsistent with equity and good conscience." *Shields v. Barrow,* 58

17   U.S. 130, 139, 17 How. 130, 15 L.Ed. 158 (1855).

18   *E.E.O.C. v. Peabody W. Coal Co.*, 610 F.3d 1070, 1078 (9th Cir. 2010).

19   **III.     LAW AND ARGUMENT**

20         **A.     This case must be dismissed under FRCP 12(b)(6) for failure to state a claim as
                    Plaintiff's theory would require this Court to enforce an illegal contract.**

21

22         Enforcement of Plaintiff's theory of the Notes at issue would result in the enforcement of an

23   illegal contract.  No additional documents or evidence needs to be referenced outside the Complaint

24   itself.  According to the Complaint, the August Note purportedly "required [the ACC Entities] to (i)

25   use the $725,000.00 as operating capital [for Defendants' marijuana business]; (ii) pay $25,000 to

26   Bart Street as due diligence costs; (iii) pay $2.2 million dollars to [BP] to pay off a prior loan; (iv)

27   pay $275,000.00 to Insight Media, LLC; and (v) pay $275,000.00 to Hill Health, LLC." *See*

28   Complaint at ¶ 14.  According to the Complaint, the September Note "required [Defendants] to (i)

FENNEMORE CRAIG, P.C.
300 S 4th Street, Suite 1400
Las Vegas, Nevada 89101
Tel: (702) 692-8000   Fax: (702) 692-8099

use $500,000.00 to acquire parcel #040-041-35 in Nye County, Nevada …, and (ii) use $700,00.00 to acquire parcel #040-041-34 in Nye Count, Nevada…" *Id.* at ¶ 23. So, even if this case were just about the Notes – which it is not – and even if the Notes expressly required that the money be used as the Complaint asserts – which they do not – this case would still have to be dismissed for failure to state a claim under FRCP 12(b)(6) **because it would require this Court to enforce an agreement for the operation and expansion of a marijuana business, which is illegal under Federal law**, namely the Controlled Substance Act ("CSA"), codified at 21 USC § 801, et seq. Further, state law clearly state law provides the rule of decision on the merits in this case, since the Plaintiff's theory of the purported breach of contract would require this Court to find that a contract for the operation and expansion of a drug business was enforceable, which it cannot do. *See Crockett & Myers, Ltd. v. Napier, Fitzgerald & Kirby, LLP.*, 430 F. Supp. 2d 1157, 1162 (D. Nev. 2006) ("As the Court noted in its prior Order, Nevada recognizes the rule that "traditionally neither courts of law nor equity will interpose to grant relief to parties to an illegal agreement." *Shimrak v. Garcia–Mendoza,* 112 Nev. 246, 912 P.2d 822, 825–26 (1996)); *Rivero v. Rivero*, 125 Nev. 410, 429, 216 P.3d 213, 226 (2009) ("Parties are free to contract, and the courts will enforce their contracts if they are not unconscionable, illegal, or in violation of public policy."). And, in fact, the Plaintiff waived any right to federal court by agreeing that the Notes should be "governed by and construed under the laws of the State of Nevada, **as applied to agreements among Nevada residents, made and to be performed entirely within the State of Nevada, without giving effect to conflicts of laws principles**." *See* Exhibits 13 and 14 at ¶ 9 (second emphasis added). Accordingly, even if Bart Street's assertions were true, which they are not, the Complaint must be dismissed under FRCP 12(b)(6).

### B.   Under the Colorado River Doctrine, this Court should dismiss this action.

In addition, this case must be dismissed pursuant to the *Colorado River* doctrine. To determine whether a particular case presents the circumstances that warrant a *Colorado River* stay or dismissal, the district court must carefully consider "both the obligation to exercise jurisdiction and the combination of factors counseling against that exercise." *R.R. St. & Co. Inc. v. Transp. Ins. Co.*, 656 F.3d 966, 978–79 (9th Cir. 2011) (*citing Colorado River,* 424 U.S. at 818, 96 S.Ct. 1236.).

Drawing from *Colorado River, Moses H. Cone* and subsequent Ninth Circuit cases, the Ninth Circuit has recognized eight factors for assessing the appropriateness of a *Colorado River* stay or dismissal: (1) which court first assumed jurisdiction over any property at stake; (2) the inconvenience of the federal forum; (3) the desire to avoid piecemeal litigation; (4) the order in which the forums obtained jurisdiction; (5) whether federal law or state law provides the rule of decision on the merits; (6) whether the state court proceedings can adequately protect the rights of the federal litigants; (7) the desire to avoid forum shopping; and (8) whether the state court proceedings will resolve all issues before the federal court. *Id.*

### 1. Which court first assumed jurisdiction over any property at stake.

In this case, Defendants' State Court Complaint was filed prior to Bart Street's instant complaint. Therefore, this factor weighs in favor of dismissal.

### 2. The inconvenience of the federal forum.

The Defendants' Business is located in Pahrump, Nevada. Accordingly, it will be more convenient for all parties to litigate this case in Pahrump, in the Fifth Judicial District Court where Defendants' First Amended Complaint was filed.

### 3. The desire to avoid piecemeal litigation.

Here the desire to avoid piecemeal litigation always weighs in favor of dismissal, particularly given the fact that the Plaintiff's theory of the Notes at issue would require a finding that the suggested uses of the funds set forth in the Notes were actually mandatory requirements for use of the loaned funds, effectively requiring enforcement of illegal contracts as they would require Defendants to operate, and purchase land to expand and operate, a marijuana growhouse, which would be illegal under the CSA.

### 4. The order in which the forums obtained jurisdiction.

As set forth above, in this case, Defendants' state court complaint was filed prior to Bart Street's instant complaint and jurisdiction in Nevada was consented to in the Notes. Therefore, this factor weighs in favor of dismissal.

### 5. Whether federal law or state law provides the rule of decision on the merits.

FENNEMORE CRAIG, P.C.
300 S 4th Street, Suite 1400
Las Vegas, Nevada 89101
Tel: (702) 692-8000   Fax: (702) 692-8099

Here again the fact that the Plaintiff's theory of its purported case[6] would require a finding by the Court that a contract for the operation and expansion of an illegal drug business was enforceable – which this Court cannot find – requires dismissal.  In fact, in *In re Medpoint Mgmt., LLC*, 528 B.R. 178 (Bankr. D. Ariz. 2015), *vacated in part on other grounds,* No. BAPAZ151130KUJAJU, 2016 WL 3251581 (B.A.P. 9th Cir. June 3, 2016), the Court held that because the creditors at issue had voluntarily entered into an agreement with an LLC the creditors knew was in the medical marijuana business, or to build cultivation facility on LLC's behalf, despite the problems posed by illegality of the LLC's operations under federal law, in order to earn lucrative consulting and other fees, the creditors were barred by "unclean hands" doctrine from later seeking relief in federal bankruptcy court by filing involuntary Chapter 7 petition against the LLC when the LLC failed to pay creditors for their services.  *See also In re Rent-Rite Super Kegs W. Ltd.*, 484 B.R. 799 (Bankr. D. Colo. 2012) ("Whether characterized, strictly speaking, as application of "unclean hands" doctrine or simply as part of the court's totality of the circumstances "cause" analysis, Chapter 11 debtor's continued criminal activity, in deriving roughly 25% of its revenues from leasing warehouse space to tenants who, to debtor's knowledge, were engaged in business of growing marijuana without certificate of approval from the Drug Enforcement Agency (DEA), satisfied requirement of "cause" and required dismissal or conversion of its Chapter 11 case, whichever was in best interests of creditors and estate."); *see also Jenkins v. Micks*, 2014 U.S. Dist. LEXIS 160361, *15, 2014 WL 6241217 (N.D. Cal. Nov. 14, 2014) (dismissing a plaintiff's claim that his medical marijuana was seized in violation of due process because "Plaintiff lacks a federal Constitutional right to possess marijuana for medical purposes. Thus, he has no due process right under the Fourteenth Amendment in connection with the seizure or destruction of his medical marijuana.");  *Staffin v. County of Shasta*, 2013 U.S. Dist. LEXIS 64625, *12, 2013 WL 1896812 (E.D. Cal. May 6, 2013) (dismissing a claim for violation of the Contract Clause because the relevant contract related to distribution and cultivation of medical marijuana, and "marijuana is contraband under federal law," and "[t]herefore, under federal law for the purposes of Contract Clause analysis, no valid agreement exists.")

---

[6] Defendants in no way concede Plaintiff's theory of its case is accurate, legally or factually.

FENNEMORE CRAIG, P.C.
300 S 4th Street, Suite 1400
Las Vegas, Nevada 89101
Tel: (702) 692-8000   Fax: (702) 692-8099

Here, clearly state law provides the rule of decision on the merits in this case, since – even though this is a breach of contract case – the Plaintiff's theory of the purported breach of contract would require this Court to find that a contract for the operation and expansion of a drug business was enforceable, which it cannot do.  *See Crockett & Myers, Ltd. v. Napier, Fitzgerald & Kirby, LLP.*, 430 F. Supp. 2d 1157, 1162 (D. Nev. 2006) ("As the Court noted in its prior Order, Nevada recognizes the rule that "traditionally neither courts of law nor equity will interpose to grant relief to parties to an illegal agreement." *Shimrak v. Garcia–Mendoza,* 112 Nev. 246, 912 P.2d 822, 825–26 (1996));  *Rivero v. Rivero*, 125 Nev. 410, 429, 216 P.3d 213, 226 (2009) ("Parties are free to contract, and the courts will enforce their contracts if they are not unconscionable, illegal, or in violation of public policy.").  Accordingly, Plaintiff's Complaint must be dismissed pursuant to FRCP 12(b)(6) for failure to state a claim upon which relief can be granted as well.

> **6.      Whether the state court proceedings can adequately protect the rights of the federal litigants.**

For similar reasons, this factor weighs heavily in favor of dismissal as well.  Not only can the state court adequately protect any rights of Plaintiff, but in fact this Court cannot adequately protect the purported rights of either the Plaintiff or the Defendants.  As set forth above,  Defendants have several claims for breach of contract against Counter-defendants in connection with the Post-Recreational financing that Counter-defendants agreed to, and then failed to provide.  The $9M Deal was for the Parties to go into business together growing and selling marijuana.

As set forth above, even if this case were only based on the Notes, dismissal is necessary. But, as the facts set forth above make clear, Bart Street's misleading and inaccurate assertions are conclusively disproven by the Parties' communications and admissions.  Thus, Defendants will be asserting numerous counterclaims against the Counter-defendants based on the breach of the Parties' $9M Deal.  The question of whether a contract such as the $9M Deal exists is one of fact for a jury to decide.  *May v. Anderson*, 121 Nev. 668, 672, 119 P.3d 1254, 1257 (2005) ("[t]he question of whether a contract exists is one of fact…").  Thus, if the Court were to retain this matter (assuming there was a way around the fact that Plaintiff's entire theory is that the Notes required Defendants to operate and expand their marijuana business and are therefore illegal and

**FENNEMORE CRAIG, P.C.**
300 S 4ᵗʰ Street, Suite 1400
Las Vegas, Nevada 89101
Tel: (702) 692-8000   Fax: (702) 692-8099

unenforceable under Federal law) and the jury were to decide that, in fact, the $9M Deal did exist, Defendants could not be awarded damages or other relief for breach of the Parties' $9M Deal because it is a deal for the Parties to go into business together to grow and sell marijuana in violation of the CSA and therefore unenforceable.   Thus, Defendants' rights would have no protection whatsoever.

Conversely, if this matter were in State Court, the State Court could enforce a contract that was valid under State law, and all Parties' rights would be protected.   Accordingly, because this Court cannot adjudicate these claims without enforcing what amounts to an illegal contract under Federal law, this factor cuts in favor of dismissal.

### 7.   The desire to avoid forum shopping.

This factor favors dismissal as well.   The only reason Plaintiff would not want its claims adjudicated at the site of the parties' business and related interests is because the Plaintiff is attempting to forum shop.   Thus, dismissal is warranted.

### 8.   Whether the state court proceedings will resolve all issues before the federal court.

As set forth above, the state court proceedings will resolve – and state court is the only forum that can resolve – the issues presented in this case.   Accordingly, dismissal is warranted.

///

### C.   Under the *Burford* Doctrine, this Court should dismiss or stay the instant action.

The power to dismiss under the *Burford* doctrine derives from the discretion historically enjoyed by courts of equity."   *Waugh v. Nevada State Bd. of Cosmetology*, 36 F. Supp. 3d 991, 1005 (D. Nev. 2014).   The exercise of this discretion must reflect principles of federalism and comity.   *Id*. Courts must consider "the federal interest in retaining jurisdiction over the dispute and the competing concern for the 'independence of state action' " in determining whether "the State's interests are paramount and that a dispute would be best adjudicated in a state forum."   *Id*. Importantly, "[t]his balance only rarely favors abstention, and the power to dismiss recognized in *Burford* represents an extraordinary and narrow exception to the duty of the District Court to

adjudicate a controversy properly before it." *Id.* *Burford* abstention normally requires dismissal of the federal action. *Knudsen Corp. v. Nevada State Dairy Comm'n*, 676 F.2d 374, 377 (9th Cir. 1982). *Burford* abstention and dismissal is appropriate "(1) when there are difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar; or (2) where the exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern." *Gilbertson v. Albright*, 381 F.3d 965, 974 (9th Cir. 2004) (citations omitted).

Here there are difficult – if not impossible – questions of state law bearing on policy issues of substantial public import in this case and the importance of the regulatory issues relating to medical and recreational marijuana certainly transcend this individual case. Further, federal review of Nevada's recreational marijuana laws is not only disruptive of state efforts to establish a coherent policy, but legally impossible given the CSA and this Court's inability to enforce what under Federal law would be considered illegal contracts for the operation and expansion of marijuana growhouses. Accordingly, this action must be dismissed.

    **D.**    <u>**Solutionary is a necessary and indispensable party and complete relief cannot be according without Solutionary.**</u>

FRCP 12(b) provides in relevant part:

**(b) How to Present Defenses.** Every defense to a claim for relief in any pleading must be asserted in the responsive pleading if one is required. But a party may assert the following defenses by motion:

    **(1)** lack of subject-matter jurisdiction;
    **...**
    **(6)** failure to state a claim upon which relief can be granted; and
    **(7)** failure to join a party under Rule 19.

Fed. R. Civ. P. 12 (West 2009). A party may not "avoid the requirement of complete diversity by failing to join a nondiverse party if that person is 'indispensable' to the proper resolution of the litigation." *Chesapeake & Ohio Ry. Co. v. Certain Underwriters at Lloyd's, London,* 716 F. Supp. 27, 29 (D.D.C. 1989), *rev'd on other grounds*, 910 F.2d 960 (D.C. Cir. 1990) (*citing* 14 C. Wright,

FENNEMORE CRAIG, P.C.
300 S. 4th Street, Suite 1400
Las Vegas, Nevada 89101
Tel: (702) 692-8000  Fax: (702) 692-8099

A. Miller, & E. Cooper, *Federal Practice and Procedure* § 3637 (2d ed. 1986)).  Rule 19 sets forth a two-step analysis for the required joinder of parties. First, courts must determine whether a party is required and must therefore be joined. Fed. R. Civ. P. 19(a). If so, and if joinder is not feasible, then the court must next balance the equitable factors set forth in Rule 19(b) to decide if the party is indispensable such that the action should be dismissed. Fed. R. Civ. P. 19(b).

Further, "[w]here a party required under Rule 19 has not been joined, a party may move for dismissal under Rule 12(b)(7)." *Cabrera-Morales v. UBS Trust Co.*, 769 F. Supp. 2d 67, 70 (D.P.R. 2011); *see also Alto v. Black*, 738 F.3d 1111, 1126 (9th Cir. 2013); *E.E.O.C. v. Peabody W. Coal Co.*, 610 F.3d 1070, 1078 (9th Cir. 2010).

In this case, despite Plaintiff's failure to admit the truth, Solutionary-NV is necessary and indispensable under the Ninth Circuit's required analysis.  There is significant email correspondence from Counter-defendants to Defendants in which Counter-defendants admit the existence of the $9M Deal, and confirm that there are multiple entities involved in the negotiation and deal, as set forth above. Idelman confirms that he did agree to "prorated equity with caveat [sic] that our **debt piece conversion rights** are good regardless of when we convert and that if you needed to raise more money then we would have right of first refusal **and if we didn't convert the [sic] any future dilution would come from you and Howard**."  *See* Exhibit 20 hereto (emphasis added), August 29, 2016 email correspondence from Idelman to Pete Seltzer (principle of Calvada) and Howard Misle (principle of the ACC Entities) (referred to herein as the "August 2016 Email").  Why would Idelman, on behalf of Counter-defendants, be discussing **future dilution** if, as Bart Street currently claims, this was merely a loan transaction and no subsequent oral modification of the parties' agreement took place?  And, in fact, Idelman's August 2016 Email was in response to an email from Mr. Seltzer earlier that day in which Mr. Seltzer points out that he was told that the "9 [million dollar] equity deal had changed to 6 [million] equity and 3 [million] debt which Howard [Misle] agreed too [sic].  In this email I clearly stated we are ok with this but needed to pro rate the percentage then as original deal called for 20% for 9 [million] and now it was only 6 [million]."  *Id*. **Idelman's response confirms the parties has orally modified the original loan agreement.**  In fact, Idelman specifically says that he "**did agree to prorated equity**…"  *Id*.  Clearly the Parties are

FENNEMORE CRAIG, P.C.
300 S 4th Street, Suite 1400
Las Vegas, Nevada 89101
Tel: (702) 692-8000   Fax: (702) 692-8099

talking about an agreement which is different than that alleged in Bart Street's complaint which only involves, according to Bart Street, two loans totaling $4.7 million.  *See* Complaint at ¶ 13 (loan of $3.5 million) and ¶ 22 (loan of $1.2 million).  Yet, in the August 2016 Email Idelman is clearly acknowledging the agreement between the parties for a total of **$9 million**.  Plaintiff is attempting to evade the truth regarding the Parties' $9M Deal to attempt to create the appearance of diversity jurisdiction that does not exist.

Further, it is true that under FRCP 19(a)(1)(A), an absent party is a necessary party if "in that person's absence, the court cannot accord complete relief among existing parties."  However, Defendants will be unable to pursue their counterclaims against Solutionary-NV[7] which are clearly mandatory as they involve the same transactions that will be litigated in the instant case.  Further, there is no dispute that Idelman, principal of Plaintiff, corresponded with Defendants on multiple occasions through email using a signature block on his email which included the email address steveidelman@solutionary.com.  Accordingly, Solutionary is a necessary and indispensable party in this matter.

**E.    NRS 78.585(1) does not apply in this case.**

Plaintiff will likely argue that because NRS § 78.585(1) provides for a three year statute of limitations for dissolved corporations for events that occurred prior to dissolution.  Plaintiff will likely argue that once three years have lapsed after a corporation's dissolution, the corporation can never be sued again under any circumstance.  This is legally incorrect.  If Plaintiff's errant reasoning were adopted it would permit a corporation to be dissolved, wait three years, then be revived and reinstated **with no potential future liability whatsoever**.  Thus, Plaintiff's reading of the statute is incorrect and does not prevent Solutionary from being joined to this litigation as the necessary and indispensable party it is.

NRS 78.730 provides in relevant part that ***any corporation which did exist*** or is existing

---

[7] As noted in the Motion, and as Plaintiff deliberately omits, Idelman did not mention by name the Nevada entity which was a necessary part of the subsequent oral modification to the parties' loan agreements.  During the negotiations regarding the subsequent oral modification, Idelman corresponded with Defendants with a signature block which included the email address steveidelman@solutionary.com.  For ease of reference the entity at issue will be referred to as Solutionary, although Defendants expressly reserve the right to amend any pleadings necessary to assert the true name of the entity at issue.

FENNEMORE CRAIG, P.C.
300 S 4th Street, Suite 1400
Las Vegas, Nevada 89101
Tel: (702) 692-8000   Fax: (702) 692-8099

under the laws of this State ***may***, upon complying with the provisions of <u>NRS 78.180</u>, ***procure a renewal or revival*** of its charter for any period, together with all the rights, franchises, privileges and immunities, and subject to all its existing and preexisting debts, duties and liabilities secured or imposed by its original charter and amendments thereto, or existing charter, by making the required filings. *See* NRS 78.730. Further, unlike reinstatement, which has a 5-year limited (NRS 78.180(4)), revival has no time limit. *Redl v. Heller*, 120 Nev. 75, 79-80, 85 P.3d 797, 799-800 (2004) ("a corporation seeking reinstatement cannot be reinstated if its charter has remained revoked for a period of five consecutive years. There is no similar restriction on revival. … Although a corporation cannot be reinstated after five years, there is no provision under NRS 78.730 that prevents a corporate revival after five years.").

Thus, under Nevada's statutes governing corporations Solutionary-NV can be both **revived** and **renewed** by simply filing a few documents and paying the proper fees. Thus, any assertion that it is somehow "factually impossible" for the parties to have discussed Solutionary-NV being part of the subsequent oral modification to the parties' agreement is nonsensical and demonstrates either a complete misunderstanding of Nevada's statutory corporate structure, or a willingness to attempt to mislead this Court to believe that a necessary and indispensable party to the parties' subsequent oral modification of the loans, and therefore to this lawsuit, does not exist.

Further, while it is true that an absent party may, under certain circumstances, be an entity who "claims an interest relating to the subject of the action" under FRCP 19(a)(1)(B), that is only one of multiple ways an entity can be a necessary party to an action. Further, as noted above, the fact that Solutionary-NV is not mentioned on the Notes is irrelevant as this case centers around the entirety of the Parties' $9M Deal, not simply the Notes, which were only a part of the deal.

Moreover, Solutionary-NV is absolutely an indispensable party to this litigation. Without Solutionary-NV being joined as a party Defendants will be unable to pursue mandatory counterclaims against Solutionary-NV for breach of the Parties' $9M Deal and therefore Plaintiff's Complaint must be dismissed.

Further, a party asserting improper joinder of another party to defeat diversity jurisdiction carries a "heavy burden" of persuasion. *Hunter v. Philip Morris USA*, 582 F.3d 1039, 1046 (9th

FENNEMORE CRAIG, P.C.
300 S 4th Street, Suite 1400
Las Vegas, Nevada 89101
Tel: (702) 692-8000   Fax: (702) 692-8099

Cir.2009).   "The defendant must demonstrate that there is *no possibility* that the plaintiff will be able to establish a cause of action in state court against the alleged sham defendant." *Good v. Prudential Ins. Co. of Am.,* 5 F.Supp.2d 804, 807 (N.D.Cal.1998).

Here Bart Street cannot meet this burden.   In fact, as set forth in the First Amended Complaint in the state court litigation, Defendants have , in fact, established several causes of action in state court against Solutionary-NV, referenced above.   The "critical question" under Rule 19(b)— and thus the key to whether a party is "indispensable"—is "'whether in equity and good conscience' the action may proceed in [the party's] absence." *B. Fernandez & Hnos, Inc. v. Kellogg USA, Inc.*, 516 F.3d 18, 23 (1st Cir. 2008) (quoting FED. R. CIV. P. 19(b)).   Accordingly, because this action cannot proceed with Solutionary-NV, Defendants' Motion should be granted.

**F.   All factors require joinder of Solutionary-NV and because Solutionary-NV's joinder would destroy diversity jurisdiction, this matter must be dismissed.**

Rule 19(b) provides four non-exhaustive factors for the trial court to consider in determining whether a party is indispensable:

> (1) the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties;

> (2) the extent to which any prejudice could be lessened or avoided by: (A) protective provisions in the judgment; (B) shaping the relief; or (C) other measures;

> (3) whether a judgment rendered in the person's absence would be adequate; and

> (4) whether the plaintiff would have an adequate remedy if the action were dismissed for non-joinder.

In deciding a motion to dismiss under Rule 12(b)(7), a court is not limited to the pleadings and may consider other relevant extra-pleading evidence.   *Hohri v. United States*, 782 F.2d 227, 241 (D.C. Cir. 1986), *vacated on other grounds*, 482 U.S. 64 (1987); *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992); 5C CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1359, at 68 (3d ed. 2004) (WRIGHT & MILLER). A defendant may move to dismiss a complaint for "failure to join a party under Rule 19."   Fed. R. Civ. P. 12(b)(7).   Courts may consider materials outside the pleadings in resolving a motion to dismiss under Rule 12(b)(7), *Anderson v. Hall,* 755 F. Supp. 2, 5 (D.D.C. 1991), and consideration

FENNEMORE CRAIG, P.C.
300 S 4th Street, Suite 1400
Las Vegas, Nevada 89101
Tel: (702) 692-8000   Fax: (702) 692-8099

of such materials will not convert the motion into a Rule 56 motion for summary judgment, *see Estes v. Shell Oil Co.,* 234 F.2d 847, 849 n.5 (5th Cir. 1956).

Here, as set forth above, Defendants will be unable to pursue mandatory counterclaims against Solutionary-NV if it is not named as a plaintiff in this matter.  Bart Street has deliberately excluded Solutionary-NV from this action in violation of FRCP 12(b)(1), 12(b)(7) and 19 and therefore the Plaintiff's complaint must be dismissed.  All factors set forth in the Rule 19 analysis weigh in favor of dismissal.  Any judgment rendered in Defendants' favor will not include all parties against whom Defendants will be entitled to collect, including Solutionary-NV.  Second, there are no measures that can be taken aside from joining Solutionary, that would lessen or avoid the damage to Defendants in not being able to pursue its claims against all applicable entities.  However, joining Solutionary-NV as a plaintiff would destroy the Court's diversity jurisdiction and therefore the instant Complaint must be dismissed.  Third, as set forth above, no judgment rendered in the absence of the missing plaintiff/counter-defendant would be adequate.  The fourth factor weighs heavily in favor of dismissal as Counter-defendants have an adequate remedy in state court.

In addition, it should be noted that in the Removed Action, Solutionary-NV has never appeared.  The only "Solutionary" entity that has appeared in the Removed Action is a dissolved Delaware corporation ("Solutionary-DE").  The entity sued in this matter is a Nevada corporation which has been properly served and which has not appeared ("Solutionary-NV").  Solutionary-NV has not appeared in the Removed Action, and likely will not appear in the instant action if named as counter-defendant.  This is important because if counsel for Solutionary-DE (which is the only Solutionary entity that has appeared in the Removed Action) does not represent Solutionary-NV, then Plaintiffs are entitled to a default against Solutionary-NV, thereby conclusively destroying diversity.  And, in fact, counsel for Defendants (Plaintiffs in the Removed Action) served requests for production ("Requests") on Solutionary-DE as they incorrectly purport to be the named defendant in this action.  Solutionary-DE's responses ("Responses") to the Requests are attached hereto as **Exhibit 24**.  In responding to the 16 requests for production**, <u>Solutionary-DE asserts a total of 15 times that "Solutionary-NV does not exist", conclusively and irrevocably establishing that Solutionary-DE's counsel does not represent the defendant in the Removed</u>**

**FENNEMORE CRAIG, P.C.**
300 S 4ᵗʰ Street, Suite 1400
Las Vegas, Nevada 89101
Tel: (702) 692-8000   Fax: (702) 692-8099

**Action (and necessary party and counter-defendant in this action), Solutionary-NV.**
Moreover, Solutionary-DE also asserts, a total of **31 times**, that the only entity named "Solutionary, Inc." is a Delaware entity.  This is demonstrably inaccurate.  Attached as **Exhibit 25** hereto are the incorporation documents for Solutionary-NV, an entirely separate corporate entity from Solutionary-DE.  Put another way, Solutionary-DE's position is essentially that if two individuals – one from Nevada and one from Nebraska – are both named "Bob Jones", they must be the same individual.  These statements by Solutionary-DE demonstrate conclusively that Solutionary-NV is not represented.  How can counsel represent an entity they claim does not exist?  Thus, Solutionary-NV is not represented in the Removed Action – and ostensibly would not be represented as a counter-defendant in this action – and, since it has been properly served in the Removed Action, a three-day notice of intent to take default has been filed, and no response has been submitted by Solutionary-NV, Defendants are entitled to a default against Solutionary-NV in the Removed Action, thereby defeating diversity jurisdiction.  Accordingly, the Motion must be granted.

**IV.**     **CONCLUSION**

For all these reasons, Defendants respectfully request that this Court grant this Renewed Motion, and grant such other and further relief as the Court deems appropriate.

DATED this 26th day of October,  2017.     **FENNEMORE CRAIG, P.C.**

By    /s/ Brenoch R. Wirthlin
Brenoch Wirthlin, Esq. (Bar No. 10282)
*Attorneys for Defendants*