MCNUTT LAW FIRM, P.C.
Daniel R. McNutt, Esq., Bar No. 7815
Matthew C. Wolf, Esq., Bar No. 10801
625 South Eighth Street
Las Vegas, Nevada 89101
Tel.: (702) 384-1170 / Fax.: (702) 384-5529
drm@mcnuttlawfirm.com
mcw@mcnuttlawfirm.com
*Counsel for Plaintiff*

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| BART STREET III, a Nebraska Limited Liability Company,<br><br>        Plaintiff,<br><br>vs.<br><br>ACC ENTERPRISES, LLC, a Nevada Limited Liability Company; ACC INDUSTRIES, INC., a Nevada corporation; CALVADA PARTNERS, LLC, a Nevada Limited Liability Company;<br><br> Defendants. | Case No.: 2:17-cv-00083-GMN-VCF<br><br>**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**<br><br>*Oral Argument Requested Per L.R. 78-1* |

Pursuant to FRCP 56, Plaintiff Bart Street respectfully requests summary judgment on its contract and unjust enrichment claims against ACC Enterprises ("Enterprises"), ACC Industries ("Industries") (collectively, "ACC"), and Calvada Partners ("Calvada") (ACC and Calvada are collectively referred to as "Defendants").

### I.    INTRODUCTION.

In 2016, Bart Street made two loans to Defendants totaling $4.7M. Defendants signed two promissory notes in which they promised to repay the loans on September 1, 2017. Defendants admit they signed the notes, received the money, and used it to purchase real estate and repay prior loans. Defendants also admitted that the notes are the only signed agreements between the parties and that the loans were required to be repaid on September 1, 2017. In fact, prior to September 1, 2017, Defendants filed a brief in this case in which they unequivocally told this Court that "Plaintiff will be repaid when the parties agreed that it would be repaid – September 2017." *See* Defs.' Opp'n to Bart Street's Mot. for Sum. Judg., March 14, 2017, ECF No. 35, 22:4-5. To date, however, Defendants have not repaid any principal or interest for the loans.

Defendants contend they are not obligated to repay the loans because (1) the parties entered a subsequent agreement modifying the notes, and (2) the notes are unenforceable. With respect to Defendants' first contention, contract formation and interpretation are questions of law. Because the notes unambiguously state that Defendants must repay the $4.7M to Bart Street, the parol evidence rule precludes Defendants from attempting to argue that despite the plain and clear language in the notes, the parties never intended for the $4.7M to be repaid. Additionally, although the parties discussed myriad *potential* deals, their negotiations never culminated in any contracts other than the notes. Defendants claim that the parties' oral and email negotiations concerning other *possible* deals form a binding, enforceable contract that modifies the notes. No email exists, however, in which Bart Street agreed that Defendants did not have to repay the loans, and the parties' emails demonstrate that they never agreed to the essential, material terms for another contract. Additionally, the purported agreement modifying the notes is barred by the statute of frauds. In short, having never been modified or rescinded, the notes remain valid and enforceable.

With respect to enforcing the Notes, this Court previously concluded that:

> "Applying Nevada law to this case, the Court finds that it can provide a remedy for Plaintiff that both complies with Nevada substantive law and does not conflict with federal law. This finding comes from the fact that several requirements of the First and Second Promissory Notes command Defendants to use the loaned funds for solely legal acts. The First Promissory Note, for example requires Defendants to use certain funds to pay off Defendants' prior lenders. (First Promissory Note at 2, Ex. 1 to Compl.). Similarly, the Second Promissory Note requires Defendants to use all the funds to purchase two parcels of land in Pahrump, Nevada (Second Promissory Note at 2, Ex. 2 to Compl.). Because of these explicit directives, enforcing those terms of the Promissory Notes as shown in the Complaint does not mandate any action that would violate the Controlled Substances Act under federal law; nor does it provide any discretion to Defendants that would enable them to use the funds for the cultivation or possession of cannabis."

*See* the Order on Defs.' Mot. to Dismiss (the "Order"), Sept. 27, 2018, ECF No. 155, 9:18 - 10:4. These conclusions are now "law of the case." *See, e.g., United States v. Bundy*, No. 2:16-CR-46-GMN-PAL, 2017 WL 2938196, at *1 (D. Nev. July 9, 2017) (wherein this Court discussed the "law of the case" doctrine).

With respect to Defendants' second contention, this Court previously concluded that except

for the "right of first refusal" and "operating capital" provisions, the provisions in the notes "command the Defendants to use the loaned funds for solely legal acts." *See* Order 9:21; *see also id*. 11:9-20 (referring to the "limited enforceability" of the notes).[1] This Court also said that whether the "right of first refusal" and "operating capital" provisions can be severed from the notes "is a question to be decided through evidence that such action would be in line with the parties' intent in contracting and that the unenforceable provisions are collateral to the overall agreement." *Id*. 11:2-5. The undisputed evidence shows those provisions can and should be severed. The main reason Defendants borrowed money from Bart Street is that they were facing critical deadlines to purchase real property and repay prior loans. The "right of first refusal" and "operating capital" provisions are collateral to that main purpose, and the severance of those provisions would be consistent with the parties' intent when they entered the notes.

For these reasons, this Court should enter summary judgment for Bart Street.

## II.   STANDARD OF REVIEW.

"Typically, suits on promissory notes provide fit grist for the summary judgment mill." *Fed. Sav. & Loan Ins. Corp. v. Musacchio*, 695 F. Supp. 1044, 1053 (N.D. Cal. 1988) (quoting *FDIC v. Cardinal Oil Well Servicing Co., Inc.*, 837 F.2d 1369, 1371 (5th Cir. 1988)). "Summary judgment should be granted where the evidence shows that 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Eat Right Foods Ltd. v. Whole Foods Mkt., Inc.*, 880 F.3d 1109, 1118 (9th Cir. 2018) (quoting FRCP 56(a); citing *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 247 (1986)). "A material fact is one 'that might affect the outcome of the suit under the governing law.'" *Id*. (quoting *Anderson*, 477 U.S. at 248). A dispute over a material fact is genuine only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. This Court should enter summary judgment for Bart Street because there are no genuine disputes as to any material fact and Bart Street is entitled to judgment as a matter of law.

---

[1]      Bart Street's First Amended Complaint does not seek any relief related to any right of first refusal. ECF No. 165.

### III.   UNDISPUTED FACTS.

**A.**   ***Fact #1: At All Relevant Times, Howard Misle and Pete Seltzer Were Owners and Operators of Defendants and Testified as Defendants' FRCP 30(b)(6) Representatives.***

1.   From 2016 until early 2019, Howard Misle was a managing member of Enterprises and Industries' president, secretary, and director, and Pete Seltzer was a managing member of Enterprises, Industries' treasurer, and Calvada's manager. Ex. 1, Enterprises' Ans. to Interrog. #1, Aug. 4, 2017; *see also* Ex. 2, Industries' Ans. to Interrog. #1, Aug. 4, 2017; Ex. 3, Calvada's Ans. to Interrog. #1, Aug. 4, 2017. In May 2016, Enterprises acquired Industries' assets. Ex. 4, DEFT002089-2150; *see also* Ex. 5, Misle Dep. 128:7 – 129:9 (authenticating DEFT002089-2105); 39:1-11 (ACC reorganized from a C corporation to an LLC); 129:10-14 (Industries currently does not have any assets). In 2019, Misle bought Seltzer's interests and became Enterprises and Calvada's main owner. *Id.* 13:12-25; 19:18-20; 20:6-14; 21:14 – 22:19. In March 2019, Bart Street deposed Misle and Seltzer in their individual capacities and as Defendants' Rule 30(b)(6) representatives. Ex. 5, Misle Dep. 9:5-15; *see also* Ex. 6, Seltzer Dep. 8:17 – 9:13.

**B.**   ***Fact #2: Sean Mullen and Steve Idelman are Members of Bart Street, Mullen is Bart Street's Sole Manager, and Bart Street Was Formed to Lend Money to Defendants.***

2.   The members of Bart Street are (1) Stavely Wright; (2) Steve Idelman, through the entity Monster Production Inc.; and (3) Sean Mullen, through the entity Eight Ball LLC. Ex. 7, Mullen Dep. 19:17 – 20:13. Mullen is Bart Street's sole manager. *Id.* 21:12-18. Bart Street was formed to lend money to Defendants. *Id.* 23:4-5.

**C.**   ***Fact #3: Before Borrowing from Bart Street, Industries Borrowed from Nonparties Hill Health, Insight Medica, and Beverly Pacific.***

3.   In August 2015, Hill Health and Insight Medica (collectively, "HHIM") each lent $250,000 to Industries. Ex. 8, the HHIM Loan Agreements; *see also* Ex. 5, Misle Dep. 99:8 – 102:20. In March 2016, nonparty Beverly Pacific ("BP") lent $2M to Industries. Ex. 9, BART01955-61; *see also* Ex. 5, Misle Dep. 39:12-25; 114:18 – 115:3; 115:10-12.

4.   Notably, when HHIM and Misle decided to modify the HHIM loan agreements, the parties modified the loan agreements in writing and physically executed the modified loan

4

agreements. Ex. 8, the HHIM Loan Agreements; *see also* Ex. 5, Misle Dep. 99:8 – 105:1 (at a dinner meeting, Misle modified the HHIM loan agreements via handwriting).

### D. *Fact #4: Bart Street Lent Defendants $4.7M in 2016.*[2]

5.      On August 19, 2016, Bart Street lent ACC $3.5M. Ex. 10, the First Note; *see also* Ex. 5, Misle Dep. 65:9 – 66:15. On September 6, 2016, Bart Street lent Defendants an additional $1.2M. Ex. 11, the Second Note; *see also* Ex. 5, Misle Dep. 83:21 – 84:25; 44:5-8; 83:17-20; 156:4-8; 250:4-7; 171:20-24. The Notes required Defendants to repay the Loans on September 1, 2017. *See* the Notes ¶ 1; *see also* Ex. 6, Seltzer Dep. 56:11-15; Ex. 5, Misle Dep. 68:4-7; 93:2-8; 216:16-19; 93:14-17. The Notes are legally binding contracts. Ex. 5, Misle Dep. 172:2-4.

6.      Seltzer took the lead for Defendants on negotiating the Notes. Ex. 5, Misle Dep. 64:1-3. The law firm Fennemore Craig reviewed the Notes and advised Seltzer to sign them. Ex. 6, Seltzer Dep. 47:23 – 48:15. Seltzer understood he was signing promissory notes. *Id.* 48:16 – 49:6; 50:6-12. He also understood the word "borrower" in the Notes to mean "someone who would be lent money, who is being lent by a party that is not taking an equity position. They're just lending you the money and you pay it back with whatever agreed upon consideration there is." *Id.* 41:13-20. He also understood the word "loan" in the Notes to mean "[a]n amount of currency that one party provides to another party based on getting it repaid with whatever consideration the two parties agree to by whatever specific date." *Id.* 41:22 – 42:3.

### E. *Fact #5: The Primary Purpose of the Loans was to Enable Defendants to Purchase Real Property and Repay HHIM and BP.*

7.      The First Note required ACC to pay $2.2M to BP and $550,000 to HHIM. *See* the First Note pg. 1. The Second Note required Defendants to use $500,000 to purchase 1241 E. Calvada Blvd. and $700,000 to purchase 1261 E. Calvada Blvd. (the "Real Property"). *See* the Second Note pg. 1. Defendants knew they were required to use the Loans for these purposes. Ex. 6, Seltzer Dep. 53:6-17; 54:17-20; 55:2-15; *see also* Ex. 5, Misle Dep. 85:4-12 (the Second Loan

---

[2]      Herein, (1) "First Loan" refers to loan referenced in the promissory note dated August 19, 2016; (2) "First Note" refers to the promissory note dated August 19, 2016: (3) "Second Loan" refers to the loan referenced in the promissory note dated September 6, 2016; (4) "Second Note" refers to the promissory note dated September 6, 2016; (5) "Loans" refers collectively to the First and Second Loans; and (6) "Notes" refers collectively to the First and Second Notes.

"was specifically to buy real estate? A. Yes."); 85:15-25; 240:1-3 (the First Loan "was to be used for these specific purposes; correct? A. That was what it was supposed to be used for.")

8.      Bart Street made the Loans because Defendants were facing deadlines to purchase the Real Property and repay HHIM and BP. *See*, *e.g.*, Ex. 12, Seltzer Email, Aug. 19, 2016, BART01195 ("[W]e are eager to pay the [HHIM] loan off now before going into revenue period next month[.]"); *see also* Ex. 6, Seltzer Dep. 122:10-24 (authenticating BART01195); 123:2-14 (ACC wanted to repay HHIM before September 2016); 123:15-20 (repaying HHIM was one reason ACC wanted the First Loan); 45:12 – 47:15 (ACC "needed money quickly" to repay HHIM); Ex. 13, Mullen Email, Oct. 4, 2016, BST003302 ("We advanced these monies almost a month ago because you told us that you were up against a critical time issue on both the real estate and the BP note."); Ex. 6, Seltzer Dep. 190:17-22 (the "critical time issue" referenced in BST003302 involved repaying HHIM and purchasing the Real Property); Ex. 7, Mullen Dep. 106:19-20 (Bart Street "advanced money to help [Defendants] pay off some debts."); 122:10-12 (Defendants "wanted to borrow money from us to pay out BP."); 125:5-8 (Defendants wanted to repay HHIM).

9.      Enterprises used the First Loan to repay HHIM. Ex. 14, DEFT001962-67; *see also* Ex. 5, Misle Dep. 69:13-18; 70:12-14; 105:3-20; Ex. 6, Seltzer Dep. 155:12 – 156:15. Similarly, as required by the Second Note, Calvada used the Second Loan to purchase the Real Property. Ex. 5, Misle Dep. 86:4; 87:8-11; 90:16 – 91:4; 281:19-21.

F.      *Fact #6: Defendants Failed to Repay BP.*

10.     Defendants knew they were required to use $2.2M from the First Loan to repay BP. Ex. 5, Misle Dep. 149:8-11 (You took "2.2 million as part of the $3.5 million promissory note for the express purpose of paying off BP; correct? A. Correct."); 74:10-13 (The First Note "required you to use the $2.2 million to pay off Beverly Pacific; correct? A. It was supposed to go to that."); 188:21-22 ("[Q.] . . . Bart Street loaned you money to pay off BP; right? A. Yes."); *see also* Ex. 15, Seltzer Email, Aug. 24, 2016, DEFT000123 (wherein Seltzer said ACC "will be paying BP back its $2mil loan" with the First Loan); Ex. 6, Seltzer Dep. 253:15-21 (authenticating DEFT000123); 255:11-23 (Seltzer understood BP would be repaid with Bart Street's money).

11.     ACC did not repay BP as required by the First Note. Ex. 5, Misle Dep. 82:12-16;

116:17-20; 117:13-21. Instead, on October 24, 2016, it converted the BP loan to equity in Enterprises for BP's successor-in-interest, Vert Holdings, LLC ("Vert"). Ex. 16, the Vert Membership Interest Purchase Agreement, § 1.4; *see also* Ex. 5, Misle Dep. 123:6 – 124:24. Rather than using the $2.2M to repay BP, Defendants pocketed the money.

12. ACC contends that Bart Street agreed to allow it to keep the $2.2M as operating capital. In a declaration, Misle claims that in late August 2016, Bart Street agreed Defendants could convert the BP loan to equity. *See* Misle Decl., March 14, 2017, ¶¶ 24-25, ECF No. 35 at ECF pg. 30; *see also* Ex. 5, Misle Dep. 72:7-17 (around the time of the First Note, Bart Street agreed Defendants could convert the BP loan). Reasonable minds could not differ in concluding that Bart Street never agreed to allow Defendants to keep the $2.2M as operating capital:

a. On September 27, 2016, Mullen asked Misle, "[W]hat is the status of the BP loan payoff?" Ex. 17, BST003315. Misle responded, "Should be wrapped up this week." *Id.* In this email, Misle told Mullen the BP loan would be paid off. Ex. 5, Misle Dep. 189:9-25 ("Q. So at the end of September, you're still telling Bart Street that you're going to pay off the BP note; correct? A. Correct.") Misle would not have made that statement if Bart Street truly had agreed in late August 2016 that Defendants could keep the $2.2M as operating capital.

b. On October 4, 2016, Mullen told Seltzer he was waiting for documentation for Defendants "to pay off the BP note." Ex. 18, BART01166-67. That same day, Seltzer told Bart Street, "The $2,200,000 payment to BP is close but still not completed . . . ." Ex. 18, BART01166. Defendants acknowledge that when Mullen sent this email, Bart Street expected them to pay off the BP loan. Ex. 5, Misle Dep. 191:23 – 192:11. Furthermore, when Seltzer said the BP payment was close, Defendants intended to repay BP. Ex. 5, Misle Dep. 193:8-10 ("[Q.] . . . So as of October 4th, are you still planning to pay off BP? A. Yes."); *see also* Ex. 6, Seltzer Dep. 191:16 – 194:12 (in BART01166, "[Y]ou were saying that Enterprises was close to making a $2.2 million payment to BP? A. At that time that's what I was told.")

c. On October 15, 2016, Misle told Bart Street that Defendants still had the $2.2M earmarked for the BP loan in his possession. Ex. 19, BART01715 ("The money is still intact."); *see also* Ex. 5, Misle Dep. 197:4-10 ("[Q.] . . . You still had 2.2 million of Bart Street's

money in your account that you haven't used to pay off the BP loan; correct? A. Correct.")

d.      On November 3, 2016, Defendants first disclosed to Bart Street that they converted the BP loan. Ex. 20, Misle Email, Nov. 3, 2016, BST001163; *see also* Ex. 7, Mullen Dep. 136:18 – 138:2 (when it received BST001163, Bart Street first learned "that Howard and Pete kept our money, our 2.2 million that was earmarked to pay off BP.") Bart Street demanded the $2.2M be returned immediately. Ex. 21, Mullen Email, Nov. 27, 2016, BART01431 ("Nothing unreasonable about us asking you to repay 2.2M . . . .").

e.      On November 18, 2016, Seltzer apologized about the BP conversion. Ex. 22, BST002940 ("I apologize about the first right refusal doc situation with BP."); *see also* Ex. 6, Seltzer Dep. 199:19 – 202:6. He also said in BST002940 that Defendants might be able to unwind the BP deal. *Id.* 204:16 – 205:1 (Misle directed Seltzer to make that statement); *but see* Ex. 5, Misle Dep. 202:17 – 203:3 (Misle claims he has no idea why Seltzer made that statement); 217:20-21 ("I don't have any idea why [Seltzer] says that I'm willing to unwind the BP deal. I never said that.") Obviously, Defendants would not have apologized and said they possibly could unwind the BP conversion if Bart Street truly had consented to the conversion.

13.      The above-referenced emails demonstrate that throughout September and October 2016, ACC misled Bart Street to believe it would repay the BP loan with Bart Street's money as required by the First Note. ACC intentionally concealed from Bart Street that in mid-September 2016, it reached an agreement with BP to convert the loan. Ex. 23, Seltzer Email, DEFT000131, Sept. 14, 2016 (wherein Seltzer told Defendants' accountant Misle offered to sell shares to BP and "BP has agreed to buy them[.]"); *see also* Ex. 6, Seltzer Dep. 181:16 – 184:7.

## G.      *Fact #7: Defendants Refer to the Money from Bart Street as a Loan in their Internal Documents.*

14.      Defendants contend that the parties never intended for the Loans to be loans. *See*, *e.g.*, Ex. 5, Misle Dep. 64:12-13 ("[W]e never expected to have to pay back that money . . . ."); 171:14-15 ("I never really have really viewed it as a loan."). However, in direct contradiction to this contention, Defendants' internal documents refer to the $4.7M as a loan:

a.      Enterprises produced wire transfer receipts showing when its Bank of

America account received wires from Bart Street. Ex. 24, DEFT001981-82; *see also* Ex. 5, Misle Dep. 273:7-10. The receipts refer to a one wire as "part of the loan proceeds of the 1.2M loan from Bart Street" and another as "loan proceeds from Bart Street." *Id.* DEFT001981.

   b. Exhibit 25 is a register for Enterprises' Bank of America account. Ex. 25, DEFT001950-61; *see also* Ex. 1, Enterprises' Ans. Interrog. #4, Aug. 4, 2017 (authenticating the register). An entry dated August 19, 2016, describes a $1.2M wire from Bart Street as "Note Payable – Idelman Group." *Id.* DEFT001950. Likewise, entries dated September 7, 2016, describe monies received from Bart Street as "Note Payable – Idelman Group." *Id.* DEFT001950; *see also* Ex. 6, Seltzer Dep. 143:11 – 144:5. Notably, the register also uses the phrase "Note Payable" to refer to the HHIM loans. *Id.* DEFT001950; *see also* Ex. 6, Seltzer Dep. 144:13 – 145:1. The phrase "note payable" clearly refers in the register to a loan. *Id.* 142:16-22 (the phrase could mean "somebody you owed money to"); 146:9-15 (someone "could probably interpret" the phrase as a loan); 146:21 – 147:4 ("[Y]ou could argue that" the phrase means a loan).

  **H.** **_Fact #8_**_: No Email or Other Document Exists in which Bart Street Said Defendants Did Not Have to Repay the Loans._

  15. On November 8, 2016, Nevadans voted to legalize recreational marijuana (hereinafter, the "Vote").[3] Defendants contend that in late August or early September 2016, Bart Street agreed to convert the Loans to equity and provide an additional $4.3M after the Vote. *See*, *e.g.*, Misle Decl., March 14, 2017, ECF No. 35 at ECF pg. 30, ¶ 23 (claiming the Notes "had been orally modified to provide for Bart Street to obtain equity in ACC Enterprises, rather than simply a loan."); *see also id.* ¶ 28 (claiming the parties agreed to $6M equity and $3M debt); ¶ 39 (claiming Bart Street "reached a subsequent agreement" with Defendants).

  16. However, no email or written agreement exists in which Bart Street said Defendants did not have to repay the Loans. Seltzer, in both his personal capacity and as Defendants' FRCP

---

[3] *See, e.g.,* Lochhead, Colton, *Nevada Voters Say Yes to Legalizing Marijuana*, Las Vegas Review-Journal (Nov. 9, 2016), available online at https://www.reviewjournal.com/news/politics-and-government/nevada-voters-say-yes-to-legalizing-marijuana/ (last accessed March 13, 2019). If necessary, this Court can judicially notice the date of this vote. The date is not subject to reasonable dispute because it is generally known and can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned. FRE 201(b).

30(b)(6) representative, is unaware of an email, written agreement, or oral statement in which Bart Street said Defendants did not have to repay the Loans. Ex. 6, Seltzer Dep. 65:10-22 ("Q. Now, the first promissory note is dated August 19, 2016, and it's for $3.5 million. A. Yes. Q. I am not aware of an email postdating August 19, 2016, from Idelman or Mullen to anyone associated with Industries, Enterprises in which Idelman or Mullen said that Industries or Enterprises would not have to repay the $3.5 million on September 1st, 2017. Are you aware of any such email? COUNSEL: Object to form. [A.] *That was never discussed in an email* specific, the way you phrased that question to this particular date."); 66:13 – 67:12 ("[Q.] . . . I'm asking if there were ever any oral discussions in which anyone associated with Bart Street ever told anyone associated with Enterprises or Industries that Enterprises and Industries would not have to repay the $3.5 million on September 1st, 2017. Do you recall oral discussions along those lines? COUNSEL: Object to form. [A.] *Not that I'm aware of.* [Q.] Okay. And then the same question for the second promissory note. Do you recall any oral discussions along those lines? A. Not that -- COUNSEL: Same objection. [A.] *Not that I'm aware of.* [Q.] Do you recall any emails along those lines? COUNSEL: Same objection. [A.] *Not that I'm aware of.* [Q.] Do you recall, for either promissory note, any written agreements along those lines? COUNSEL: Objection. Legal conclusion. [A.] *Not that I'm aware of.*") (emphasis added).

17.    Seltzer also is unaware of any contracts or agreements for Bart Street to obtain equity. Ex. 6, Seltzer Dep. 88:13 – 89:5 ("[Q.] . . . Are you aware of any contracts or agreements between Calvada and Bart Street for Bart Street to obtain equity in Calvada? COUNSEL: Same objection. [A.] *I'm not aware of any final contracts, no*. . . . [Q.] Are you aware of any contracts for Bart Street to obtain equity in Enterprises? COUNSEL: Same objections. [A.] *I'm not aware of any*. [Q.] Are you aware of any contracts for Bart Street to obtain equity in Industries? COUNSEL: Same objections. [A.] *I'm not aware*.") (emphasis added).

**I.    *Fact #9*: *After the November 2016 Election, Defendants Promised in Writing to Repay the Loans.***

18.    As aforementioned, Defendants contend that Bart Street agreed to convert its Loans to equity the day after the Vote. However, several weeks after the Vote, Defendants admitted they

were obligated to repay the Loans. On November 27, 2016, Seltzer told Bart Street, "I do know Howard has every intention of *repaying the Bart loan* as soon as we can and is adamant we will do so at first available financial period. . . . I am not sure why the hostility as Howard never said he wouldn't *repay the loan*. ACC does need a reasonable time period *to re pay the bart loan* however, as even *our loan document* spells out." Ex. 21, BART01431 (emphasis added); *see also* Ex. 6, Seltzer Dep. 214:21 – 215:2 (authenticating BART01431).

19.     On December 1, 2016, Seltzer made the following statements to Bart Street: (1) "ACC is not in a financial position today *to repay the loan* immediately, after it was called in so suddenly[;]" (2) "I am working on raising the revenue needed to make good faith payments and hopefully *pay off the entire note from Bart Group* ASAP[;]" (3) "Mr. Misle also mentioned he is hoping that he can start to make good faith payments via sales revenues soon as well[;]" (4) "ACC does not have the ability to *pay off its loan note to Bart* without ACC shutting its doors down altogether and then Bart would not be able to get paid the majority of what it is owed ever[;]" (5) Seltzer would "continue to make every effort to bring in a new investor and *repay Bart its note that is due Sept 2017*[;]" (6) "*ACC acknowledges Bart Groups loan* and intends to do everything it can to *pay your loan back* asap[;]" and (7) "I will continue to strive to raise the capital on behalf of ACC and ACC will do all it can *to re pay the note asap*. If ACC went out of business, that does nobody any good as then *the note goes unpaid for good* and my money as well as your money is lost. Thus I appreciate your patience here while we work *to repay Bart Group* as soon as we can[.]" Ex. 26, BART01427-28 (emphasis added); *see also* Ex. 6, Seltzer Dep. 70:2-8; 76:9-19.

20.     Misle directed Seltzer to send the above-referenced email. Ex. 6, Seltzer Dep. 74:15-17 ("Q. Do you recall discussing this email with Howard before you sent it? A. Yes."); 75:10-13 ("Q. And during that call, would you have told him what you intend to say in this email? A. I would have asked him what he wanted me to say."); *but see* Ex. 5, Misle Dep. 213:4 – 218:17 (when shown this email, Misle said, "I don't know what [Seltzer is] talking about" and "I don't know why Pete would send that email. I didn't authorize it.")

21.     Seltzer sent the above-referenced emails several weeks after the Vote. If the parties truly had agreed to convert the loans to equity the day after the Vote, then Seltzer would not have

sent the emails following the Vote. These emails prove the parties neither agreed to convert the Loans to equity nor entered any agreements excusing Defendants from repaying the Loans.

22. In addition to sending emails acknowledging and promising to repay the Loans, ACC also attempted after the Vote to raise money to repay the Loans. Ex. 6, Seltzer Dep. 62:12-18 ("Q. Did you ever reach out to anyone to see if you could raise any money that then could be used to repay Bart Street? A. Yeah, I believe I did. . . . Q. When did you reach out to those people? A. It would have been late November 2016, to the best of my recollection . . . .").

23. Defendants also initially sued Bart Street in Nye County, Nevada, and admitted in their own complaint that the Loans were due on September 1, 2017. Ex. 27, Defs.' Compl. in Case No. CV38198, Dec. 14, 2016, ¶ 16 ("Pursuant to the terms of the August 2016 Note, the outstanding principal amount of the note, together with all accrued interest, is due and payable on September 1, 2017."); *see also id.* ¶ 27 ("Pursuant to the terms of the September 2016 Note, the outstanding principal amount of the note, together with all accrued interest, is due and payable on September 1, 2017.") As with Seltzer's emails postdating the Vote, Defendants would not have made those statements if the parties truly had modified the Notes. Defendants are conclusively bound to those factual statements in their complaint. *See, e.g., Manuel v. Melo-Macias*, No. 2:15-CV-00309-GMN, 2015 WL 5562700, at *2 (D. Nev. Sept. 21, 2015) (quoting *American Title Insurance Co. v. Lacelaw Corp*., 861 F.2d 224, 226 (9th Cir.1988)) (unamended factual statements in pleadings are "conclusively binding on the party who made them.")

24. Defendants also pledged to this Court in writing that Bart Street "will be repaid when the parties agreed that it would be repaid - September 2017." *See* Defs.' Opp'n to Bart Street's Mot. for Sum. Judg., March 14, 2017, ECF No. 35, 22:4-5. As with Seltzer's emails postdating the Vote, Defendants would not have made that statement if the parties truly had modified the Notes. This Court should treat that statement of fact as a binding judicial admission. *See, e.g., Manuel*, 2015 WL 5562700, at *2 (wherein this Court concluded a defendant was bound to a statement in his notice of removal that he had been served); *see also Am. Title Ins. Co.*, 861 F.2d at 227 ("[S]tatements of fact contained in a brief *may* be considered admissions of the party in the discretion of the district court.") (emphasis in original).

### J.      *Fact #10: The Parties Never Entered Any Contracts Other than the Notes.*

25.      From July to October 2016, the parties discussed a variety of investment ideas in addition to the Notes. Ex. 7, Mullen Dep. 135:5-7. The discussions ended when Bart Street learned ACC did not repay BP. *Id.* 136:3 – 138:2 (this event "was the straw that broke the camel's back"); 167:22 – 168:2 (Defendants made "the unilateral decision that they would keep 2.2 million of our dollars that were intended and designated and requested by them to pay off BP.")

26.      Defendants contend, however, that the parties reached a finalized equity deal that modified the Notes. *See*, *e.g.*, Ex. 5, Misle Dep. 45:13-16 ("[D]o you contend that there was an agreement to convert the $4.7 million to something other than a repayable loan? A. Yes.") They claim Bart Street agreed to convert the Loans to equity and provide an additional $4.3M after the Vote. Ex. 5, Misle Dep. 64:9-12 (Bart Street agreed "the day after [the Vote] passes that they'd send us the rest of the money and we would redo all the paperwork to show their 6 million equity and 3 million of debt."); 176:13-17 (the parties agreed "[t]hat once the vote came in from Nevada where the recreational was passing, the next day that we would have the rest of the money and the paperwork would be restructured for $6 million of equity and $3 million [of debt].")

27.      Defendants admit this purported agreement was not reduced to writing, and they contend it was entered orally, at least in part. Misle Decl. ¶ 23, March 14, 2017, ECF No. 35 at ECF pg. 30 (the Notes were "orally modified"); *see also* Ex. 28, Enterprises' Ans. to Req. for Admission #22, June 22, 2017, 11:26-27 ("the Notes were orally modified"); *id.* 12:21-22 (the parties "entered into an oral contract or agreement" for post-recreational financing); Ex. 29, Calvada's Ans. to Req. for Admission #24, 13:6-8 (the parties entered an agreement for post-recreational financing, "portions of which were oral and portions of which were in writing.").[4]

28.      This Court should conclude that the parties never entered any binding, enforceable contracts other than the Notes. They never agreed to the essential, material terms for an equity deal.

---

[4]      Realizing Calvada's response to Bart Street's request for admission #24 makes the alleged agreement for post-recreational financing unenforceable under the statute of frauds, Seltzer contradicted the response at his deposition. *See*, *e.g.*, Ex. 6, Seltzer Dep. 249:15 - 252:24 ("Q. True or false: Portions of the agreement for the post-recreational financing were entered orally. COUNSEL: Same objection. Asked and answered. Legal conclusion. Speculation. Form. [A.] *I would say false, the way it's written*.") (emphasis added).

That undisputable fact is proven by the following uncontroverted evidence:

a. Defendants admit no equity deal had been reached as of August 12, 2016. Ex. 5, Misle Dep. 141:2-7; 141:11-13; 143:1-4 ("[Q.] So would you agree with me that at this point you're discussing a potential deal but no deal has been struck? A. Yeah.")

b. On August 17, 2016, Seltzer said the deal would be for $6M equity and $3M debt "at interest rate TBD[.]" Ex. 30, BART01190-91; *see also* Ex. 6, Seltzer Dep. 118:14-25 (when he sent this email, Seltzer "didn't know [the rate] yet.") Seltzer does not know if the parties ever decided on a rate for the $3M in debt. *Id.* 168:3-13 ("Q. Do you know if an agreement was ever reached for the interest rate for the 3 million debt? COUNSEL: Same objection. [A.] I would not know that. Howard would have that information.").

c. Seltzer believes the parties reached a finalized equity deal on or before August 19, 2016. Ex. 6, Seltzer Dep. 129:20-24; 130:23 – 131:2. However, as of that date, he did not know the identity of the parties to the deal. *Id.* 135:10 – 136:1 ("It could have been Steve Idelman. It could have been Bart Group. It could have been Solutionary. It could have been something they hadn't even shared with us at that point.") In fact, he never knew the identity of the exact parties to the deal. *Id.* 120:8-15 ("Q. And who precisely was going to get the equity in Enterprises? Was it going to be Bart Street, Idelman, Mullen, Idelman Group? A. That was not -- as of August 17, 2016, that wasn't shared with me, so I did not know."); 164:9-10 ("I don't believe that I was ever told the entity that's going to be doing it is XYZ."); 259:18-22 ("Q. Do you recall any emails in which Idelman or Mullen said Bart Street would be providing the additional financing? COUNSEL: Object to form. [A.] I'm not sure."); 259:7 - 261:21 (Seltzer does not recall any emails stating the additional financing would come from Bart Street).[5]

---

[5] After consulting with counsel during a break, Seltzer attempted to change this testimony. *See, e.g.,* Ex. 6, Seltzer Dep. 255:24 – 257:16 ("Q. Now, Mr. Seltzer, you previously told me that you didn't know the precise identify of the party that would be providing the additional financing. Do you recall that? COUNSEL: Objection. Misstates testimony. [A.] *Yeah.* It's -- *that's not how I meant it though*."); 258:18 – 259:1 ("Q. Do you recall telling me earlier today that there were periods of time after Bart Street made the loans in 2016 where you didn't know the precise person or entity that would be obtaining equity and providing additional financing? COUNSEL: Same objection. Misstates testimony. Asked and answered multiple times. [A.] *If I said that, I misunderstood the question and so my answer came across differently*.") (emphasis added).

14

d.      On August 23, 2016, Mullen sent an email to Seltzer indicating that the parties still needed to have future negotiations about additional funding. Ex. 31, Mullen Email, Aug. 23, 2016, BART01888. Seltzer admits that as of August 23, 2016, the parties still needed to have "talks" to finalize "the amounts" and "the dates" for any additional financing. Ex. 6, Seltzer Dep. 162:2 – 163:24.

e.      Defendants admit that around August 29, 2016, the discussions changed from a possible $9M equity deal to a possible deal for $6M equity and $3M debt. Ex. 6, Seltzer Email Aug. 29, 2016 ("I was told the 9m equity deal had changed to 6m equity and 3m debt . . . "); *see also* Ex. 6, Seltzer Dep. 164:15 – 167:4 ("[T]here was a deal originally that was at one time agreed upon at 9 million, and then it was changed to 6 million with additional 3 million being convertible debt."); Ex. 5, Misle Dep. 43:17-19 (the deal "changed a couple of different times as to how the 9 million was going to come in.")

f.      On August 31, 2016, Seltzer asked Mullen to clarify whether Bart Street would "put in the rest of the money above the loan portion" the day after the Vote or when Defendants' business became self-sustaining as Idelman had indicated. Ex. 32, Seltzer Email, Aug. 31, 2016, BST003375. When Seltzer sent this email, Defendants did not know the date on which any additional financing would be provided. Ex. 6, Seltzer Dep. 172:9 – 178:5 ("Q. So when you sent this email [on August 31, 2016], you didn't know on what date the additional money was going to be put in. That was the purpose of this email; correct? COUNSEL: Same objections. [A.] Yes. I did not know an exact date."); *see also* Ex. 5, Misle Dep. 176:18 – 177:2 (admitting the date for additional financing was "not definitive" at this time).

g.      On September 7, 2016, Mullen emailed Misle and Seltzer to confirm Bart Street had funded the $4.7M. Ex. 33, Mullen Email, Sept. 7, 2016, BART01847. He said, "The next step is to discuss finalizing the equity piece of the deal. I will begin those discussions with Pete." *Id.* Mullen's email clearly indicates the parties had not yet finalized an equity deal. Despite that fact, Misle contends the parties already had reached a finalized deal at this time. Ex. 5, Misle Dep. 175:22 - 176:3 ("[Q.] . . . Are you telling me you read [Mullen's email on September 7, 2016] and you understood that you already had a deal for equity? A. Absolutely.")

h.      Seltzer never knew the exact amount of additional financing to be provided because no deal had been finalized. Ex. 6, Seltzer Dep. 231:9-21 ("Q. So on top of the 4.7 that Bart Street already gave ACC in 2016, ACC was expecting to get anywhere from an additional 1.3 to an additional 4.3 from Bart Street? A. At the time, yes. Q. . . . [T]hat's a broad range, Pete. I mean, that's a $3 million range. What precise number was ACC expecting to get? A. No. You're absolutely right. You're absolutely right. Again, that was not for me to decide. That was between Steve and Howard, whether or not it was going to be a $6 million deal or a $9 million deal. And you're right, it's -- it's a big range, *and I don't know the answer*.") (emphasis added).

i.      In a declaration, Misle said Bart Street would have obtained equity in Enterprises. Misle Decl. ¶ 23, March 14, 2017, ECF No. 35 at ECF pg. 30 (the Notes were "orally modified to provide for Bart Street to obtain equity in ACC Enterprises . . . .") However, at his deposition, Misle claimed Bart Street would have obtained equity in Enterprises, Calvada, and nonparties Building Management Company A, LLC ("BMC A"), Building Management Company B, LLC ("BMC B"), and Building Management Company C, LLC ("BMC C") (collectively, the "BMCs"). Ex. 5, Misle Dep. 51:11-14 ("I believe it was Building A, B, and C. I believe it was ACC Enterprises and Calvada Partners."). Misle also does not know what equity percentage Bart Street would have received. *Id*. 50:17-18 ("I don't remember the number. I think it was somewhere around 30 percent."); 50:25 – 51:1 ("Again, I'm not exactly sure if it was 30 percent."); 51:17-18 ("It could have been 20 percent. Maybe 30 percent. I -- I -- I'm not exactly sure.")

j.      Misle testified that the parties anticipated entering formal, written contracts for any eventual equity deal. Ex. 5, Misle Dep. 47:12-19 (Defendants expected "there would be new paperwork drawn up for the conversion. Q. Was there ever any new paperwork drawn up for the conversion? A. No."); 49:4-13 (the Notes are the only documents signed by Bart Street); 49:14-21 (Misle never sent Bart Street an equity agreement because "I would have gone through a lawyer to do that."); 64:11-12 ("[W]e would redo all the paperwork to show" Bart Street's $6M equity and $3M debt); 64:20-23 (no conversion documents were prepared by any lawyers); 81:2-7; 82:3-6; 176:15-17 (the "paperwork would [have been] restructured for" $6M equity and $3M debt).

k.      Likewise, Seltzer testified that he expected the parties would enter a formal,

written contract. Ex. 6, Seltzer Dep. 134:15-19 ("[Y]ou would need future contracts."); 134:25 – 135:7 (the final contract would have memorialized the deal). Contradicting Misle, Seltzer said Defendants prepared a formal contract, but it was never signed. *Id.* 89:7-24 ("Q. Okay. And was it your understanding that at some point a formal written contract would be drawn up pursuant to which Bart Street would get that equity? A. Yes. Q. And no such contract was ever drawn up or signed; correct? COUNSEL: Object to form. [A.] *I believe that contracts were drawn up. I – I don't believe I signed anything.* I – I don't know what else happened after that. [Q.] Are you aware of anyone who signed those contracts? A. I am not."); 121:19-22 ("I know that there were agreements that, I guess, *at the end of the day didn't get signed*, which is why we're sitting here at this table unfortunately.") (emphasis added).

l.      Misle testified that Bart Street never converted its Loans. Ex. 5, Misle Dep. 46:21-22 ("I don't think they ever formally converted the 4.7 to equity, if that's what you're asking me."); 243:4-6 (discussing Ex. 34, Idelman Email, Aug. 29, 2016) ("[Q.] . . . So there's been no conversion [as of August 29, 2016]; correct? A. Not yet.")

m.      Nevada's Division of Public and Behavioral Health ("Division") requires that for any transfer of an ownership interest in a medical marijuana establishment ("MME") "in any amount greater than zero (0) percent," the MME must "notify the [Division] on a form prescribed by the Division." The transfer "shall not be effected" before the Division approves it. If an MME owner "proposes to transfer any portion of his interest to a person who is not then the listed owner of an interest in a registered MME, no such transfer shall become effective for any purpose until the proposed transferee or transferees have made notification to the Division and have been found to be individually qualified. Notification shall be made on a form prescribed by the Division." Ex. 35, pg. 2. Enterprises is a licensed MME. Ex. 5, Misle Dep. 13:24 - 14:2. Enterprises never notified the Division of any intent to transfer any equity to Bart Street. Ex. 36, Enterprises' Response to Req. for Production #27, Aug. 4, 2017, 26:1-2; *see also* Ex. 6, Seltzer Dep. 91:20 – 92:1. Without such approval from the Division, a final, enforceable contract for an equity deal cannot exist as a matter of law.

**K.** **_Fact #11_: _Defendants Have Never Repaid Any Principal or Interest of the Loans and Have Been Unjustly Enriched_.**

29.     Defendants have not repaid any principal or interest for the Loans. Ex. 5, Misle Dep. 68:9-14; 93:18-19; 253:13-15; *see also* Ex. 6, Seltzer Dep. 56:19-22. Defendants believe they are entitled to keep the money without compensating Bart Street. Ex. 5, Misle Dep. 98:10-16. As of April 10, 2019, Bart Street is owed (1) $4,147,065.72 in principal and interest under the First Note, and (2) $1,293,303.98 in principal and interest under the Second Note. Alternatively, if this Court were to enter summary judgment on Bart Street's unjust enrichment claims, then as of April 10, 2019, Bart Street would be owed (1) $4,008,413.6 in principal and prejudgment interest under the First Note and (2) $1,371,055.72 in principal and prejudgment interest under the Second Note. Ex. 37, Mullen Decl. ¶ 7-8.

**IV.    LEGAL ARGUMENTS.**

**A.    This Court Should Enter Summary Judgment on the Contract Claims.**

**1.    _Defendants Breached the Notes_.**

This Court should enter summary judgment on Bart Street's contract claims. *Laguerre v. Nevada Sys. of Higher Educ.*, 837 F. Supp. 2d 1176, 1180 (D. Nev. 2011) (citing *Bernard v. Rockhill Dev. Co.*, 734 P.2d 1238, 1240 (Nev. 1987)) (identifying the elements for a contract claim). The Notes are valid, unambiguous contracts, Bart Street performed its obligations by funding the Loans, and Defendants breached their contractual obligations by refusing repayment.

**2.    _The Notes Must Be Enforced as Written_.**

A clear and unambiguous contract "must be enforced as written." *Ringle v. Bruton*, 86 P.3d 1032, 1039 (Nev. 2004); *see also Mendenhall v. Tassinari*, 403 P.3d 364, 373 (Nev. 2017). To augment this, parol evidence concerning the intent of the parties is inadmissible to vary or add to the unambiguous terms. *See, e.g., Canfield v. Gill*, 697 P.2d 476, 477 n.1 (Nev. 1985) ("[P]arol evidence on the intent of the parties should not have been admitted" because "[t]he contract in this case does not appear to be ambiguous on its face."). Despite the fact their own internal documents refer to the money from Bart Street as a loan (*see supra* Undisputed Fact ¶ 14 herein), Defendants now contend that the parties never intended for the Loans to be a loan. *See*, *e.g.*, Ex. 6, Seltzer Dep.

18

249:8-9 ("This note misstates that as if it was a loan. It wasn't a loan."); 63:17-18 ("I know the intent of our deal was different than this agreement . . . ."). These statements of purported intent cannot be introduced to contradict the plain and clear English of the Notes.

### 3. *The Parties Never Entered Any Contracts Other Than the Notes.*

Contract formation and interpretation are questions of law. *See, e.g., Grisham v. Grisham*, 289 P.3d 230, 236 (Nev. 2012) (citing *Cogswell v. CitiFinancial Mortg. Co., Inc.*, 624 F.3d 395, 398 (7th Cir. 2010)) (it is a question of law whether the parties described their essential obligations in sufficiently definite and certain terms to create an enforceable contract); *see also Anderson v. Sanchez*, 373 P.3d 860, 863 (Nev. 2016) (contract interpretation is a question of law); *Wall Data Inc. v. Los Angeles Cty. Sheriff's Dep't*, 447 F.3d 769, 786 (9th Cir. 2006); *Local Motion, Inc. v. Niescher*, 105 F.3d 1278, 1280 (9th Cir. 1997). Based on the undisputed facts, this Court should conclude the parties never entered any contracts other than the Notes.

#### a. *The Purported Agreement Modifying the Notes is Subject to and Barred by the Statute of Frauds.*

##### i. *Any Agreement Modifying the Notes Must Independently Satisfy the Statute of Frauds Because the Notes are Subject to the Statute of Frauds.*

When an original agreement is subject to the statute of frauds, a subsequent agreement modifying it must independently satisfy the statute of frauds. *See, e.g.*, *Golden Key Realty, Inc. v. Mantas*, 699 P.2d 730, 732 (Utah 1985) ("[I]f an original agreement is within the statute of frauds, a subsequent agreement which modifies the original written agreement must also satisfy the requirements of the statute of frauds to be enforceable."); *see also Davila v. BAC Home Loans Servicing, LP*, No. 2:10-cv-02252-ECR, 2011 WL 3159146, at *2 (D. Nev. July 26, 2011) (because deeds of trust are subject to the statute of frauds, "[o]ral agreements to modify deeds of trust are also subject to the statute of frauds."). The Notes are subject to the statute of frauds for at least two reasons. ***First***, every agreement to lend $100,000 or more "made by a person engaged in the business of lending money" is subject to the statute of frauds. NRS 111.220(4). The Loans exceed $100,000, and Bart Street was formed to make the Loans. *See supra* Undisputed Fact ¶ 2.

***Second***, every agreement not to be performed within a year is subject to the statute of frauds.

NRS 111.220(1). An agreement is not exempt merely because performance in a year is conceivable; rather, the statute of frauds applies so long as it was the parties' "manifest intent and understanding" for performance to exceed a year. *Stanley v. A. Levy & J. Zentner Co.*, 112 P.2d 1047, 1052–53 (Nev. 1941); *see also Branch Banking & Trust Co. v. Eloy Bus. Park, LLC* ("*Branch Banking*"), No. 2:12-cv-01679-LRH, 2014 WL 1304649, at *3 (D. Nev. Mar. 31, 2014) (when the parties did not contemplate that their oral agreement would be performed in a year, the statute of frauds applied even though full performance of the oral agreement in a year was conceivable).

The First Note is dated August 19, 2016 and matured on September 1, 2017. Under its unambiguous terms, Defendants' final performance was more than a year after formation. Defendants admit as much. When Bart Street accelerated the Notes in late 2016 due to Defendants' breaches, Defendants responded that they were entitled to more time for repayment under "our loan document." Ex. 21, Seltzer Email, Nov. 27, 2016, BART01431; *see also* Ex. 6, Seltzer Dep. 214:21 – 215:3 (authenticating BART01431); Ex. 38, Seltzer Email, Dec. 1, 2016, BST002921-22 (requesting more time to repay the Loans); Ex. 6, Seltzer Dep. 57:15-19 (when Bart Street asked for its money back, "there was still almost a year before you even got to [the] maturity date . . . ."). Defendants also told this Court in a brief that they did not have to repay the Notes until September 2017. *See supra* Undisputed Fact ¶ 24.

Any agreement modifying the Notes must satisfy the statute of frauds because the Notes themselves are subject to the statute of frauds; that means any modification, to be enforceable, itself had to be in writing. Yet, no written agreement signed by both parties exists that modifies the Notes. The Notes are the only documents signed by Bart Street. Ex. 5, Misle Dep. 49:4-13 ("I don't believe that they signed any other documents. Q. Other than the promissory notes? A. Correct.")

Furthermore, to satisfy the statute of frauds, "the substantial parts of the contract must be embodied in writing with such a degree of certainty so as to make clear and definite the intention of the parties without resorting to oral evidence." *Tri-Pac. Commercial Brokerage, Inc. v. Boreta*, 931 P.2d 726, 728 (Nev. 1997). Contrary to this rule, Defendants contend the Notes were modified orally, at least in part. *See supra* Undisputed Fact ¶ 27. For these reasons, the purported agreement modifying the Notes is barred by the statute of frauds, and having never been modified or rescinded,

the Notes remain enforceable.

### ii. An Agreement Imposing an Indefinite Obligation on Bart Street Not to Enforce the Notes Would Be Subject to and Barred by the Statute of Frauds.

In *Branch Banking*, the District of Nevada (Hicks) concluded that when an alleged oral agreement imposed on a lender "an indefinite obligation not to enforce certain [contractual] rights or foreclose, the agreement, by its terms, could not be fully performed in one year" and therefore was subject to and barred by the statute of frauds. *Branch Banking*, 2014 WL 1304649, at *3; *see also Corchado v. BAC Home Loans Servicing, LP*, No. 2:10-cv-01860-KJD, 2011 WL 4573905, at *2 (D. Nev. Sept. 29, 2011) (an "alleged oral loan modification contract" was subject to the statute of frauds); *Lyon Fin. Servs., Inc. v. AKB Enterprises, Inc.*, 2010 WL 1978703, at *4 (N.D. Ill. May 17, 2010) (concluding an "alleged promise to forebear" indefinitely on enforcing a lease would violate the statute of frauds); *Solaia Tech. LLC v. ArvinMeritor, Inc.*, 2006 WL 695699, at *12 (N.D. Ill. Mar. 16, 2006) (quoting 9 Williston on Contracts § 24:1 (4th ed. 2005)) ("[A]n oral contract to forebear bringing suit on a certain claim for more than a year has been held unenforceable."); *Second Nat. Bank v. Hustead*, 6 A.2d 63, 63–64 (Pa. 1939) (an oral agreement to forebear on filing an appeal was subject to the statute of frauds).

Likewise, to the extent Defendants contend that the parties entered an agreement imposing on Bart Street an indefinite obligation not to enforce its contractual right under the Notes to be repaid $4.7M with interest, that agreement would be subject to and barred by the statute of frauds. For that reason, an enforceable agreement to convert the Loans to equity does not exist, and having never been modified or rescinded, the Notes remains enforceable.

### c. The Parties Expected to Enter Formal, Written Contracts if They Reached a Deal.

In addition to the statute of frauds, any purported agreement to convert the Loans to equity is unenforceable because the parties intended to be bound only if they subsequently signed a formal, written contract. *See supra* Undisputed Facts ¶¶ 28(j)-(k). Misle and Seltzer both testified that they would have expected a formal contract to be prepared and signed. Misle and Seltzer's testimony on this point only differs to the extent that Seltzer said that a formal contract was prepared but never

signed and Misle did not know if a contract was prepared. *See supra* Undisputed Facts ¶¶ 28(j)-(k).

When, as here, the parties expect a written contract to be signed but it never is signed, no binding contract exists. *See, e.g., Powell v. City of Newton*, 703 S.E.2d 723, 728 (N.C. 2010) (an unsigned settlement agreement was unenforceable because "the parties intended for plaintiff's physical signature to appear on the" agreement); *see also Ergon Asphalt & Emulsions, Inc. v. Capriati Const. Corp, Inc.*, No. 2:13-CV-1683-GMN-NJK, 2015 WL 1959851, at *5 (D. Nev. Apr. 29, 2015) ("[I]f a written agreement indicates that a signature is required for acceptance, its terms are not binding unless the offeree actually provides a signature."); *Steven Cohen Prods., Ltd. v. Lucky Star, Inc.*, No. 2:12-CV-01995-GMN-CWH, 2016 WL 1170985, at *3 (D. Nev. Mar. 23, 2016). Hence, the parties never entered a valid agreement converting the Loans to equity, and having never been modified or rescinded, the Notes remains enforceable.

### d.   *The Parties Never Agreed to the Essential, Material Terms for Any Deal Other than the Promissory Notes.*

A valid contract exists only when the parties have agreed to all material terms. *See*, *e.g.*, *May v. Anderson*, 119 P.3d 1254, 1257 (Nev. 2005) ("A valid contract cannot exist when material terms are lacking or are insufficiently certain and definite."); *see also Chung v. Atwell*, 745 P.2d 370, 371 (Nev. 1987) (a contract "must be sufficiently definite."); Restatement (Second) of Contracts § 33(1)-(2) (1981). In *Chung v. Atwell*, a real estate broker and two prospective buyers of a hotel executed an "offer for sale" in which the buyers allegedly agreed to use the broker exclusively. *Id.* at 370-71. The broker sued after the buyers used someone else to purchase the hotel. *Id.* The Nevada Supreme Court said the "offer for sale" was "incomplete and unenforceable" because it lacked essential, material terms. *Id.* at 371. The *Chung* court said that in deciding if a valid contract exists, the district court should consider whether it can ascertain the contract's "exact meaning and fix the legal liability of the parties." *Id.* (quoting *Pendleton v. Sard*, 297 A.2d 889, 892 (Me. 1972)); *see also May*, 119 P.3d at 1257 ("The court must be able to ascertain what is required of the respective parties."); *Stoddart v. Miller*, 238 P.3d 845, 2008 WL 6070835, at *4 (Nev. Aug. 22, 2008) (same).

The parties did not agree to the essential, material terms for any deal other than the Notes,

22

as established by the following evidence:

1.  Even under their case theory, Defendants claim that $3M was to be debt and therefore would have to be repaid as a loan to Bart Street. Although interest was expected to be paid, an interest rate for that debt was never determined (*see supra* Undisputed Fact ¶ 28(b));

2.  The parties never agreed when Defendants would repay this alleged deal for new debt, and no writing exists in which a repayment date was determined;

3.  The parties never agreed to a date for Bart Street to provide any additional financing (*see supra* Undisputed Facts ¶¶ 28(d), (f));

4.  The parties never agreed on the exact amount of additional financing to be provided by Bart Street. Seltzer does not know the exact amount and believes it would have been between $1.3 – 4.3M (*see supra* Undisputed Fact ¶ 28(h));

5.  The parties never agreed on the entities that would either be the borrowers for any new debt or issue equity to Bart Street. In a declaration, Misle claimed Bart Street would have received equity in Enterprises, but at his deposition, he claimed Bart Street would have received equity in Enterprises, Calvada, and the BMCs (*see supra* Undisputed Fact ¶ 28(i)); *and*

6.  The parties never agreed on the equity percentage Bart Street would have obtained. Misle does not know the percentage (*see supra* Undisputed Fact ¶ 28(i)).

Without knowing these essential, material terms, it would be impossible for any court to fashion a remedy for an alleged breach of the deal. *May*, 119 P.3d at 1257 ("The court must be able to ascertain what is required of the respective parties."); *see also Chung*, 745 P.2d at 371; *Stoddart*, 2008 WL 6070835, at *4. For that simple reason, no binding, enforceable contract was entered that modifies the Notes.

The evidence also shows that negotiations continued after Defendants claim the parties reached a finalized equity deal. *See supra* Undisputed Facts ¶ 28(a)-(g). A valid contract cannot exist when terms are still being negotiated. *Stoddart*, 2008 WL 6070835, at *4 ("When evidence shows that, after a contract was purportedly formed, the parties continued to negotiate the agreement's essential terms, it is clear that there has been no meeting of the parties' minds, and consequently, that no binding contract exists as a matter of law."); *see also McKenzie v. Comcast*

23

*Cable Commc'ns, Inc.*, 393 F. Supp. 2d 362, 370 (D. Md. 2005) ("[T]he relevant case law uniformly refuses to find the existence of a contract when the parties are still in the negotiation phase and have not agreed on integral terms."); *Midwest Generation, LLC v. Carbon Processing & Reclamation, LLC*, 445 F. Supp. 2d 928, 936 (N.D. Ill. 2006) (disposing of a contract claim when emails "show that the parties were engaged in ongoing negotiations and that no contract existed at the time."); *Titan Int'l, Inc. v. Bridgestone Firestone N. Am. Tire, LLC*, 752 F. Supp. 2d 1032, 1050 (S.D. Iowa 2010) ("[N]o meeting of the minds occurred" when material terms still needed clarification).

For these reasons, the parties never entered a valid agreement modifying the Notes, and having never been modified or rescinded, the Notes remain enforceable.

### 3.     *Any Unenforceable Provisions in the Notes Are Severable.*

Defendants allege "Plaintiffs claims are barred by illegality." *See* Defs.' Ans. to Pl.'s First. Am. Compl., Dec. 14, 2018, ECF No. 167. Defendants bear the burden of establishing this defense. *See, e.g., Adobe Sys. Inc. v. Christenson*, 809 F.3d 1071, 1078 (9th Cir. 2015) ("The burden of proof for an affirmative defense to a civil claim generally falls on the party asserting the defense."); *see also Bus. Capital Grp., Inc. v. Thai Airways Int'l Pub. Co. Ltd.*, 2012 WL 13018424, at *5 (C.D. Cal. Sept. 10, 2012) ("[T]he illegality of the [agreement] is an affirmative defense, on which [the defendant] bears the burden of proof."); *Hamilton v. Abadjian*, 179 P.2d 804, 806 (Cal. 1947) ("[T]he burden of proof of unlawful purpose is upon the person asserting the illegality."); *Dickson v. Uhlmann Grain Co.*, 288 U.S. 188, 195 (1933) ("The burden was on the defendants to establish the defense of illegality . . . .") Defendants cannot establish this affirmative defense.

In the Order, this Court said that any unenforceable aspects of the Notes can be severed if severance "would be in line with the parties' intent in contracting and [if] the unenforceable provisions are collateral to the overall agreement . . . ." Order 11:2-5. Bart Street made the Loans because Defendants were facing critical deadlines to purchase the Real Property and repay HHIM and BP. *See supra* Undisputed Fact ¶ 8. This Court already has concluded the provisions in the Notes requiring Defendants to purchase the Real Property and repay HHIM and BP "command Defendants to use the loaned funds for solely legal acts." Order 9:20-25; *see also id*. 12:7-8 (concluding "the potential remedy in this case . . . would not mandate illegal activity.")

The "right of first refusal" and "operating capital" provisions are severable because severance would not defeat the primary purpose of the Notes, which was to enable Defendants to purchase the Real Property and repay HHIM and BP. Indeed, the overwhelming value of the loans (85%) was expressly dedicated to the "solely legal acts" of purchasing real estate and paying off prior debt. Conversely, the line item for "operating capital" represents a mere 15% of the loan proceeds. This minor percentage evidences the collateral nature of this line item in the First Note and can easily be severed. As for the "right of first refusal," there has never been a value assigned, is *de minimis,* collateral to the main purpose of purchasing real estate and paying off prior debt and can therefore easily be severed. Additionally, the "right of first refusal" was a contractual right which belonged to Bart Street, and Bart Street hereby waives that right in furtherance of severance.

With those provisions eliminated, the Notes contain valid legal obligations for this Court to enforce because it is undisputed that Bart Street lent monies to be used for "solely legal acts." *See, e.g., In re F.T.R.*, 833 N.W.2d 634, 649 (Wis. 2013) ("If a contract contains an illegal clause, the remaining portions of the contract can be enforced if severing the illegal portions does not defeat the primary purpose of the bargain."); *see also Beneficial Hawaii, Inc. v. Kida*, 30 P.3d 895, 917 (Haw. 2001) (severance is possible when, *inter alia*, "the illegal provision is not central to the parties' agreement . . . .")*; Fonte v. AT&T Wireless Servs., Inc*., 903 So. 2d 1019, 1024 (Fla. Ct. App. 2005) (contractual provisions are severable "where the illegal portion of the contract does not go to its essence, and, with the illegal portion eliminated, there remain valid legal obligations."); *Asbury Auto. Used Car Ctr. v. Brosh*, 314 S.W.3d 275, 278 (Ark. 2009) (valid contract provisions "will remain unchanged if the invalid provision can be easily separated from them.") Therefore, this Court can, and should, sever any unenforceable provision (the operating capital and the right of first refusal)[6] in the Notes and enter summary judgment for Bart Street on its breach of contract claim in the amount of $3,950,000 plus interest.[7]

///

---

[6]    Neither Bart Street's Amended Complaint, nor this Motion, seek relief on this provision.
[7]    This is the net amount owed to Bart Street after severing the $725,000 in "operating capital."

**D.    In the Alternative, this Court Should Enter Summary Judgment for Bart Street on its Unjust Enrichment Claims.**

If this Court were to find the Notes unenforceable as contracts, then in the alternative, it should enter summary judgment for Bart Street on its unjust enrichment claims. "To prevail on an unjust enrichment claim, a plaintiff must prove the following three elements: (1) a benefit conferred on the defendant by the plaintiff; (2) appreciation by the defendant of such benefit; and (3) an acceptance and retention by the defendant of such benefit under circumstances such that it would be inequitable for him to retain the benefit without payment of the value thereof." *Bank of New York Mellon v. Hillcrest at Summit Hills Homeowners Ass'n*, No. 2:16-CV-02295-GMN-PAL, 2019 WL 415324, at *6 (D. Nev. Jan. 31, 2019); *see also WMCV Phase 3, LLC v. Shushok & McCoy, Inc.*, 750 F. Supp. 2d 1180, 1196 (D. Nev. 2010). The undisputed evidence shows Bart Street lent Defendants $4.7M (a benefit conferred), Defendants accepted and used the money, and it would be inequitable for Defendants to keep the money without compensating Bart Street.

Even if it were to conclude the Notes are not enforceable under a breach of contract theory, this Court still would be permitted to afford relief to Bart Street. "In certain circumstances, restitution is warranted from the recipient of performance under an illegal contract." *Weaver v. Aetna Life Ins. Co.*, No. 308-CV-00037-LRH-VPC, 2008 WL 4833035, at *3 (D. Nev. Nov. 4, 2008), aff'd, 370 F. App'x 822 (9th Cir. 2010) (citing Restatement (Third) of Restitution & Unjust Enrichment § 32 (2004)); *see also George Foreman Assocs., Ltd. v. Foreman*, 389 F. Supp. 1308, 1316 (N.D. Cal. 1974), aff'd, 517 F.2d 354 (9th Cir. 1975) (citing *Southfield v. Barrett*, 13 Cal.App.3d 290, 294, 91 Cal.Rptr. 514, 516 (1970)) (ordering that money paid under unenforceable boxing contracts be returned); *Mann v. Gullickson*, 2016 WL 6473215, at *6 (N.D. Cal. Nov. 2, 2016) (citing *Asdourian v. Araj*, 696 P.2d 95 (Cal. 1985)) (noting that under California law, illegal contracts can be enforced to avoid unjustly enriching the defendant and imposing a disproportionately harsh penalty on the plaintiff); *Duncan v. Kasim, Inc.*, 810 So. 2d 968, 970 (Fla. Ct. App. 2002) (if the buyer of illegal drugs were to steal the seller's car during the illegal drug transaction, "an action for conversion should not be barred.")

In *Magill v. Lewis*, 333 P.2d 717 (Nev. 1958), the Nevada Supreme Court concluded that

even though Nevada law prohibits unlicensed contractors from acting as contractors, bidding jobs, and bringing collection actions, an unlicensed contractor still could pursue claims for fraud and unjust enrichment related to its construction of a building. Reversing summary judgment, the *Magill* court approvingly quoted California law providing that "[w]here, by applying the rule [against the enforcement of an illegal agreement], the public cannot be protected because the transaction has been completed, where no serious moral turpitude is involved, where the defendant is the one guilty of the greatest moral fault, and where to apply the rule will be to permit the defendant to be unjustly enriched at the expense of the plaintiff, the rule should not be applied." *Id.* at 719 (quoting *Norwood v. Judd*, 209 P.2d 24, 31 (Cal. 1949)); *see also Edalatdju v. Am. Invsco*, No. 2:12-CV-01106-APG-NJK, 2018 WL 3156806, at *4 (D. Nev. June 28, 2018) (applying *Magill* and stating that "even if the leases could be considered illegal due to a licensing violation, that does not excuse [the defendant's] breach" when "the leases have already been completed, there is no serious moral turpitude on behalf of the plaintiffs, and [the defendant] (and its related predecessors-in-interest) — not the plaintiffs — are guilty of the moral fault.").

Bart Street is entitled to relief on its unjust enrichment claim under the *Magill* and *Edalatdju* factors. The transaction has been completed, Bart Street has never grown or sold marijuana, Defendants are the only parties involved with marijuana, marijuana is legal in Nevada, and allowing Defendants to keep the $4.7M would unjustly enrich Defendants at Bart Street's expense. In addition to being awarded $4.7M pursuant to its unjust enrichment claims, Bart Street also should be awarded prejudgment interest of 5.5% accruing from the dates on which the Notes were signed. *See, e.g., Kerala Properties, Inc. v. Familian*, 137 P.3d 1146, 1149 (Nev. 2006) ("[T]he transactional date for purposes of NRS 99.040(1) is the date when the contract was signed."); *see also Smith v. Owens*, No. 3:07-CV-00396-WGC, 2014 WL 6069826, at *18 (D. Nev. Nov. 13, 2014) (same); NRS 99.040(1)(c) (per NRS 99.040(1)(c), Bart Street is entitled to prejudgment interest equal to the prime interest rate plus 2% on its unjust enrichment claim).[8]

---

[8] The prime interest rate in 2016 was 3.5%. *See* http://fid.nv.gov/uploadedFiles/fidnvgov/content/Resources/Prime%20Interest%20Rate%20Jan.%201,%202019.pdf (last accessed April 8, 2019).

### V.     CONCLUSION.

Wherefore, this Court should enter summary judgment for Bart Street. As of April 10, 2019, Bart Street is owed (1) $4,147,065.72 in principal and interest under the First Note, and (2) $1,293,303.98 in principal and interest under the Second Note. Alternatively, if the Court orders that summary judgment is appropriate on the unjust enrichment claims, then as of April 10, 2019, Bart Street is owed (1) $4,008,413.6 in principal and prejudgment interest under the First Note and (2) $1,371,055.72 in principal and prejudgment interest under the Second Note.

DATED April 10, 2019.

MCNUTT LAW FIRM, P.C.

*/s/ Dan McNutt*
Daniel R. McNutt, Esq., Bar No. 7815
Matthew C. Wolf, Esq., Bar No. 10801
625 South Eighth Street
Las Vegas, Nevada 89101
*Counsel for Plaintiff*

**CERTIFICATE OF SERVICE**

The undersigned is an employee of McNutt Law Firm, P.C. and certifies that under FRCP 5, on April 10, 2019, I served a true and correct copy of **PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** via electronic mail through the United States District Court's CM/ECF system to the following at their last known e-mail:

Brenoch Wirthlin, Esq. (SBN 10282)
FENNEMORE CRAIG, P.C.
300 South Fourth Street, Suite 1400
Las Vegas, NV 89101
bwirthlin@fclaw.com
*Counsel for Defendants*

/s/ Lisa Heller
An Employee of McNutt Law Firm, P.C.