**FENNEMORE CRAIG, P.C.**
Brenoch R. Wirthlin (Nevada Bar No. 10282)
Thomas H. Fell, Esq. (Nevada Bar No. 3717)
Daniel Cereghino (Nevada Bar No. 115342)
300 South Fourth Street, Suite 1400
Las Vegas, Nevada  89101
Telephone:  (702) 692-8000
Facsimile:  (702) 692-8099
Email:  bwirthlin@fclaw.com
Email:  tfell@fclaw.com
Email:  dcereghino@fclaw.com
*Attorneys for Defendants*

# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

| | |
|---|---|
| BART STREET III, a Nebraska Limited Liability Company, | Case No. 2:17-cv-00083-GMN-VCF |
| Plaintiff, | **DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| v. | Oral Argument Requested |
| ACC ENTERPRISES, LLC, a Nevada Limited Liability Company; ACC INDUSTRIES, INC., a Nevada corporation; CALVADA PARTNERS, LLC, a Nevada Limited Liability Company, | LR 78-1 |
| Defendants. | |

Defendants ACC Enterprises, LLC ("Enterprises"), ACC Industries, Inc. ("Industries," and together with Industries the "ACC Entities"), and Calvada Partners, LLC ("Calvada," and together with the ACC Entities, "Defendants"), by and through counsel, Fennemore Craig, P.C., hereby submit their Motion for Summary Judgment.  This motion is brought pursuant to FRCP 56 and is based on the attached memorandum of points and authorities, all exhibits attached thereto, any oral

///

///

///

///

///

*(left margin, vertical text)* **FENNEMORE CRAIG, P.C.**
300 S 4th Street, Suite 1400
Las Vegas, Nevada 89101
Tel: (702) 692-8000   Fax: (702) 692-8099

argument the Court entertains, and all papers and pleadings on file herein.

DATED this 9th day of April, 2019.   FENNEMORE CRAIG, P.C.

By: _____
Brenoch R. Wirthlin (Nevada Bar No. 10282)
Thomas H. Fell, Esq. (Nevada Bar No. 3717)
Daniel Cereghino (Nevada Bar No. 115342)
300 South Fourth Street, Suite 1400
Las Vegas, Nevada 89101
Telephone: (702) 692-8000
Facsimile: (702) 692-8099
Email: bwirthlin@fclaw.com
Email: tfell@fclaw.com
Email: dcereghino@fclaw.com
*Attorneys for Defendants*

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.   INTRODUCTION AND SUMMARY OF ARGUMENT

Plaintiff has alleged claims for purported breach of two notes ("Notes") totaling 4,700,000 (the "Advanced Funds"). The Court has also already determined that the Controlled Substances Act, 21 U.S.C. § 801 *et seq*. ("CSA") applies in this case to the parties agreements. *See* generally, Order (Document 155) ("Dismissal Order") granting in part and denying in part Defendants' Renewed Motion to Dismiss. This finding alone requires summary judgment be granted in favor of Defendants.

In addition, this Court has already found that the CSA prohibits this Court from enforcing any agreement between the parties "that provides funds for Defendants to use as 'operating capital' to cultivate cannabis." *See* Dismissal Order at page 10. The Court has also already recognized that the terms of the Notes expressly allocate $725,000 as operating capital. *See* Dismissal Order at page 2. Plaintiff has admitted in deposition testimony that after the execution of the Notes, Plaintiff modified the agreement of the parties by agreeing that the Defendants could use everything other than the $2,200,000 allocated to Beverly Pacific ("BP") – or $2,475,000[1] – as operating capital.

---

[1] This amount excludes the $25,000 allocated in the Notes as due diligence costs.

FENNEMORE CRAIG, P.C.
300 S 4th Street, Suite 1400
Las Vegas, Nevada 89101
Tel: (702) 692-8000   Fax: (702) 692-8099

Thus, based upon the Court's prior findings and the Plaintiff's admissions, this portion of the Notes is unenforceable.

As to the remaining $2,200,000, there is no dispute that the plain language of the Notes provides that no repayment can be required prior to August 1, 2017.  Yet, there is no dispute that the Plaintiff filed this action in bad faith on January 10, 2017 – over six (6) months prior to the earliest possible date any alleged repayment obligation could have matured.  This constitutes a breach of the parties' agreements.  This is so even if Plaintiff's asserted narrative regarding the parties' agreement only constituting the Notes were true, which it is not.  Accordingly, under Nevada's first breach doctrine Plaintiff is barred from any recovery in this case.

Finally, the admissions by the Plaintiff in its deposition and in the documents produced by Plaintiff in this case, the parties' deal was for an equity investment by Plaintiff of $6,000,000 and a $3,000,000 loan.  Plaintiff breached that agreement and is therefore barred from pursuing any recovery against Defendants in this case.

## II.      STATEMENT OF FACTS WHICH ARE UNDISPUTED OR CANNOT REASONABLY BE DISPUTED.

1.      Defendants own and operate a marijuana cultivation plant in Pahrump, Nevada ("Pahrump Operation").  *See* Declaration of Howard Misle ("Misle Declaration"), **Exhibit 1** hereto, at ¶ 3.  Defendants are licensed to grow medical and recreational marijuana.[2]  *Id*. at ¶ 4.

2.      Prior to reaching any agreement with Plaintiff, herein, Defendant Enterprises had entered into a funding agreement with non-party Beverly Pacific ("BP") for purposes of funding and developing the marijuana cultivation facility and business (the "BP Loan") for medical marijuana purposes.

3.      Defendants, however, anticipated that recreational use of marijuana ("Recreational"), as distinguished from medical use, would be approved by Nevada voters in November 2016.  Defendants also anticipated and desired that they would be able to obtain a Recreational license

**FENNEMORE CRAIG, P.C.**
300 S 4th Street, Suite 1400
Las Vegas, Nevada 89101
Tel: (702) 692-8000   Fax: (702) 692-8099

---

[2] As set forth herein, the term "marijuana" is used to mean the flowering plants of the family cannabaceae, illegal under federal law, including cannabis, hemp, or other nicknames.

FENNEMORE CRAIG, P.C.
300 S 4th Street, Suite 1400
Las Vegas, Nevada 89101
Tel: (702) 692-8000   Fax: (702) 692-8099

1  from the controlling regulatory agencies, which would thereby greatly expand their marijuana

2  business. *Id*. at ¶ 9.

3      4.    In order to facilitate such expansion, however, Defendants needed to raise additional

4  capital in order to finance related expansion activities, including, but not limited to, the purchase of

5  land on which to build out a larger marijuana cultivation facility.

6      5.    Defendants had already obtained the option to purchase the one parcel on which they

7  were operating their medical marijuana facility, but they identified two (2) parcels adjacent thereto

8  (#040-041-35 and #040-041-34) as suitable and ideal for their expansion efforts. *Id*. at ¶ 10.

9  Defendants thus began negotiations to acquire those parcels.

10      6.    Defendants became acquainted with Plaintiff's ("Bart Street") principal, Steven

11  Idelman ("Idelman"), through a family relation of Howard Misle ("Misle"), principal of the

12  Defendant ACC Entities. *Id*. at ¶ 5.

13      7.    Because of the need for additional funds to expand their marijuana cultivation plant,

14  Defendants entered into negotiations with Bart Street for such additional capital. *Id*.

15      8.    Around June 2016, as part of those negotiation, Idelman expressed an interest in

16  obtaining an equity / ownership stake in Defendants' marijuana business. *Id*. at ¶ 6.

17      9.    Idelman came to Las Vegas and personally visited Defendants' Pahrump marijuana

18  facility. *See* Misle Declaration at ¶ 6. At the time of his visit, recreational marijuana

19  ("Recreational") had not yet been approved in Nevada.[3]

20      10.    At the time of the Bart Street negotiations, that BP loan had an outstanding principal

21  in the amount of $2,000,000. *See* Misle Declaration at ¶ 7. At the same time, BP also expressed

22  interest in obtaining an ownership stake in Defendants' marijuana business via conversion of the BP

23  Loan to equity. *Id*. at ¶ 8.

24      11.    On July 7, 2016, as part of the negotiations with Bart Street, Defendants provided

25  Idelman details of the anticipated Recreational sales and other details regarding the Defendants'

26

27

28  ---

[3] Defendants request the Court take judicial notice of the fact that on November 8, 2016, Nevada voters approved Question 2, which legalizes, regulates and taxes recreational marijuana throughout the state. *See* also NRS 453A.010 et seq. which legalizes medical marijuana.

FENNEMORE CRAIG, P.C.
300 S 4th Street, Suite 1400
Las Vegas, Nevada 89101
Tel: (702) 692-8000   Fax: (702) 692-8099

marijuana growing business. *See* **Exhibit 2**. The related communications also included several marijuana-specific terms and language. *Id.*

12. On July 12, 2016, Pete Seltzer ("Seltzer") again emailed Idelman details of the Defendants' marijuana cultivation business and related plans for expansion. *See* **Exhibit 3**.

13. Over the course of negotiations, Misle and Seltzer also had numerous in-person and telephonic discussions with Idelman (and his business partner, Mullen) regarding Defendants' marijuana cultivation business, which included specific and express reference to Defendants as growers and sellers of marijuana. *See* Misle Declaration at ¶ 11.

14. In early July, 2016, Idelman visited the Pahrump Operation. *See* Deposition of Steven Idelman ("Idelman Deposition"), **Exhibit 4** hereto, at 22:5-15.

15. Idelman admitted that he was interested in an investment in the Pahrump Operation at that time. *Id.* at 23:2-5.

16. Idelman admitted he knew at that time exactly what the Pahrump Operation entailed, including cultivating and processing marijuana plants. *Id.* at 47:4 – 48:1. Idelman toured the facility, including visiting the rooms where the marijuana plants were actively being grown, and also viewed the inventory of the Pahrump Operation, *i.e.*, the processed marijuana. *Id.*

17. Further, Sean Mullen ("Mullen") testified, as both a manager and member of Plaintiff, and as its person most knowledgeable ("PMK") that he also visited the Pahrump Operation prior to August 19, 2016. *See* Deposition of Sean Mullen ("Mullen Deposition"), **Exhibit 5** hereto, at 39:14 – 18.

18. Mullen also testified that he toured the marijuana cultivation facility at the Pahrump Operation and knew exactly what the nature of Defendants' marijuana business was. *Id.* at 39-43.

19. In fact, Mullen testified that he specifically knew that the purpose of the $1,200,000 advanced to Defendants as part of the Second Note was "for the purpose of [Defendants] acquiring the property known as 1241 East Calvada … and 1261 East Calvada." *Id.* at 282:4-16.

20. Mullen also testified the Plaintiff knew as early as August, 2016, that acquisition of the parcels was part of the Defendants' business plan to expand their marijuana operation in Pahrump. *Id.* at 183:7-184:16.

FENNEMORE CRAIG, P.C.
300 S 4th Street, Suite 1400
Las Vegas, Nevada 89101
Tel: (702) 692-8000   Fax: (702) 692-8099

21.     Defendants and Bart Street continued negotiations, which included the aforementioned specific and express discussions of the cultivation and sale of marijuana, through July and August 2016.  *See id.* at ¶ 12; *see also* **Exhibit 6**, various email correspondence.

22.     At all related times (including to the date of this Motion), the possession, cultivation, sale, financing, and ownership of marijuana and marijuana-related businesses has been illegal under the CSA.

23.     Notwithstanding that illegality, Bart Street continued to negotiate with Defendants, and also actually provided funds to Defendants, with respect to a known marijuana cultivation facility.

24.     On August 8, 2016, Seltzer again sent an email to Bart Street (via Mullen) setting out further details of Defendants' marijuana business plan and specifically noting Defendant's: (a) anticipation that Recreational would be approved by the voters; and (b) intention to expand their cultivation and sales activities beyond merely medical marijuana to include Recreational marijuana. *See* **Exhibit 7** hereto.

25.     In that email, Seltzer also specifically detailed for Mullen that he had "adjusted The Idelman equity from my last term sheet which had you at 10% in building B and 26% in Building A and C[4] (20% avg.)."  *See id.*

26.     These negotiations with Bart Street, including regarding its equity interest, specifically included and involved the issue of Defendants' outstanding BP Loan.  In summary, BP's desire to convert its Loan to equity in the Defendants' marijuana business directly conflicted with Bart Street's similar desire to obtain a certain ownership interest in Defendants' marijuana business. *See* **Exhibit 8**.

27.     On August 15, 2016, Seltzer advised BP of Defendants' intent to honor their contractual commitments BP, including the conversion of same to an equity stake in favor of BP – even though doing so would likely jeopardize any deal between Defendants and Bart Street.

> "Guys thank you for your efforts and believing in our business.  We really wanted you as partners, however, it is with mixed emotions that I tell you that we were notified today that Beverly Pacific (Marciano) intends to convert their note and fund next week.  Again THANK YOU for your time and consideration."

---

[4] Buildings A, B, and C refer to the three (3) parcels identified in ¶ 5, *supra*.

*See* **Exhibit 9**.

28.     Thus, Defendants would honor their commitment to BP, even though that meant that Bart Street could not, as it wished, join Defendants as a partner in Defendants' business.  However, Plaintiff reversed course and decided that it wanted to partner with Defendants even if that meant waiving any right of first refusal ("ROFR") regarding BP, which Plaintiff did.

29.     The next day, August 16, 2016, Idelman contacted Seltzer to attempt to save the deal between the Parties, thereby waiving any right of first refusal.  In response to Idelman's call, Seltzer explained that he was not sure the deal was even still possible due to the commitment to BP:

> Good morning steve.  I listened to your msg and already spoke to Howard who will call u.  **I must call our lawyer to see if it's even still possible** since BP announced conversation last eve, set things in motion.  **Must see if we are now contractual bound or if it's still possible to convince BP not to convert."**

*See* **Exhibit 10**.

30.     Additionally, in a text message dated August 16, 2016, Idelman, principal and agent of Bart Street and Solutionary, admitted the following to Wright, who is also a member of Bart Street:

> Ready to do deal.  Important, please call me as soon as you can on this number 402.680.5000.  Ned [Need] you to confirm you are in for 5 mil.  **We will have 6 mil equity and 3 mil debt and can convert the debt to equity.**  Way exciting, need talk with you as we want to move quickly as there are some other investors who want the deal.  We have done very deep due diligence.

*See* **Exhibit 11** hereto (emphasis added) ("August 16 Text").

31.     Bart Street then reiterated its desire to participate in Defendants' marijuana business, as well as its willingness to fund a total of $9,000,000, comprising $6,000,000 as an equity contribution and approximately $3,000,000 being an immediate advance "in the form of a loan" (but convertible to equity with the other $6,000,000).

32.     Mullen later confirmed the Parties' agreement – including the fact that the two loans at issue were merely part of the overall $9M Deal and *were merely taking the form of a loan* in an email exchange dated August 17, 2016, one day after the above text message.  In that exchange, Mullen says to Seltzer, principal of Calvada, the following:

FENNEMORE CRAIG, P.C.
300 S. 4th Street, Suite 1400
Las Vegas, Nevada 89101
Tel: (702) 692-8000   Fax: (702) 692-8099

FENNEMORE CRAIG, P.C.
300 S 4th Street, Suite 1400
Las Vegas, Nevada 89101
Tel: (702) 692-8000   Fax: (702) 692-8099

**Pete - sounds like we are moving forward**.  Sounds like there is a need for an advance on 3.5m … Do to the short notice on this, **I anticipate the advance will be in the form of loan.**  Agree?

*See* **Exhibit 12 at 8:56 AM**.  In response, Seltzer responds as follows:

33.      In response, Seltzer states as follows:

**Sean, I did not want to bother you on vacation in Colorado but yes, we are moving forward as partners!!**  Steve [Idelman] and Howard [Misle] are both Very excited and their energy radiates…
**Deal is for: $6,000,000 in Equity, $3,000,000 Loan at interest rate TBD…**

*See id.* at 10:54 AM.

In fact, Mullen later forwarded this email to Idelman requesting that Idelman "confirm your understanding **of the deal**."  *Id.* at 10:54 AM.  Mullen states that he would like to change the deal but never once do Mullen or Idelman respond to Seltzer and claim that he has incorrectly stated the deal or that there is no deal (referred to herein as the "$9 Million Dollar Deal").[5]

34.      To memorialize the initial advance "in the form of a loan," the parties entered into the subject promissory notes: (a) August 19, 2016 ("August Note"), **Exhibit 13** hereto; and (b) September 6, 2016 ("September Note") , **Exhibit 14** hereto (*i.e.* the Notes).  *See also* Exhibit 12.

35.      That the subject deal was both for a total of $9,000,000 (without segregation into independent subparts) and structured around Bart Street obtaining an equity interest in that full amount is further borne out by the parties' subsequent communications.   *See* **Exhibit 15** at 4:57 PM (Mullen and Idelman state that the indemnification provision "really needs to address [Bart Street's] protection against **dilution**."  (Emphasis added.)).

36.      Thus, the Notes were merely one part of the Parties' agreement and, in reality, were an advance on the total $9M Deal that happen to take the form of notes, not the entirety of the

---

[5] Alternatively, it does not matter for summary judgment purposes whether the parties reached the agreement at this time or orally modified it later, as such oral modification is not prohibited under Nevada law.  *Silver Dollar Club v. Cosgriff Neon Co.*, 80 Nev. 108, 111, 389 P.2d 923, 924 (1964) ('Parties may change, add to, and totally control what they did in the past. They are wholly unable by any contractual action in the present, to limit or control what they may wish to do contractually in the future.").

FENNEMORE CRAIG, P.C.
300 S 4th Street, Suite 1400
Las Vegas, Nevada 89101
Tel: (702) 692-8000   Fax: (702) 692-8099

Parties' deal as Counter-defendants claim.  Further, the terms of the Notes clearly contemplate the funds are directly intended to support the expansion and operation of Defendants' marijuana business.

37.     Moreover, **Mullen himself admitted the Parties' deal was for 9 million**.  In an email from Mullen to Idelman, dated August 17, 2016, Mullen states to Idelman that, in fact, the Parties' deal is for 9 million dollars:

> I have an email into Pete to get their "use of proceeds" and to confirm the loan transaction for the 3.5  Who funds what portion of the 3.5?  I assumed it would be pro rata?  **I will assume that the total is nine.  Stave is in for five.  How much are you in for?  Three for you and one for me?**...

*See* **Exhibit 16**.

38.     Further, on August 19, 2016, Seltzer emails Idelman and Mullen and again refers to them as his "**Partners**." *See* **Exhibit 17** at 9:34 AM.  Mullen responds and copies Idelman, but *never once disputes that the parties are partners in the $9 million financing deal*. *Id.* Then, on August 22, 2016, Mullen emails Seltzer, and Idelman follows up with an email as well, in which Mullen and Idelman state that the indemnification provision "really needs to address **our protection against dilution**." *See* **Exhibit 18** at 4:57 PM.  That the parties were discussing "protection against dilution" shows that the financing was not simply a loan.

39.     Moreover, on August 22, 2016, Seltzer sent a copy of the Indemnity Agreement which Counter-defendants had requested be prepared,  see *Id* .  The Indemnity Agreement is attached as **Exhibit 19**.  The Indemnity Agreement describes the Parties full $9M Deal as follows:

> Indemnitees [Counter-defendants], or principals thereof, have made or are **making a loan concurrently with the date hereof to ACC [Enterprises] LLC, in the amount of $3,000,000 (the "Loan"), and subsequent to the making of a loan, will be making an equity investment in ACC [Enterprises] LLC in the amount of $6,000,000.**

40.     *See Id.*  After reviewing the draft Indemnity Agreement, Mullen and Idelman – Bart Street and Solutionary-NV's principals – expressed no objection to the description of the parties' $9M Deal.  This constitutes an admission to the terms of the agreement by silence. *See Davies v. Butler*, 95 Nev. 763, 778, 602 P.2d 605, 614 (1979) (recognizing that admission by silence occurs

when "remarks were made to, or in the hearing of, any defendant," and the defendant responds with silence); *see also In re Harrison Living Tr.*, 121 Nev. 217, 223, 112 P.3d 1058, 1062 (2005) ("[S]ilence can raise an estoppel quite as effectively as can words."). The only suggestion that Counter-defendants provided was to add a provision to address "protection against dilution." *See* Exhibit 17. This response demonstrates conclusively that the financing provided to Defendants was always intended to be more than just a loan – it was an *investment* in Defendants' marijuana business, an investment that warranted "protection against dilution." Second, the response also shows that the principals of Counter-defendants and Defendants – Howard Misle, Pete Seltzer, Sean Mullen, and Steven Idelman – all shared the same understanding regarding their financing agreement: that the Counter-defendants would provide a total of $9 million in financing to Defendants.

41.    Regarding the right of first refusal with BP, when Defendants had not heard back from their August 15 email, on August 23, 2016, Defendants again texted Idelman and Mullen and requested to know the status of the situation regarding BP and whether Bart Street was willing to waive any right of first refusal:

> What is the status on the release from BP? It is approved by all and if so where is it? If not what is the hold up?

*See* **Exhibit 20**. In response Mullen stated the following:

> I have been communicating with Pete on this. He indicated at 3 o'clock cst that he was going to have a call with you. I assume you're in the loop. If not I sent you a copy of the email I sent him. **Simply put, this is your release.** If you and your lawyer are comfortable with it that's fine.

*Id.* Thus, as of August 23, 2016, Counter-defendants waived their right of first refusal and clearly indicated and affirmed their commitment to Defendants to enter into the $9M Deal.

42.    Moreover, Mullen admitted in his deposition that the reason Plaintiff wanted BP out of the deal was to have a "clean slate" for Plaintiff's investment. *See* Mullen Deposition, Exhibit 5, at 122:13-17.

43.    Further, Idelman himself also acknowledged the Parties' deal was for Plaintiff to contribute a total of 9 million, as Idelman stated in the email correspondence between the parties on

FENNEMORE CRAIG, P.C.
300 S 4th Street, Suite 1400
Las Vegas, Nevada 89101
Tel: (702) 692-8000   Fax: (702) 692-8099

August 29, 2016. In that exchange, Seltzer set forth the Parties' agreement on the terms set forth above and Idelman acknowledged that it was, in fact, the Parties' agreement. Seltzer stated as follows:

> Gentlemen [Mullen and Idelman]:
> I sent this email 17 days ago to you Sean after steve and Howard worked out details via a 1 on 1 call. I then wanted to recap it all in writing so we had an email trail backing it up what steve and howard agreed too. **I was told the 9m equity deal had changed to 6m equity and 3m debt which Howard agreed too.** In this email I clearly stated we are ok with this but needed to pro rate the percentage then as the original deal called for 20% for 9m and now it was only 6m. Thus is was .666% of original equity. …

*See* **Exhibit 21** hereto at 7:12 PM. In response, Idelman admitted the Parties' deal was in exactly as Seltzer had described it:

> We will have a call on this but for now **I did agree to prorated equity with caveat that our debt piece conversion rights are good regardless of when we convert** and that if you needed to raise more money then we would have right of first refusal **and if we didn't convert the any future dilution would come from you and Howard.** …

44.     *Id.* at 5:53 PM. This is conclusive and irrefutable proof that the Plaintiff's narrative is false and misleading and that the truth is the Parties agreed to the $9M Deal, not merely the 4.7 million they provided prior to recreational marijuana being approved in Nevada. Clearly "prorated equity" referenced is the reduction of equity from $9M to $6M as $3M was now going to be debt, as referenced in Seltzer's August 29, 2016 email. Here again the parties' $9M Deal was again affirmed by Mullen and Idelman in writing.

45.     Moreover, Misle and Seltzer disclosed to Idelman that Defendants intended to convert BP's debt into equity in ACC Enterprises consistent with a right of first refusal. In response Idelman exercised his purported right of first refusal and stated to "I don't give a damn what you guys do with keeping BP in the deal as long as we're not diluted and it comes from your end only." *See* Misle Declaration at ¶ 16.

46.     And, in fact, Idelman admitted to this conversation between himself, Mullen and Misle as well. In his deposition, Idelman admitted not only having the conversation with Misle, but

FENNEMORE CRAIG, P.C.
300 S 4th Street, Suite 1400
Las Vegas, Nevada 89101
Tel: (702) 692-8000   Fax: (702) 692-8099

expressly stating that he did not care if BP converted its interest into equity in Defendants' marijuana operation:

> We were so frustrated trying to just get done with the deal, I said to him, look, at this point, Howard, I don't really give a – and I don't know whether I said shit or damn. He's testified that I said both, but I used one of those words. And I said, I don't really give an mmmm about BP, as such, at this point, I said, just as long as they don't impact our rights under this right of first refusal in our loan, just as long as they don't dilute any future equity we might pick up.

*See* Exhibit 4 at 103:17-25.

47.    Further, it is clear from communications between the parties that Plaintiff and its principals, up until just before the election, were fully committed to the $9M Deal.  As late as October 14, 2016, Idelman emailed Defendants and again referred to them as his "partners," indicating their intent for Plaintiff to own equity in ACC Enterprises. *See* **Exhibit 22.**

48.    Subsequently, in November, 2016 the use, production and distribution of recreational marijuana was approved in Nevada.  Pursuant to the terms of the Parties' agreement, Defendants anticipated Bart Street and/or Solutionary providing the additional $4,300,000 in funding to Defendants as contractually agreed.  However, in violation of their agreement, Bart Street and Solutionary refused to provide said additional funding, to the detriment and damage of Defendants.  *See* Misle Declaration at ¶ 20.

49.    At the time of the execution of the Notes at issue, Defendants had informed Bart Street, Idelman and Mullen on multiple occasions of the nature of Defendants' business and that the purpose of acquiring additional land and capital was to expand and operate Defendants' marijuana business.  *Id*. at ¶ 21.  On November 9, 2016, Seltzer sent an email to Idelman and Mullen regarding the fact that recreational marijuana had been approved in Nevada and moving forward with the parties' agreement for funding post-recreational approval.  *See* **Exhibit 23**.  In response, Idelman thanked Seltzer and asked that he be available for a call as Misle was out of the country.  *Id*.  Idelman stated in his email that he "just want[ed] to clarify something."  *Id*.  Seltzer contacted Idelman at his request, believing the call to be a discussion about moving forward with the remaining funding of the parties' $9 million deal as agreed.  Seltzer Declaration at ¶ 22.  Instead,

FENNEMORE CRAIG, P.C.
300 S 4th Street, Suite 1400
Las Vegas, Nevada 89101
Tel: (702) 692-8000   Fax: (702) 692-8099

despite his statements that he just wanted to clarify something, Idelman stated that he was breaching the parties' agreement by demanding a premature return of all monies and refusing to move forward with post-recreational funding. *Id.*

50.     All through the negotiations and at the time of executing the Promissory Notes, Defendants had repeatedly expressly informed Bart Street (via both Idelman and Mullen) that Defendants' business overall, as well as the specific purpose of the $9,000,000 financing transaction, was for the cultivation and sale of marijuana (both Recreational and medical). *See* Misle Declaration at ¶ 21.

51.     Further, Plaintiff admitted that in late 2016, subsequent to the execution of the Notes, Plaintiff agreed that in addition to the $725,000 specifically identified in the First Note as being allocated to operating capital, Plaintiff agreed that Defendants could keep an additional $1,775,000 as operating capital. *See* Idelman Deposition, Exhibit 4, at 97:10-98:10.

52.     Specifically, Idelman testified that he and Mullen stated in a conversation to Misle the following:

> My first thing was, I said, look, you said you were going to use the 750 – when he told me he couldn't afford it – **I said, you said you were going to use $750,000 for working capital.  Keep a million and a half.**  That ought to give you plenty of runway.  You claim that there's all sorts of easy, you know, pathways, to raising other money.  Go ahead. We'll give you all the time in the world here**. Take up – and while that's being, we told him, keep 2 million bucks, keep as much as you can, but give us back our 2.2.**

*Id.* at 97:25 – 98:10.

53.     Idelman further testified Plaintiff agreed as follows in reference to the late 2016 call with Misle:

> And that's when I told him, **look, we told you to keep 750 for operating capital in the first place, keep another 750….Sean was engaged with me, telling [Misle] – I made the statement, well, then, why don't you keep a million and a half or why don't you keep two?  Sean, are you okay with that.  And he said, yeah,** just send us back our 2.2

*Id.* at 229:2-11.

FENNEMORE CRAIG, P.C.
300 S 4ᵗʰ Street, Suite 1400
Las Vegas, Nevada 89101
Tel: (702) 692-8000   Fax: (702) 692-8099

54.    Further, any judgment against the Defendants would necessarily be repaid from proceeds from Defendants' marijuana operation.  *See* Misle Declaration at ¶ 23.

## II.    STANDARD OF REVIEW

"The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court."  *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994).  Pursuant to FRCP 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  An issue is "genuine" if there is a sufficient evidentiary basis on which a reasonable fact-finder could find for the nonmoving party and a dispute is "material" if it could affect the outcome of the suit under the governing law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-9 (1986).

## III.    LAW AND ARGUMENT

As already partially decided by this Court, the enforcement of the Promissory Notes involves the enforcement of a contract that violates federal law.  See Dismissal Order.  In that prior Order, this Court identified patently illegal aspects of the subject transaction and thereby dismissed Bart Street's claims pertaining to those aspects "on the face of the Complaint."  *See id.* This Court, however, left open other aspects of the subject transaction for further analysis in light of related evidence.  *See id.* Defendants bring this Motion for Summary Judgment as part of the analysis of those still remaining aspects.

### A.    <u>Because the subject transactions violate federal law, the Court cannot grant any relief on Counts One and Two of the Amended Complaint and must grant summary judgment in favor of Defendants.</u>

As this Court aptly noted in its prior Order, the question of the enforceability of the subject transaction – at least those aspects that survived that prior Order as not plainly illegal "on the face of the Complaint" – requires analysis of the parties' intent and purpose related to that agreement.  *See id.* Defendants submit that, contrary to Bart Street's presentation, that purpose and intent is not found in any particular earmarking or preferred use of funds.  *See* Original Complaint [Document

FENNEMORE CRAIG, P.C.
300 S 4th Street, Suite 1400
Las Vegas, Nevada 89101
Tel: (702) 692-8000   Fax: (702) 692-8099

FENNEMORE CRAIG, P.C.
300 S 4th Street, Suite 1400
Las Vegas, Nevada 89101
Tel: (702) 692-8000   Fax: (702) 692-8099

1]; Dismissal Order.  Bart Street admits as much because its Amended Complaint alleges no significance at all as to those earmarks.  *See generally*, Amended Complaint [Document 165].

Moreover, there is no statutory or other legal basis for the principle that the enforceability of a contract pertaining to an illegal business turns on the method of financing, with equity being illegal but lending being legal and enforceable.  Rather, the CSA is plain and unambiguous in making any financing of and attempt to profit from a controlled substances business is illegal.  *See* CSA, generally

### 1.    Contracts that violate federal law are unenforceable.

As this Court has previously recognized, it cannot provide relief on a claim if the lone remedy available would be illegal under either federal or state law.  *See id*.  Contracts that violate a federal statute on their face are "intrinsically illegal." *N. Ind. Pub. Serv. Co. v. Carbon Cnty. Coal Co*.,  799 F.2d 265, 273 (7th Cir. 1986) ("NIPSCO").  Express agreements to violate the law are clearly illegal, as are agreements that explicitly contradict a federal statute. *See, e.g., Kaiser Steel Corp. v. Mullins*, 455 U.S. 72, 78 (1982) (holding that agreement was illegal because it required plaintiff to pay a penalty if it breached a separate agreement to restrain trade).

"In addition, even if the contract is not illegal on its face, courts have found contracts inherently illegal where one party must violate a statute or regulation to fulfill its obligations." *Energy Labs, Inc*., 2015 WL 3504974, at *3 (citing cases); *see also, e.g., D.R. Wilder Mfg. Co. v. Corn Prods. Ref. Co*.,  236 U.S. 165, 172-73 (1915) (recognizing that if contract is "inherently illegal . . . the also elementary rule that courts will not exert their powers to enforce illegal contracts or to compel wrongdoing" may apply).  In other words, as this Court noted, it is the parties' intent and purpose that determines whether or not the agreement contravenes the CSA.  *See* Dismissal Order, generally.

Where it is alleged that an agreement contravenes a federal statute, courts looks to federal law to determine whether the contract is illegal or violates public policy, and, if so, whether the contract is unenforceable as a result. *See Kelly v. Kosuga*, 358 U.S. 516, 519 (1959) ("the effect of illegality under a federal statute is a matter of federal law"); *Sola Elec. Co. v. Jefferson Elec. Co*., 317 U.S. 173, 174 (1942) ("When a federal statute condemns an act as unlawful the extent and

nature of the legal consequences of the condemnation, though left by the statute to judicial determination, are nevertheless federal questions, the answers to which are to be derived from the statute and the federal policy which it has adopted. To the federal statute and policy, conflicting state law and policy must yield."); *see also NIPSCO*, 799 F.2d at 273 ("When the statute is federal, federal law determines not only whether the statute was violated but also, if so, and assuming the statute itself is silent on the matter, the effect of the violation on the enforceability of the contract." (citing cases)); *Energy Labs, Inc. v. Edwards Eng'g, Inc.*, 2015 WL 3504974, at *3 (N.D. Ill. June 2, 2015) ("Since Defendants argue that a federal statute . . . makes its contract with ELI illegal, we must apply federal law to answer both whether the contract violates that statute and whether the contract is enforceable."); *U.S. v. Crawford*, 657 F.2d 1041, 1044 (9th Cir. 1981) ("Since s 3109 is the applicable federal statute, we treat the problem as one of federal law").

### 2.   Marijuana is illegal under federal law, specifically the Controlled Substances Act, 21 U.S.C. 801 *et seq*. Thus, the Notes are unenforceable.

As noted, the Court cannot enforce a contract that violates *either* state or federal law. Thus, regardless of whether Nevada permits the use and possession of marijuana in some situations, the contracts here are unenforceable because federal law continues to prohibit marijuana-related activities. The extent of the CSA is not limited to medical or recreational distinctions. It is also not limited to possession or use. Rather, the CSA is exceedingly broad and deals with use, possession, cultivation, distribution, financing, and other business-related aspects. *See* 21 U.S.C. §§ 812 (controlled substances), 844(a) (penalties); *Gonzales v. Raich*, 545 U.S. 1, 26-29 (2005) (Congress' plenary power under Commerce Clause includes power to prohibit local cultivation and use of marijuana in compliance with state medicinal use statutes); *United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483, 491-95 (2001) (holding that medical necessity is not a defense to manufacturing and distributing marijuana).

Marijuana is a schedule-I controlled substance under the CSA. See 21 U.S.C. § 802(6) (defining controlled substance to include any drug or substance "included in schedule I . . . of part B of this subchapter."); *id*. § 812(c), Schedule I at (c)(10). "By classifying marijuana as a Schedule I

FENNEMORE CRAIG, P.C.
300 S 4ᵗʰ Street, Suite 1400
Las Vegas, Nevada 89101
Tel: (702) 692-8000   Fax: (702) 692-8099

drug, as opposed to listing it on a lesser schedule, the manufacture, distribution, or possession of marijuana became a criminal offense, with the sole exception being use of the drug as part of a Food and Drug Administration preapproved research study." *Gonzales*, 545 U.S. at 14 (citations omitted). The first section of the CSA provides that "[t]he illegal importation, manufacture, distribution, and possession and improper use of controlled substances have a substantial and detrimental effect on the health and general welfare of the American people." 21 U.S.C. § 801(2).

Nevada's enactment of the Marijuana Act does not affect the fact that marijuana, including medical marijuana, is prohibited under the CSA. As the Ninth Circuit recently explained in *United States v. McIntosh*, 833 F.3d 1163 (9th Cir. 2016):

> The CSA prohibits the manufacture, distribution, and possession of marijuana. **Anyone in any state who possesses, distributes, or manufactures marijuana for medical or recreational purposes (or attempts or conspires to do so) is committing a federal crime.** The federal government can prosecute such offenses for up to five years after they occur. See 18 U.S.C. § 3282. Congress currently restricts the government from spending certain funds to prosecute certain individuals. But Congress could restore funding tomorrow, a year from now, or four years from now, and the government could then prosecute individuals who committed offenses while the government lacked funding. Moreover, a new president will be elected soon, and a new administration could shift enforcement priorities to place greater emphasis on prosecuting marijuana offenses.
>
> **Nor does any state law "legalize" possession, distribution, or manufacture of marijuana. Under the Supremacy Clause of the Constitution, state laws cannot permit what federal law prohibits. U.S. Const. art VI, cl. 2. Thus, while the CSA remains in effect, states cannot actually authorize the manufacture, distribution, or possession of marijuana. Such activity remains prohibited by federal law.**

*Id.* at 1179 n.5.

Further, under federal law, contracts that violate a federal statute on their face are "intrinsically illegal." *NIPSCO*, 799 F.2d at 273. For example, express agreements to violate the law are clearly illegal, as are agreements that explicitly contradict a federal statute. *See, e.g., Kaiser Steel Corp. v. Mullins*, 455 U.S. 72, 78 (1982) (holding that agreement was illegal because it required plaintiff to pay a penalty if it breached a separate agreement to restrain trade). "In addition, even if the contract is not illegal on its face, courts have found contracts inherently illegal where one party must violate a statute or regulation to fulfill its obligations." *Energy Labs, Inc.*, 2015 WL 3504974, at

FENNEMORE CRAIG, P.C.
300 S 4th Street, Suite 1400
Las Vegas, Nevada 89101
Tel: (702) 692-8000   Fax: (702) 692-8099

*3 (citing cases); *see also, e.g., D.R. Wilder Mfg. Co. v. Corn Prods. Ref. Co.,* 236 U.S. 165, 172-73 (1915) (recognizing that if contract is "inherently illegal . . . the also elementary rule that courts will not exert their powers to enforce illegal contracts or to compel wrongdoing" may apply).

Thus, the Court need only determine whether the subject transactions violate federal law, specifically the CSA, in order to determine whether the Promissory Notes are unenforceable.

### 4.    The subject transactions violate the CSA and are unenforceable.

In granting Defendants' Renewed Motion to Dismiss, in part, the Court previously held that it "cannot order any remedy that permits Defendants to directly use Plaintiff's funds for cannabis cultivation or to gain ownership in Defendants' cannabis business.  Doing so would provide relief in contravention of federal law under the [CSA]."  MTD Order at 10.  On that basis, the Court correctly determined that it could not "enforce the provisions of both Promissory Notes that give Plaintiff the 'right of first refusal' for an ownership interest in Defendants' business; nor can the Court enforce the provision under the First Promissory Note that provides funds for Defendants to use as 'operating capital' to cultivate cannabis."  *See id.* at 10.

Defendants move for summary judgment on the remaining provisions of the Promissory Notes, which relate to the use of funds for the (1) purchase of land; (2) repayment of other business debts; and (3) due diligence costs.  As set forth herein, those provisions are likewise unenforceable, regardless of whether they appear, at first blush, to be traditionally "legal" activities.  To the contrary, because Plaintiff entered into those transactions knowing (and, in fact, intending) that they further an illegal business enterprise, they also run afoul of the CSA.  In fact, the CSA criminalizes the very relationships and/or transactions at issue in this case:

- 21 U.S.C. § 812 Schedule I(c)(10) includes and governs "any quantity" of "marihuana";[6]

- 21 U.S.C. § 846 makes an "attempt or conspiracy" to violate the CSA subject to the same penalties as for those directly committing the offenses set forth in § 841;

---

[6] *See also, In re Rent-Rite Super Kegs West Ltd.*, 484 B.R. 799, 802-03 (Bkrtcy. D. Colo. 2012) ("Under the CSA, marijuana is classified as a Schedule I controlled substance."); *Mann v. Gullickson*, 2016 WL 6473215, at *3 (N.D.Cal.) ("Marijuana is a schedule-I controlled substance under the CSA.").

FENNEMORE CRAIG, P.C.
300 S 4th Street, Suite 1400
Las Vegas, Nevada 89101
Tel: (702) 692-8000   Fax: (702) 692-8099

FENNEMORE CRAIG, P.C.
300 S 4ᵗʰ Street, Suite 1400
Las Vegas, Nevada 89101
Tel: (702) 692-8000   Fax: (702) 692-8099

- 21 U.S.C. § 848(c)(2)(B) defines a "continuing criminal enterprise" as including those who provide **"substantial income or resources"** in furtherance of the illegal **manufacture** of controlled substances;

- 21 U.S.C. § 854(b) defines an "enterprise" as "**any union or group of individuals associated in fact although not a legal entity**"; and

- 21 U.S.C. § 856(a)(2) criminalizes acts or attempts to "manage or control any place … **as an owner** … and **knowingly and intentionally … profit** from … unlawfully manufacturing … a controlled substance." (Emphasis added.)[7]

To put the transactions in context, the Court can and should analogize them to loans made by traditional financial institutions.  Most banks will not loan money to a business engaged in the cultivation and possession of marijuana - for any purpose, seemingly legitimate or otherwise - because they refuse to run the risk that the transaction (and thus their investment) will run afoul of federal law.[8]  "Not only does selling marijuana violate federal law; handling the proceeds of any marijuana transaction is considered to be money laundering. Very few banks are willing to bear that risk.  *See id.*  Despite recent changes to state law, most marijuana business still cannot even do basic banking with traditional financial institutions.  Because "[t]he [CSA] makes it illegal under federal law to manufacture, distribute, or dispense marijuana[,]" and banking regulations are "unaffected by any state law that legalizes marijuana-related activity[,]" the banks are required to report each transaction that the know or suspect is related to marijuana in the manner they were required to report suspicious transactions prior to state law changes.[9]

---

[7] *See also Safe Streets All. v. Hickenlooper*, 859 F.3d 865, 882 (10th Cir. 2017) (Recognizing that RICO liability includes any dealings regarding controlled substances under the CSA, including conspiring to engage with others to engage in such activity).

[8] *See* New York Times, *Where the Pot Entrepreneurs Go When the Banks Just Say No*, January 4, 2018, https://www.nytimes.com/2018/01/04/magazine/where-pot-entrepreneurs-go-when-the-banks-just-say-no.html (Banks will not loan marijuana businesses money "because the federal authorities could seize whatever collateral backs a loan.").

[9] *See* Report from U.S. Treasury Financial Crimes Enforcement Network, *BSA Expectations Regarding Marijuana-Related Businesses*, February 14, 2014, https://www.fincen.gov/resources/statutes-regulations/guidance/bsa-expectations-regarding-marijuana-related-businesses ("A financial institution is required to file a [Suspicious Activity Report] if, consistent with FinCEN regulations, the financial institution knows, suspects, or has reason to suspect that a transaction conducted or attempted by, at, or through the financial institution: (i) involves funds derived from illegal activity or is an attempt to disguise funds derived from illegal activity; (ii) is designed to evade regulations promulgated under the BSA, or (iii) lacks a

FENNEMORE CRAIG, P.C.
300 S 4th Street, Suite 1400
Las Vegas, Nevada 89101
Tel: (702) 692-8000   Fax: (702) 692-8099

The overarching reason why financial institutions will not lend money to marijuana businesses is because it is illegal under federal law, putting the bank's interests at serious risk of (1) unenforceability (at best) or (2) seizure and forfeiture by the federal government. The Promissory Notes here are no different. The involve loans that further an illegal business enterprise and would be (and could only be) repaid by "the proceeds" illegal of marijuana transactions.

Turning back to the Promissory Notes, it is undisputed that Plaintiff, through the parties' overarching financing scheme, knowingly "attempted" to obtain an ownership interest in and profit from an illegal marijuana business, which is expressly prohibited by the CSA. 21 U.S.C. § 846; *See* Statement of Facts, generally. Likewise, Plaintiffs knowingly provided "substantial income or resources" to further a "continuing criminal enterprise." 21 U.S.C. § 848(c)(2)(B); *Id.* By its plain terms, the CSA does not permit a party to provide "substantial income or resources" to a continuing criminal enterprise as long as they are used for some purposes, but not others. In fact, it provides the opposite.

Moreover, in this case, it is undisputed that Plaintiff specifically knew that the funds were going to be used for illegal purposes. For one, Plaintiff knew that the funds set aside to purchase land were going to be used to purchase specific parcels of land adjacent to the existing cultivation facility. *See* Statement of Facts, *supra*. The undisputed (and well known) purpose of purchasing those parcels was to expand the cultivation facility. *See* Statement of Facts (noting that Defendants informed Plaintiff on multiple occasions that it intended to use the money to expand the business in anticipation of obtaining a Recreational license). Likewise, the parties' correspondence demonstrates that it is undisputed that Plaintiff knew that funds set aside to repay prior lenders were set aside in order to ensure that Plaintiff's anticipated (and unenforceable) equity interest would not be diluted. *See* Statement of Facts. The "due diligence" costs to be repaid to Plaintiff were part and parcel of the larger illegal financing transaction.

business or apparent lawful purpose. **Because federal law prohibits the distribution and sale of marijuana, financial transactions involving a marijuana-related business would generally involve funds derived from illegal activity**. Therefore, a financial institution is required to file a SAR on activity involving a marijuana-related business (including those duly licensed under state law), in accordance with this guidance and FinCEN's suspicious activity reporting requirements and related thresholds.") (emphasis added).

FENNEMORE CRAIG, P.C.
300 S 4th Street, Suite 1400
Las Vegas, Nevada 89101
Tel: (702) 692-8000   Fax: (702) 692-8099

Regardless of the seemingly legitimate uses for which the funds were designated, there is ample authority that the transactions are illegal in their entirety under federal law.  The decision in *In re Medpoint Mgmt., LLC*, 528 B.R. 178 (Bankr. D. Ariz. 2015), vacated in part on unrelated grounds, No. BAPAZ151130KUJAJU, 2016 WL 3251581 (B.A.P. 9th Cir. June 3, 2016), involved loans made to a marijuana-related business.  *See id.* at 182.  Those loans, like those in the instant case, were made knowing that the borrower was involved in the marijuana business. *See id.*  There, the lenders argued that their loans were not directly related to the marijuana itself, but were for other, legal business purposes and that the monies they sought were not "proceeds" from the marijuana.  *See id.* at 183.  The Court rejected those arguments.  *See id.* at 184, and 187 ("Petitioning Creditors *[just like Plaintiff here]* knew or should have known that *[Defendants']* activities were illegal under federal law.  *[Defendants]* did not dupe them into entering the … marijuana business. …  The unclean hands defense arises … and *[Plaintiff]* cannot now seek relief from this Court.").

In *Fourth Corner Credit Union*, the financial institution argued it would simply be providing otherwise lawful services to a business that were both legal under state law and subject to various Executive Branch pronouncements suggesting non-enforcement by federal authorities.  *See id.* at 1054-56.  The credit union sought an order form the court compelling the Federal Reserve to recognize it.  *Id.*  Without the court order, the credit union would essentially lose everything and go out of business.  *Id.*  The credit union's complaint was dismissed on the same illegality grounds raised here.  *Id.*

In response to Defendants' Renewed Motion to Dismiss (ECF No. 140), Plaintiff relied in part on the *Mann* case for the proposition that the Court could enforce provisions of the Promissory Notes that, in a vacuum, do not run afoul of the CSA.  ECF No. 144 at 4-5.  Such proposition has, however, been previously unequivocally and repeatedly rejected as set forth above.  *See Fourth Corner Credit Union*, 861 F.3d 1052, 1055 (10th Cir. 2017); *In re Rent-Rite Super Kegs West Ltd.*, 484 B.R. 799, 802-805 (Bankr. D. Colo. 2012); *In re McGinnis*, 453 B.R. 770, 772 (Bankr. D. Or. 2011); *see also*, **Exhibits 24 and 25**, Grassley Letter to FinCEN and subsequent press statement.[10]

---

[10] Defendants request this Court take judicial notice of Exhibits 24 and 25 pursuant to FRE 201.

FENNEMORE CRAIG, P.C.
300 S 4th Street, Suite 1400
Las Vegas, Nevada 89101
Tel: (702) 692-8000   Fax: (702) 692-8099

1   Separately, though, the *Mann* case actually further supports Defendants in this matter.

2        Perhaps the most critical factor in the *Mann* case was the claimant's allegation that the

3   companies underlying the loan transactions at issue never possessed, cultivated, or distributed

4   cannabis plants.  *Mann*, 2016 WL 6473215 at *2, and n.4 (There is no evidence in the record that

5   the Companies actually possess, use, cultivate, or distribute marijuana[.]").  "Mandating *[the*

6   *contractual]* payment does not require Gullickson to possess, cultivate, or distribute marijuana, or

7   to in any other way require her to violate the CSA."  *Id.* at *7.  Because none of the companies ever

8   possessed, cultivated, or distributed marijuana, the *Mann* court also stated that "[e]nforcing the

9   contract in this case is not endorsing the cultivation, possession, or distribution of marijuana."  *Id.* at

10  *8.  Based on this total separation from the cannabis plants themselves – "considering the particular

11  facts and circumstances of this case" – the court rejected the illegality argument as dispositive.  *Id.*

12  There are material distinctions to the case at bar, however, because there is no dispute that the

13  business underlying the financing transactions is directly engaged in the possession, cultivation, and

14  distribution of cannabis plants, a fact that was well known to all parties involved.  Moreover, any

15  judgment against the Defendants would have to be repaid out of proceeds from illegal marijuana

16  activities, in violation of the CSA.  *See* Misle Declaration at ⁋ 23.  Such receipt of money from the

17  sale of illegal substances is itself, unquestionably, illegal.  *See e.g., United States v. Nolan-Cooper*,

18  155 F.3d 221, 225 (3d Cir. 1998) ("This case arises out of an IRS investigation into the money

19  laundering activity of Nolan-Cooper, who became a target when that agency received information

20  from confidential informants that she was assisting others to launder funds derived from illegal

21  activities, including the sale of drugs."); *Perez v. C.I.R.*, 56 T.C.M. (CCH) 312 (T.C. 1988) ("

22  'Operation Greenback' investigates the financing of narcotics trafficking and the 'laundering' of

23  money received from the importation and sale of illegal drugs in the United States.").  Accordingly,

24  the Motion should be granted.

25        **5.      Plaintiff admits that it agreed Defendants could use $2,475,000 of the**
          **Advanced Funds for operating capital.  Accordingly, there can be no**
26        **dispute this amount cannot be recovered by Plaintiff.**

27        It is undisputed that this Court has already found that this Court cannot give Plaintiff relief

28  as to Defendants' alleged failure to repay amounts Plaintiff advanced to Defendants which Plaintiff

FENNEMORE CRAIG, P.C.
300 S. 4th Street, Suite 1400
Las Vegas, Nevada 89101
Tel: (702) 692-8000   Fax: (702) 692-8099

agreed Defendants could use for operating capital.  *See* Dismissal Order at 16.  It is also undisputed that Plaintiff admits it agreed Defendants could use the advanced funds, other than the BP Allocation – a total of $2,475,000 – for operating capital.  *See* Statement of Facts.  Accordingly, pursuant to the CSA, the cited case law, and the Court's findings in the Dismissal Order, Defendants are entitled to summary judgment as to this portion of the amounts sought by Plaintiff.

> **6.      Because the Court cannot enforce the Promissory Notes, Defendants are entitled to summary judgment on Plaintiff's First and Second Causes of Action.**

As noted above, the CSA does not, by its plain terms, permit a party to enter into illegal loan agreements simply because the money is designated to be used (by an illegal business) in a specific manner.  Because the undisputed evidence demonstrates that the transactions between the parties, in their entirety, violate the CSA, the Court cannot enforce the Promissory Notes.  With no relief available to Plaintiff, the Court must grant summary judgment in Defendants' favor on Counts One and Two of the Amended Complaint.

**C.      Even if the parties' agreement was enforceable under the CSA, it could not be enforced by Plaintiff under Nevada's first breach doctrine.**

Plaintiff's material breaches of the Parties' $9M Deal, taking place prior to any possible alleged breach by Defendants, forecloses Plaintiff's claims for breach.  In Nevada "[a] breach or non-performance of a promise by one party to a bilateral contract, so material as to justify a refusal of the other party to perform a contractual duty, discharges that duty." *Las Vegas Sands, LLC v. Nehme*, 632 F.3d 526, 536 (9th Cir. 2011) (citing Restatement (First) of Contracts § 397); *Thornton v. Agassiz Constr., Inc.*, 106 Nev. 676, 799 P.2d 1106, 1108 (1990); *Young Elec. Sign Co. v. Fohrman*, 86 Nev. 185, 466 P.2d 846, 847 (1970).  Plaintiff breached the Parties' agreements in multiple ways.  Plaintiff failed to comply with its obligation to provide the additional $4.3M in funding it promised to provide to Defendants which is a breach of the $9 Million Dollar Deal.  Moreover, Plaintiff brought a bad faith lawsuit against Defendants seeking to recover the Advanced Funds over six months before the earliest possible date any funds could have been due, even under

Plaintiff's misleading narrative that the Parties' agreement was merely a loan.  *See Clancy v. King*, 405 Md. 541, 570–71, 954 A.2d 1092, 1109 (2008) ("Stated otherwise, under the covenant of good faith and fair dealing, a party impliedly promises to refrain from doing anything that will have the effect of injuring or frustrating the right of the other party to receive the fruits of the contract between them.").  This constitutes an anticipatory repudiation and breach of the Parties agreement, including even the terms of the Notes themselves, and constitutes a first material breach by Plaintiff. *See Covington Bros. v. Valley Plastering, Inc.*, 93 Nev. 355, 360, 566 P.2d 814, 817 (1977) ("A contractual anticipatory repudiation must be clear, positive, and unequivocal."); *Crown Prod. Co. v. California Food Prod. Corp.*, 77 Cal. App. 2d 543, 551, 175 P.2d 861, 865 (1947).

And, since this breach by Plaintiff occurred before any breach by Defendants could possibly have occurred (since no maturity date had occurred and none of the three categories of breach set forth in the Notes had taken place), Plaintiff is prohibited from pursuing any later claimed damages for alleged breach of the Notes.

Plaintiff reneged on the Parties' $9 Million Dollar Deal and wanted to re-do the deal and escape its obligations.  This is clearly a breach of the Parties' agreement – even if the agreement was limited to the Notes, which it was not – because it demonstrates that Plaintiff was not even willing to do what it now says was its obligation, i.e., to permit Defendants to borrow the Advanced Funds until maturity of the Notes.  Any such obligation Plaintiff alleges against Defendants, or claim for subsequent breach, is unenforceable under Nevada's first breach doctrine.

## D.  Even if the remaining provisions of the Promissory Notes are legal and enforceable, the illegal and unenforceable parts of the deal cannot be severed. Thus, the entire transaction is unenforceable.

Even if the Court decides that certain provisions in the Promissory Notes are enforceable, it has already held that others are illegal and unenforceable.  ECF No. 155.  The entirety of the Parties' agreement – including the advances represented by the Notes – was to further Defendants' marijuana growing business.  The Notes were part of a larger financing plan contemplated and agreed to by the Parties  to exchange equity for the substantial capital the marijuana business needed to expand its operations.  *See* Statement of Facts, generally. The deal was negotiated for months,

FENNEMORE CRAIG, P.C.
300 S 4th Street, Suite 1400
Las Vegas, Nevada 89101
Tel: (702) 692-8000   Fax: (702) 692-8099

FENNEMORE CRAIG, P.C.
300 S 4th Street, Suite 1400
Las Vegas, Nevada 89101
Tel: (702) 692-8000   Fax: (702) 692-8099

with numerous moving parts. *See id.* As this Court correctly recognized, the ability to sever "legal" portions of a contract from illegal portions can only be done where the illegal portions are "collateral to the main transaction" and "the language employed and the subject-matter of the contract" shows that severability will preserve the parties' intent in making the contract. *Vincent v. Santa Cruz*, 98 Nev. 338, 341, 647 P.2d 379, 381 (1982) (citation omitted).  However, this only applies "where a contract consists of several agreements, one of which is illegal". *Id.*

Here there are not multiple agreements – there is one agreement for providing funding to Defendants' marijuana business. *See Bermuda Rd. Properties, LLC v. Ecological Steel Sys., Inc.*, No. 2:12-CV-1579-RCJ, 2013 WL 1338307, at *8 (D. Nev. Apr. 1, 2013) (severing portions where the court found there were two separate and distinct agreements).  In this case, however, there is no dispute that the entirety of the Parties' agreement was based on providing financing to Defendants – when Plaintiff knew without question that Defendants' business was an activity illegal under federal law.  Mullen testified that Bart Street was a single purpose entity formed as "an investment vehicle" for the express purpose of making an investment in Defendants' marijuana business. *See Mullen Deposition*, Exhibit 5, at 22:1 – 23:5.  Thus, no part of the funds provided to Defendants were "collateral" to any other purpose – the express and only purpose was providing funding to Defendants' illegal marijuana business.  Accordingly, no provision of the Notes can be severed.

### E.   Plaintiff's unjust enrichment claims are barred by unclean hands as a matter of law.  Accordingly, Defendants are entitled to summary judgment on Plaintiff's Third and Fourth Causes of Action.

Plaintiff's attempt to sidestep the illegal and unenforceable Promissory Notes by asserting claims for unjust enrichment suffers from the same defect.  It is black letter Nevada law that a party who engaged in improper conduct cannot later seek equitable relief arising out of the same matter. *See Truck Ins. Exch. V. Palmer J. Swanson, Inc.*, 124 Nev. 629, 637-38, 189 P.3d 656, 662 (2008) ("The doctrine of unclean hands 'derives from the equitable maxim that "he who comes into equity must come with clean hands."'  The doctrine bars relief to a party who has engaged in improper conduct in the matter in which that party is seeking relief.") (internal footnote omitted).

As noted in the *In re Medpoint Mgmt., LLC* case, *supra*, "[t]he unclean hands defense arises

FENNEMORE CRAIG, P.C.
300 S 4th Street, Suite 1400
Las Vegas, Nevada 89101
Tel: (702) 692-8000   Fax: (702) 692-8099

1  from and applies to Petitioning Creditors' medical marijuana-related claims against Medpoint.

2  **Petitioning Creditors' hands are unclean and they cannot now seek relief from this Court."**

3  528 B.R. 178 (Bankr. D. Ariz. 2015); *Arm Ventures, LLC,* 564 B.R. 77, 85 (Bankr. S.D. Fla. 2017);

4  *In re Rent-Rite Super Kegs W. Ltd.,* 484 B.R. 799, 805 (Bankr. D. Colo. 2012).  In *Medpoint,* the

5  Court held that because the creditors at issue had voluntarily entered into an agreement with a LLC

6  they knew was in the medical marijuana business, despite the problems posed by the illegality of the

7  LLC's operations under federal law, in order to earn lucrative consulting and other fees, the

8  creditors were barred by the unclean hands doctrine from later seeking relief in federal court.  *Id.*

9       Here, because Plaintiff knowingly entered into loan transactions that violated federal law,

10  the same loan transactions it now seeks to benefit from in equity, its claims are barred by the

11  doctrine of unclean hands as a matter of law.  The Court should therefore grant summary judgment

12  in Defendants' favor on Counts Three and Four of the Amended Complaint.

13  **IV.    CONCLUSION**

14       For all these reasons, Defendants respectfully request that the Court grant Defendants'

15  Motion for Summary Judgment in its entirety, and grant such other and further relief as the Court

16  deems appropriate.

17

18       DATED this 9th day of April, 2019.

19                                          FENNEMORE CRAIG, P.C.

20

21                                          By: _____

22                                          Brenoch R. Wirthlin (Nevada Bar No. 10282)
                                            Thomas H. Fell, Esq. (Nevada Bar No. 3717)
23                                          Daniel Cereghino (Nevada Bar No. 115342)
                                            300 South Fourth Street, Suite 1400
24                                          Las Vegas, Nevada  89101
                                            Telephone:  (702) 692-8000
25                                          Facsimile:  (702) 692-8099
                                            Email:  bwirthlin@fclaw.com
26                                          Email:  tfell@fclaw.com
                                            Email:  dcereghino@fclaw.com
27                                          *Attorneys for Defendants*

28

FENNEMORE CRAIG, P.C.
300 S. 4th Street, Suite 1400
Las Vegas, Nevada 89101
Tel: (702) 692-8000   Fax: (702) 692-8099

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CERTIFICATE OF SERVICE

I hereby certify that on <u>April 10, 2019</u>, I served a copy of the foregoing **DEFENDANTS'**

**MOTION FOR SUMMARY JUDGMENT** upon the parties to this action via electronic service

pursuant to the U.S. District Court CM/ECF filing system, addressed as follows:

Dan McNutt, Esq.
Matthew C. Wolf, Esq.
McNutt Law Firm, P.C.
625 South Eighth Street
Las Vegas, Nevada 89101
drm@mcnuttlawfirm.com
mcw@cmlawnv.com
*Attorneys for Plaintiff Bart Street III*

_____*/s/ Morganne Westover*_____
An employee of Fennemore Craig, P.C.